WILLIAM E. KOVACIC
General Counsel

BARBARA ANTHONY
Director, Northeast Region

CAROLE A. PAYNTER
ELVIA P. GASTELO
Federal Trade Commission
One Bowling Green, Suite 318
New York, New York 10004
(212) 607-2813; 2811
Attorneys for Plaintiff

FILED
IN CLERKS OFFICE

2004 NOV -2  P 2: 05

U.S. DISTRICT COURT
DISTRICT OF MASS.

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FEDERAL TRADE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civ No. |
| BETTER BUDGET FINANCIAL SERVICES, INC., | ) |
| JOHN COLON, JR., and JULIE FABRIZIO-COLON, | ) 04  12326 WGY |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFF'S MOTION FOR AN *EX PARTE*
## TEMPORARY RESTRAINING ORDER, ASSET FREEZE,
## APPOINTMENT OF A TEMPORARY RECEIVER, AND
## EXPEDITED DISCOVERY



## TABLE OF CONTENTS

I.   INTRODUCTION ........................................................ 1

II.  THE PARTIES ......................................................... 2
     A.   Plaintiff ...................................................... 2
     B.   Defendants ..................................................... 2

III. DEFENDANTS' FRAUDULENT BUSINESS PRACTICES ................... 3

IV.  LEGAL ARGUMENT ........................................................ 9
     A.   The Evidence Presented Justifies Entry of a Temporary Restraining Order and
          a Preliminary Injunction ....................................... 11

          1.   The Standard for Relief ................................... 11

          2.   The Commission has Demonstrated a Likelihood of Success on the
               Merits that the Defendants have Violated Section 5(a) of the FTC Act 12

               a.   The Defendants' express or implied representations
                    about their debt negotiation program were deceptive.   12
                    1)   Defendants, contrary to their representations,
                         do not take actions on consumers' behalf that
                         enable consumers to pay off all of their
                         unsecured debts for a reduced amount ........ 13
                    2)   Defendants, contrary to their representations,
                         fail to settle each creditor's account as a
                         consumer accumulates sufficient funds to pay
                         one-half of amount owed to the creditor....... 14
                    3)   Defendants, contrary to their representations,
                         fail to contact all of the consumer's unsecured
                         creditors on the consumer's behalf and ensure
                         that the creditors do not call or harass consumers
                         about their payments that may be overdue .  ... 14
               b.   Defendants John Colon, Jr. and Julie Fabrizio-Colon are
                    Individually Liable. ............................. 15

          3.   The Balance of Equities Mandates Preliminary Injunctive Relief and
               Such Preliminary Injunctive Relief Would Serve the Public Interest.  16

     B.   An Asset Freeze and Expedited Discovery are Necessary to Preserve Effective
          Final Relief. ................................................. 18

     C.   The Appointment of a Temporary Receiver is Necessary. ............... 19

     D.   The Temporary Restraining Order Should Be Entered *Ex Parte*. ......... 20

V.   CONCLUSION ........................................................ 21

# TABLE OF AUTHORITIES

## FEDERAL CASES

*CFTC v. Hunt*, 591 F.2d 1211, (7th Cir.), *cert. denied*, 442 U.S. 921 (1979) ................ 19

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir.), *cert denied,*
    493 U.S. 954 (1989) ........................................................................................... 10, 15

*FTC v. Atlantex Assocs.*, 1987-2 Trade Cas. (CCH) ¶ 67,788, (S.D. Fla. 1987),
    *aff'd*, 872 F.2d 966 (11th Cir. 1989) ............................................................ 12, 15

*FTC v. Evans Products Co.*, 775 F.2d 1084 (9th Cir. 1985) .......................................... 10

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996) .................................... 2, 10, 11

*FTC v. H.N. Singer, Inc.*, 668 F.2d 1107 (9th Cir. 1982) ............................................ 9, 19

*FTC v. Jordan Ashley, Inc.*, 1994-1 Trade Cas. (CCH) ¶ 70,570 (S.D. Fla. 1994) .. 12, 15

*FTC v. Minuteman Press*, 53 F.Supp.2d 248 (E.D.N.Y. 1998) ...................................... 13

*FTC v. Patriot Alcohol Testers*, 1991 U.S.Dist. LEXIS 19488
    (D. Mass. Dec. 19, 1991). ............................................................................... 10, 11

*FTC v. Rare Coin Galleries of Am., Inc.*, 1986-2 Trade Cas. (CCH) P67 (1986) .......... 11

*FTC v. Removatron Int'l Corp.*, 111 F.T.C. 206 (1988), *aff'd*,
    884 F.2d 1489 (1st Cir. 1989) ................................................................................... 12

*FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312 (8th Cir. 1991) ...................... 10

*FTC v. Southwest Sunsites*, 665 F.2d 711 (5th Cir.), *cert denied,*
    456 U.S. 973 (1982) ........................................................................................... 12, 19

*FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431 (11th Cir. 1984) ............................. 2, 9, 10

*FTC v. Wallace*, 2000 U.S.Dist. LEXIS 10506 (N.D. Ga. 2000) .................................... 12

*FTC v. World Travel Vacation Brokers*, 861 F.2d 1020 (7th Cir. 1988) ............. 10, 11,19

*FTC v. World Wide Factors, Ltd.*, 882 F.2d, 344 (9th Cir. 1989) ............................ 17, 19

*Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417 (11th Cir.), *cert. denied sub*
    *nom., Windrush Partners, Ltd. v. Metro Fair Hous. Servs.*, 469 U.S. 882 (1984) ... 18

*Mitchell v. Demario*, 361 U.S. 288 (1962) .................................................................... 10

*SEC v. First Fin. Group of Tex.*, 645 F.2d 429 (5th Cir. 1981) ...................................... 20

*SEC v. Management Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975) ................................ 11

*SEC v. Unifund SAL*, 910 F.2d 1028 (2d Cir. 1990) .................................................. 11, 12

*Standard Educs., Inc. v. FTC*, 475 F.2d 401 (D.C. Cir.), *cert. denied*,
    414 U.S. 828 (1973) ................................................................................... 15

*Thompson Medical Co.*, 104 F.T.C. 648 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986),
    *cert. denied*, 479 U.S. 1086 (1987) .......................................................... 12

*Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27 (2d Cir. 1995) ..... 11

*U.S. v. Diapulse Corp. of Am.*, 457 F.2d 25 (2d Cir. 1972) ........................................... 18

*In re Vuitton et Fils*, 606 F.2d 1(2d Cir. 1979) ................................................. 20

## DOCKETED CASES

*FTC v. Dion*, No. 03-40005 (D. Mass. Feb. 6, 2003) ................................................. 15, 19

## FEDERAL STATUTES

15 U.S.C. § 41 *et seq* .......................................................................................... 2

Section 5(a) of the FTC Act, 15 U.S.C. § 45(a) ........................................................ 2, 12

Section 13(b) of the FTC Act, 15 U.S.C. § 53(b) .............................................. 1, 2, 9, 10

## FEDERAL RULES

Fed. R. Civ. Pro. 65 ...............................................................................1, 2, 9, 10

## I.   INTRODUCTION

Plaintiff, Federal Trade Commission ("FTC" or "Commission"), brings this action under Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), against defendant Better Budget Financial Services, Inc. ("BBFS"), and the company's principals, John Colon Jr. and Julie Fabrizio-Colon ("Defendants"), seeking preliminary and permanent injunctive relief to halt defendants' ongoing deceptive debt settlement scheme. Defendants falsely represent their debt settlement services in order to induce consumers to join defendants' program and to pay defendants fees ranging from $200 to $2,000. Defendants represent to consumers that they will: 1) take actions to enable consumers to pay off all of their unsecured debts for a reduced amount; 2) settle each creditor's account as a consumer accumulates funds to pay one-half of the amount owed to the creditor; and 3) contact all of the consumers' creditors in order to stop the creditors' harassing collection calls.

Once consumers sign up and begin paying for defendants' program, however, they find that defendants do not do what they promised. As the consumer complaints, consumer declarations and other evidence submitted in support of this motion demonstrate, defendants typically fail to take actions that enable consumers to pay off their unsecured debt for a reduced amount. Further, defendants typically fail to settle each creditor's account as the consumer accumulates one-half of the amount owed on the debt. Defendants also typically fail to contact consumers' creditors, as promised.

As a result of defendants' malfeasance, consumers often find themselves in worse financial straits than when they joined defendants' program. Consumers face lawsuits from collection agencies or become the subject of a creditor's lawsuit, and consumers typically fail to realize the 50%-70% savings on their total debt as defendants promised. In fact, many consumers leave defendants' program owing their creditors more money due to late fees and penalties accumulating on their accounts as a result of being in defendants' program. Some consumers' finances are so adversely affected that they are forced to resort to the extreme remedy of filing personal bankruptcy. Absent swift and immediate action by the Court in

entering the requested relief, defendants will continue operating their illegal scheme, injuring many more consumers. Accordingly, the FTC respectfully requests that this Court grant the proposed *ex parte* Temporary Restraining Order to halt defendants' operation.

## II.    THE PARTIES

### A.    Plaintiff

Plaintiff FTC is an independent agency of the United States government created by the FTC Act. 15 U.S.C. § 41 *et seq*. The FTC is charged with enforcement of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair and deceptive acts and practices in or affecting commerce, among other duties. The FTC is authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate federal district court proceedings to enjoin violations of the FTC Act in order to obtain consumer redress and to secure such equitable relief as may be appropriate in each case. 15 U.S.C. §§ 53(b); *FTC v. Gem Merch. Corp.*, 87 F.3d 466, 468-69 (11th Cir. 1996); *FTC v. U.S. Oil & Gas Corp.*, 748 F.2d 1431, 1434 (11th Cir. 1984).

### B.    Defendants

Defendant Better Budget Financial Services Inc., ("BBFS") is a Massachusetts corporation that was incorporated on August 21, 2000.[1] The company's principal business address is 800 Cummings Center, Suite 152R, Beverly, MA 01915. The company maintains a second office suite in that same building, Suite 260T. BBFS markets and sells a debt settlement[2] program to consumers who are financially burdened by their consumer debt. BBFS was a member of the Boston Better Business Bureau ("BBB") but had its membership revoked in May 2004 because of BBFS's failure to correct the practices

---

[1]PX-1, Ex. A.

[2]Debt settlement is where a company contracts with a debtor to act as the debtor's intermediary with the creditor, for the express purpose of negotiating with the creditor to accept less than the full amount of the debt owed, sometimes pennies on the dollar. PX-2, ¶ 4.

2

that were resulting in substantial consumer injuries.[3] BBFS maintains websites at http://www.betterbudget.net and http://www.termidebt.net[4] BBFS conducts business throughout the United States, including in this District.

Defendant John Colon, Jr. is the President and a director of BBFS. Colon executed the company's application for membership in the BBB[5] and is a signatory to at least one corporate bank account.[6]

Defendant Julie Fabrizio-Colon is the wife of defendant John Colon, Jr. and serves as the Treasurer, Clerk and a director of BBFS. Fabrizio-Colon is also a signatory to at least one corporate bank account.[7] Fabrizio-Colon has also responded to consumer complaints filed against BBFS with the BBB and the office of the Massachusetts Attorney General.[8]

## III.  DEFENDANTS' FRAUDULENT BUSINESS PRACTICES

Since August 2000, defendant BBFS, and its principals, defendants John Colon, Jr., and Julie Fabrizio-Colon, have operated a simple but effective fraudulent scheme that has collected thousands of dollars in fees from consumers, in exchange for little to no performance from defendants as promised. Defendants' debt settlement program purports to help consumers "eliminate anywhere between 50 and

---

[3]PX-1, Ex. I.

[4]PX-1, Ex. C.

[5]PX-1, Ex. H.

[6] PX-1, Ex. B.

[7]*Id.*

[8]PX-1, Ex. H.

3

70 percent"[9] of the consumers' debts through "creditor negotiation,"[10] in exchange for the consumer's payment of: 1) a retainer fee that ranges from hundreds to thousands of dollars, 2) a monthly administrative fee, and 3) 25% of any savings realized in a settlement. Defendants market their services on their Internet websites, and through Internet advertising, promising assistance for consumers with financial needs. Consumers who contact defendants to inquire about or to join the program, do so for a variety of reasons. Some consumers are facing financial difficulties due to loss of employment[11]; others are concerned about carrying a high amount of debt[12]; while still others want to actually avoid bankruptcy.[13]

During defendants' sales pitch, consumers are told that BBFS is "a debt settlement company" that will be able to "eliminate anywhere between 50 to 70 percent of [the consumer's] total debt through creditor negotiations."[14] Defendants' sales representative gathers information about the consumer's unsecured debts and finances. The representative tells the consumer that BBFS can bring the consumer out of debt in a shorter period of time than if the consumer simply made minimum payments on his accounts, and that BBFS will ultimately save the consumer a substantial amount of money.[15] The sales representative uses the financial information provided by the consumer to calculate a sum that the

---

[9]PX-1, Ex. E, p. 6

[10]PX-1, Ex. C.

[11]PX-3, ¶ 4.

[12]PX-4, ¶ 4; and PX-5, ¶ 4.

[13]PX-6, ¶ 5.

[14]PX-6, ¶ 4 ("The website advertised that consumers could save up to 70% with our debt reduction program. Because of this advertisement I called BBFS to find out more about their services.")

[15]PX-1, Ex. E, p.7.

4

consumer can afford to deposit monthly into a bank account that the consumer will control.[16] The sales

representative tells the consumer that once his bank account "has accumulated into enough funds, ... we

start doing your negotiations with your creditors one by one."[17] The consumer is told that once he joins

the program, his "[credit] accounts, will unfortunately, be delinquent because you will no longer be

paying your creditors."[18] Instead, the consumer will be "making a monthly payment into the banking

account" that BBFS directs him to establish.[19] The consumer is told that he must allow his credit

accounts to go into "delinquency ... because you can never settle an account that's current ... The best way

to settle an account ... is to prove financial hardship. The best way to prove financial hardship is by you

not making your payments."[20]

Defendants' sales representative informs the consumer as to how long he will be required to

remain in the debt settlement program in order to settle all of his debts. The length of the program varies

depending on the amount of outstanding overall debt the consumer has and the amount of money he can

pay monthly, although thirty-six (36) months appear to be a standard duration for the debt settlement

program.[21] Defendants' sales representative informs the consumer that he must authorize defendants to

automatically withdraw a monthly fee of $39.95 (the amount of this fee was raised from $29.95 in June

---

[16]*Id.* at pp. 7-8.

[17]*Id.* at p. 8.

[18]*Id.*

[19]*Id.*

[20]*Id.* at p. 9.

[21]*See e.g.*, PX-3, ¶ 4 (36 months); PX-4, ¶ 5 (48 months); PX-5, ¶ 7 (40 months); PX-7, ¶5 (30 months); PX-8, ¶ 6 (36 months).

5

2004) from the consumer's bank account.[22] The first monthly payment that the consumer deposits, goes

directly to defendants as payment of a retainer fee. According to defendants, the consumer's first

payment gives BBFS "the permission to contact [the consumer's] creditors and let them know that "the

consumer is working with [BBFS].[23] This means that the consumer's creditors will be contacting BBFS

and not the consumer with any harassing phone calls." BBFS debits its monthly fee for administrative

costs connected with negotiating with the creditors.[24] This administrative fee, consumers are told, also

pays defendants to deal with creditors' "harassment"[25] and covers items such as: "faxing settlements

back and forth," and making "telephone calls and [mailing] letters" to creditors.[26]

Once defendants negotiate a settlement, the consumer is required to pay the negotiated amount

to the creditor, and pay BBFS a commission for settling the account equal to 25% of the savings realized

in the settlement.[27] Defendants further claim that they have good relationships with many creditors,

which is why their negotiations are successful.[28] If, at the end of the sales conversation, the consumer

indicates that he is interested in the program, defendants send the consumer an application packet that

---

[22]PX-1, Ex. E, p. 11; PX-3, ¶ 6; PX-4, ¶ 6; PX-5, ¶ 6.

[23]PX-1, Ex. E, at p. 11; PX-1, Ex. F, at p. 7 ("we contact your creditors and let them know you are a client of ours, that you've enrolled in our program ... and to refer any questions over " to the defendants.")

[24]PX-9, ¶ 7; PX-19, ¶¶ 6 and7; PX-12, ¶ 6; PX-17, ¶ 6.

[25]PX-1, Ex-E at p. 11.

[26]PX-1, Ex-F at p. 10.

[27]See e.g., PX-3, ¶ 6.

[28]At least one major creditor, CitiCards (a subsidiary of Citibank) has a policy of not working with debt settlement companies like BBFS. CitiCards maintains a policy of immediately referring to collection any account where a debt settlement company is involved. CitiCards does this because the company wants to ensure that it collects all monies owed to it rather than settling for the lesser amount that a debt settlement will bring. PX-2, ¶ 7.

6

repeats the basic information about the program for the consumer to sign and join the program.[29]  The

consumer, lulled into a comforting sense of false security that defendants will begin representing the

consumer as soon as the retainer fee is paid, joins the program and agrees to pay defendants' fees. Once

consumers have paid defendants and, in accordance with defendants' instructions, have stopped paying

their creditors, consumers typically discover that defendants fall far short of their promise of being the

consumers' financial savior.

Instead, consumers typically continue to receive harassing phone calls from their creditors[30]

because BBFS has not contacted the creditors to inform them that BBFS is working on behalf of the

consumers.  In fact, BBFS often fails to make any contact whatsoever with the consumers' creditors,

even several months after consumers have joined the program and after BBFS has had time to deliver

on this promised service.[31]

More ominously for the consumer, is the subsequent discovery that defendants do not negotiate

at all with the consumer's creditors as promised, as monies accumulate in the consumer's bank

---

[29] PX-1, Ex. G.

[30] *See e.g.*, declarant Shellie Tucker informed defendants that she was receiving harassing calls from a creditor.  Despite defendants' assurances that they would handle this matter, Ms. Tucker continued to receive harassing calls.  The creditor finally stopped calling after Ms. Tucker herself faxed information to the creditor showing that Ms. Tucker's account had been settled.  In fact, BBFS had this same information but did not take appropriate action with the creditor on Ms. Tucker's behalf. PX-11, ¶ 11; *see also* PX-12, ¶¶ 7-9 and PX-13, ¶ 8.

[31] *See e.g.*, declarant Kimberly Epps discovered that after three months of paying BBFS's administrative fee, her creditors had never heard from BBFS.  Ms. Epps believed, based on BBFS's sales pitch, that all she had to do was pay the monthly fee and BBFS would take care of her credit situation, PX-14, ¶ 9; *see also*, declarant Timathy (sic) Dain urged BBFS to contact Citibank, one of his creditors that was threatening to sue him.  Despite his many requests, BBFS did not contact Citibank until that company sued him and his wife, which was six months after Mr. Dain had enrolled in the program, not upon payment of the retainer fee as defendants had promised would happen PX-3, ¶¶ 9-12.

account.[32] Even when the consumer calls and reminds defendants that he has sufficient funds in the bank account, defendants still often fail to contact the creditor to attempt a settlement.[33] As a result of defendants' failure to act, many consumers end up being sued by their creditors, lose out on reasonable settlements offered by their creditors,[34] and suffer significant damage to their credit histories.

Finally, consumers discover that defendants' program does not result in a 50% savings on their debt, as promised by defendants as an inducement to consumers to enter defendants' program in the first place. Many consumers find that defendants settle some of their accounts but not others.[35] Some consumers see none of their accounts settled.[36] Typically, consumers leave the program after finding that defendants have never contacted their creditors, nor done anything to stop creditors from making harassing calls to consumers, as promised. When consumers do terminate their contracts, they often find that their overall debt has actually increased because they owe interest and late fees due to not paying creditors as required by defendants' program.[37] Many consumers, prior to entering the program,

---

[32]*See e.g.*, declarant Shenita Melvin-Dove owed only $500 on one of her accounts and had saved over $1000 her BBFS account. This was more money for BBFS to negotiate with Mrs. Melvin-Dove's creditor. BBFS, however, never contacted the creditor to attempt a settlement, even though Mrs. Melvin-Dove called several times to alert the defendants that she had sufficient monies in her savings account. Defendants assured her that they would try to negotiate with her creditor, but they never did so. PX-15, ¶7; *see also*, declarant Timathy Dain who received offers of settlement on two Chase credit accounts, at 65% and 50% savings. He faxed the offers to BBFS for them to handle but BBFS never called the creditor. Mr. Dain eventually negotiated these settlements himself. PX-3 at ¶ 13.

[33]*See e.g.*, PX-5, ¶ 10; PX-8, ¶ 10; PX-15, ¶ 7.

[34]*See e.g.*, PX-10, ¶¶ 14-15; PX-12, ¶8; PX-14, ¶ 11; PX-15, ¶¶ 8-10.

[35]*See e.g.*, PX-4, ¶ 7; PX-6, ¶ 8; PX-10, ¶ 10; PX-16, ¶ 11.

[36]*See e.g.*, PX-5, ¶ 10; PX-8, ¶¶ 13-14; PX-9, ¶ 8.

[37] For example, declarant Shellie Tucker's debt increased from $17,000 when she joined BBFS, to $22,000 when she terminated her membership because of defendants' failure to fulfill
(continued...)

8

were able to pay their credit accounts on time, but find that enrolling in defendants' debt management

scheme caused their financial situation to deteriorate. Some consumers find their financial situation has

deteriorated to the point of their being forced to file bankruptcy.[38]

As set forth above, defendants perpetrated a deceptive scheme that induced consumers to join

their program in the hopes of eliminating their debt and saving money. Instead, consumers find that their

debts are not eliminated by defendants' program, they often end up paying more money on their accounts

as a result of defendants' scheme. As fully discussed below, defendants' misrepresentations were made

in violation of the FTC Act and should be halted immediately through entry of the requested relief.

## IV.    LEGAL ARGUMENT

The Commission brings this action under the second proviso of Section 13(b) of the FTC Act, 15

U.S.C. § 53(b), which states that "in proper cases the Commission may seek, and after proper proof the

court may issue, a permanent injunction." *See U.S. Oil & Gas*, 748 F.2d at 1434; *FTC v. H.N. Singer, Inc.*,

668 F.2d 1107, 1110-12 (9th Cir. 1982).[39]  A routine fraud case like this one, involving misrepresentations

---

[37](...continued)
their promises. PX-11, ¶ 11.

[38]Declarants Peter Avallone, Kathy Doty, and Jody Manzanares ultimately filed for
bankruptcy after spending several months in defendants' program without their accounts being
settled. PX-9, ¶ 8; PX-16, ¶ 13; and PX-16, ¶ 11, respectively.

[39]The first proviso of Section 13(b) addresses the circumstances under which the Commission
can seek preliminary injunctive relief before or during the pendency of an administrative
proceeding, and grants authority for the issuance of temporary restraining orders and preliminary
injunctions after a proper showing by the Commission and notice to the defendants. 15 U.S.C.
§ 53(b).  The second proviso, under which the Commission proceeds here, does not subject the
Commission to the procedural conditions of the first proviso. *See FTC v. H.N. Singer*, 668 F.2d
1107, 1111 (9th Cir. 1982) (routine fraud cases may be brought under the second proviso, without
being subject to the first proviso requirement that the Commission institute an administrative
proceeding); *FTC v. U.S. Oil & Gas Corp.*, 748 F. 2d 1431, 1434 (11th Cir. 1984); *U.S. Oil &
Gas*, 748 F.2d at 1434. ("Congress did not limit the court's powers under the [second and] final
proviso of §13(b) and as a result this Court's inherent equitable powers may be employed to issue
(continued...)

9

of material facts in violation of Section 5(a) of the FTC Act, is a "proper case" for a permanent injunction under Section 13(b). *FTC v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1028 (7th Cir. 1988); *FTC v. Evans Products Co.*, 775 F.2d 1084, 1086 (9th Cir. 1985).

In cases filed pursuant to the second proviso of Section 13(b), the Court may exercise the full breadth of its equitable authority:

> Congress, when it gave the district court authority to grant a permanent injunction against violations of any provisions of law enforced by the Commission, also gave the district court authority to grant any ancillary relief necessary to accomplish complete justice because it did not limit that traditional equitable power explicitly or by necessary and inescapable inference.

*U.S. Oil & Gas*, 748 F.2d at 1434 *quoted in FTC v. Gem Merchandising Corp.*, 87 F.3d 466, 468 (11th Cir. 1996); *see also Mitchell v. Demario*, 361 U.S. 288, 291-92 (1962). Section 13(b) confers full equitable powers on this Court. "[P]ursuant to Section 13(b), the Court is authorized to issue a preliminary injunction as well as an order freezing assets when the attendant facts and circumstances so warrant as an exercise of the broad equitable powers." *FTC v. Patriot Alcohol Testers*, Inc., 199 U.S. Dist. LEXIS 19488 AT *4 (D. Mass. Dec. 19, 1991), attached hereto. In addition to entering a permanent injunction, the Court may order the recession of contracts, restitution, and/or disgorgement of ill-gotten gains. *FTC v. Gem Merch. Corp.*, 87 F. 3d 466, 468-70 (11th Cir. 1996); *FTC v. Sec. Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1314-15 (8th Cir., 1991); *FTC v. Amy Travel Serv., Inc.*, 875 F. 2d 564, 571-72 (7th Cir. 1989) *cert. denied*, 493 U.S. 954 (1989). Thus, under Section 13(b), the Court may order remedies such as rescission of contracts and restitution, and whatever additional temporary or preliminary relief is necessary to preserve the possibility of effective final relief, such as an order freezing assets, permitting expedited discovery, appointing a receiver, and immediate access to the business premises. When, as here, the public

---

[39](...continued)
a preliminary injunction, including a freeze of assets, during the pendency of an action for permanent injunctive relief.")

10

interest is implicated, this Court's equitable powers "assume an even broader and more flexible character than when only a private controversy is at stake." *Gem Merch.*, 87 F.3d at 469 (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)).

### A.    The Evidence Presented Justifies Entry of a Temporary Restraining Order and a Preliminary Injunction.

#### 1.    The Standard for Relief

In the First Circuit, in order to grant preliminary injunctive relief under the FTC Act, the district court must consider: (1) the Commission's likelihood of ultimate success on the merits, (2) whether the balance of equities tips in the Commission's favor, and (3) whether such an action would be in the public interest. *See FTC v. Dion, No. 03-40005, slip op. at 2 (*D. Mass. Feb. 6, 2003*); FTC v. Patriot Alcohol Testers,* 1991 U.S. Dist. LEXIS 19488, 9 (D. Mass. Dec. 19, 1991); *FTC v. Rare Coin Galleries of America, Inc.*, 1986-2 Trade Cas. (CCH) P67, 338 (1986). Where the Commission is acting to prevent violations of federal law, the government proceeds "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest," *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808-09 (2d Cir. 1975), and irreparable injury is presumed and need not be proved, unlike in a private litigation. *SEC v. Unifund SAL*, 910 F.2d 1028, 1037 (2d Cir. 1990); *World Travel Vacation Brokers*, 861 F.2d at 1028-29. The requisite showing for the first prong of this test--likelihood of success on the merits-- depends on whether the requested preliminary relief alters ("mandatory" provision) or preserves ("prohibitory" provision) the status quo. When a government agency seeks a mandatory injunction, which "is said to alter the status quo by commanding some positive act" or provide "relief [that] cannot be undone even if the defendant prevails at a trial" it must make a "clear" or "substantial" showing of the likelihood of success on the merits. *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995); *Unifund SAL*, 910 F.2d at 1040.

Conversely, when seeking only prohibitory relief, such as an asset freeze or the preservation of records, the agency is not required to satisfy this higher standard because such provisions merely preserve

the *status quo. Unifund SAL*, 910 F.2d at 1041. In this case, the requested TRO and preliminary

injunction, asset freeze, expedited discovery and immediate access to business records would serve to

preserve the *status quo. FTC v. Southwest Sunsites*, 665 F.2d 711, 718, 720 (5th Cir. 1982), *cert denied*,

456 U.S. 973 (1982) (ancillary relief granting preliminary injunction and preventing dissipation of assets

or funds is used to preserve the *status quo.*) If the court finds the first prong of the test is satisfied, the

court must then balance the equities to determine the propriety of injunctive relief.

> **2.    The Commission has Demonstrated a Likelihood of Success on the Merits that Defendants have Violated Section 5(a) of the FTC Act**
>
> > **a.    Defendants' express or implied representations about their debt settlement program are deceptive.**

Section 5(a) of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting

commerce." 15 U.S.C. § 45(a). An act or practice is deceptive under Section 5(a) if it involves a

material misrepresentation or omission that is likely to mislead consumers acting reasonably under the

circumstances. *FTC v. Jordan Ashley, Inc.*, 1994-1 Trade Cas. (CCH) ¶ 70,570 at 72,096 (S.D. Fla.

1994); *FTC v. Atlantex Assocs.*, 1987-2 Trade Cas. (CCH) ¶ 67,788 at 59,252 (S.D. Fla. 1987), *aff'd*,

872 F.2d 966 (11th Cir. 1989). Express claims, or deliberately-made implied claims, used to induce the

purchase of a particular product or service are presumed to be material. *Thompson Med. Co.*, 104 F.T.C.

648, 816 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987); *Jordan Ashley*,

1994-1 Trade Cas. at 72,096; *see also FTC v. Wallace*, 2000 U.S. Dist. LEXIS 10506 (N.D. Ga. 2000)

*5 (ordering a permanent injunction against defendants' advance fee credit card business). Moreover,

any representations concerning the price of a product or service are presumptively material. *FTC v.*

*Removatron Int'l Corp.*, 111 F.T.C. 206, 309 (1988) (citing in re *Thompson Medical*, 104 F.T.C. at 817.,

in re *Thompson Medical Co., Inc.*, 1984 FTC LEXIS 6 at *94), *aff'd*, 884 F.2d 1489 (1st Cir. 1989); *see*

*also Wallace*, 2000 U.S. Dist. LEXIS at *6 (defining the term "material" to mean anything "likely to

affect a person's choice of, or conduct regarding, goods or services" when interpreting a violation). *See,*

*e.g., FTC v. Minuteman Press,* 53 F. Supp. 2d 248, 258 (E.D.N.Y. 1998) (a "representation is material

if it involves an issue "important to consumers and, hence, likely to affect their choice of . . . a product".)

>   1)   **Defendants, contrary to their representations, do not take actions on consumers' behalf that enable consumers to pay off all of their unsecured debts for a reduced amount.**

In the course of advertising, marketing, promoting, offering for sale and sale of their debt

negotiation services, defendants have represented, expressly or by implication, that actions taken by them

will enable consumers to pay off all of their unsecured debts for a reduced amount. As the consumer

declarations presented in support of this motion demonstrate, this representation is material to consumers

who join defendants' program. Once on the program, consumers find, however, that defendants typically

do not take actions that allow the consumers to pay off all of their unsecured debt for a reduced amount.

In fact, defendants' actions -- advising consumers not to pay their creditors, and then failing to contact

consumers' creditors and negotiating settlements at the appropriate times as promised -- typically leads

to consumers paying more money on their unsettled accounts than they would have paid had they never

enrolled in defendants' program.[40]

---

[40] For example, consumer victim, Timothy Dain had one of his accounts settle for $100 more than what he owed when he joined the program, PX-3, ¶ 11; *see also* declaration of Jeannette Canham, PX-18, ¶ 10 ("Because BBFS told me to stop paying my creditors, I was charged interest and late fees on my accounts, which has added $1,000 to what I owed when I joined the program"); Declaration of Shellie Tucker, PX- 11, ¶ 11 ("I currently owe $22,000 to creditors, whereas prior to enrolling with BBFS, I only owed $17,000"); Declaration of Christopher Gadomski, PX-10,  ¶¶12-14 ("When I started with BBFS, I had been able to make my payments and only because of their  promised assistance, I had stopped paying. My credit was damaged and I now owe $10,000 on my two Capital Once accounts, whereas prior to joining BBFS, I owed $8,000").

2)     **Defendants, contrary to their representations, fail to settle each creditor's account as a consumer accumulates sufficient funds to pay one-half of the amount owed to the creditor.**

Defendants in their written sales material[41] and in their sales calls with consumers,[42] represent that they will negotiate and settle each of the consumers' accounts as consumers accumulate sufficient funds to pay one-half of the money owed to one of their creditors. Defendants' representations typically prove to be false, as defendants rarely negotiate settlements as the consumer accumulates necessary funds in his account.[43] Defendants' representations that they will negotiate settlements as the consumer accumulates monies was material to consumers and their failure typically to act as promised violates Section 5 of the FTC Act.

3)     **Defendants, contrary to their representations, fail to contact all of the consumer's unsecured creditors on the consumer's behalf, and ensure that creditors do not call or harass consumers about payments that may be overdue.**

In their sales materials, defendants represent to consumers that they will contact all of the consumers' unsecured creditors on the consumers' behalf and ensure that creditors do not call or harass consumers about their accounts. As shown above, defendants do not contact the consumers' creditors as promised, subjecting consumers to continuing collection calls from their creditors. This promise is material to the consumers' decision to join defendants' program. The fact that defendants purport to handle all calls regarding the consumers' accounts surely serves to allay any concerns that consumers have about not paying their creditors for the significant period of time that they are supposed to remain in defendants' program. Many consumers are paying their accounts on time when they join defendants'

---

[41]PX-1, Ex. C and Ex. G.

[42]*See e.g.,* PX-7, ¶ 5; PX-8, ¶ 6; and PX-9, ¶ 6.

[43]*See e.g.,* PX-8, ¶ 10; and PX-15, ¶ 7.

14

program,[44] and only stop paying their creditors on defendants' counsel that this is the only way to negotiate their accounts.[45] Defendants' failure to contact creditors on the consumers' behalf as promised violates the FTC Act.

  **b.**  **Defendants John Colon, Jr. and Julie Fabrizio-Colon are Individually Liable for BBFS's Deceptive Conduct.**

  Individual defendants John Colon, Jr. and Julie Fabrizio-Colon are directly liable for their own violations of Section 5 of the FTC Act. They are also liable for the corporate defendant's violations because: (1) the corporate defendant violated the FTC Act; (2) the individual defendants participated directly in the wrongful acts or practices *or* the individual defendants had authority to control the corporate defendant;[46] and (3) the individual defendants had some knowledge of the wrongful acts or practices.[47] *Jordan Ashley,* 1994-1 Trade Cas. at 72,096 (citing *Amy Travel,* 875 F.2d at 573).

  The FTC has submitted substantial evidence showing that the individual defendants knew or should have known of, or have recklessly disregarded, the deceptive practices engaged in by the corporate defendant. The unlawful practices at issue hin this case go to the heart of defendants'

---

[44]*See e.g.,* PX-17, ¶ 7; PX-18, ¶ 7.

[45]PX-1, Ex. E at p. 9.

[46] An individual's status as a corporate officer gives rise to a presumption of ability to control a small, closely-held corporation. "A heavy burden of exculpation rests on the chief executive and primary shareholder of a closely held corporation whose stock-in-trade is overreaching and deception." *Standard Educs., Inc. v. FTC,* 475 F.2d 401, 403 (D.C. Cir.), *cert. denied,* 414 U.S. 828 (1973).

[47] To satisfy Section 5's knowledge requirement, the Commission "need not demonstrate . . . that the individual defendants possessed the intent to defraud." *Jordan Ashley,* 1994-1 Trade Cas. at 72,096 (*citing FTC v. Amy Travel Serv., Inc.,* 875 F.d, 564, 573-74(7th Cir. 1989)). In addition, "direct participation in the fraudulent practices is not a requirement for liability. Awareness of fraudulent practices and failure to act within one's authority to control such practices is sufficient to establish liability." *Atlantex Assocs.,* 1987-2 Trade Cas. at 59,254 (citations omitted); *See also FTC v. Dion,* No. 03-40005, slip op. at 3 (D. Mass. Feb. 6, 2003)

fraudulent operation.  Both defendant Colon and defendant Fabrizio-Colon are officers and directors of defendant BBFS and have held themselves out in their corporate capacity throughout the course of this deceptive scheme.  Defendant Colon is a signatory to the corporate bank account.[48]  Colon also completed BBFS's application for membership with the Boston BBB.[49]  Defendant Fabrizio-Colon is also a signatory to the corporate bank account.[50]  Moreover, Fabrizio-Colon has responded to consumer complaints filed against BBFS with the BBB and the Massachusetts Attorney General.[51]  Defendants Colon and Fabrizio-Colon have either participated directly in the wrongful acts of the corporate defendant or have had the authority to control BBFS.  They clearly knew or should have known of the deceptive acts.  Thus, defendants Colon and Fabrizio-Colon should be held individually liable for the corporate defendant's wrongdoing.

### 3.    The Balance of Equities Mandates Preliminary Injunctive Relief and Such Preliminary Injunctive Relief Would Serve the Public Interest.

The Commission has not only established the likelihood of success on the merits, but has also satisfied the second prong for obtaining a preliminary injunction under Section 13(b) of the FTC Act, by showing that the public equities mandate preliminary injunctive relief.  The evidence presented clearly demonstrates that defendants are engaged in a harmful scheme to defraud vulnerable consumers.  Defendants have operated for several years now, and consumer injury is substantial.  Defendants have

---

[48]PX-1, Ex. B.

[49]PX-1, Ex. H.

[50]PX-1, Ex. B.

[51]PX-1, Ex. H

shown a disdain for the law by allowing problems with their program to go uncorrected even when they are confronted with their wrongdoing. Specifically, defendants' program received a high volume of BBB complaints about the misrepresentations described above. This pattern of deceptive conduct continued after repeated attempts by the BBB to have defendants correct the problems with their program. The BBB ultimately took the drastic step of terminating BBFS's membership because of the company's failure to "correct a pattern of complaints"[52] made against the company. Thus, defendants are aware that their program is not operating as promised and that they are injuring substantial numbers of consumers. Yet, their false representations about their services and the substantial consumer injury continue unabated. Moreover, defendants show no evidence of stopping their deceptive practices, as they are not only continuing their fraudulent business but are expanding their operation, according to press releases issued this year.[53]

The consumer victims in this case, who number in the thousands[54], are consumers who, in many cases, are in heavy debt, and are looking to avoid bankruptcy and for ways to responsibly manage their debt. Some of these consumers are forced to declare bankruptcy after defendants fail to perform on their promises. This is the very result that the consumers wanted to avoid when they enrolled in defendants' program. Despite paying defendants significant fees for their services, many consumers are forced to negotiate with creditors themselves, and end up paying more than they would have paid had they never

---

[52]PX-1, Ex. D.

[53]In April 2004, the defendants issued a press release touting the fact that they were expanding their business operations and that they were adding 20 new employees to their staff. According to the defendants, over 400 new customers were being signed up each month. PX-1, Ex. I.

[54]PX-1.Ex. G email from John Colon to BBB, dated April 2, 2004, claiming that 11,000 consumers had been served by BBFS.

17

enrolled in defendants' program. Consumers who can ill afford to pay monthly fees are then denied refunds of these fees when they opt out of the program after defendants fail to perform. Absent the injunctive relief sought here, defendants' ongoing illegal conduct will continue to injure consumers.

In addition, in weighing the equities in a government statutory enforcement action, the Court may presume irreparable injury. *Gresham v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423 (11th Cir.), *cert. denied sub nom., Windrush Partners, Ltd. v. Metro Fair Hous. Servs.,* 469 U.S. 882 (1984); *FTC v. World Wide Factors, Ltd.* 882 F.2d, 344, 347 (9th Cir. 1989). Giving due weight to the public interest, the balance of hardships tips decidedly in the plaintiff's favor. The defendants "can have no vested interest in a business activity found to be illegal." *U.S. v. Diapulse Corp. of Am.,* 457 F.2d 25, 29 (2d Cir. 1972). Any hardship that a TRO and asset freeze imposes on defendants would be temporary and outweighed by the public interest in preserving assets for redress to injured consumers.

**B.    An Asset Freeze and Expedited Discovery are Necessary to Preserve Effective Final Relief.**

As part of the permanent relief requested herein, the Commission seeks redress for consumers who have lost money to defendants. To ensure the possibility of such relief, the temporary restraining order is designed to preserve the status quo, pending a hearing on preliminary injunctive relief. The order would: (1) require that defendants immediately cease their deceptive sales practices; (2) freeze assets of the individual and corporate defendants; and (3) allow expedited discovery of defendants. The Commission's requests for such additional equitable relief are generally granted where, as here, the defendants' operations are permeated with fraud. Thus, the Commission seeks such temporary relief as may be and usually is enforceable in this Court.

Where, as here, the defendants' business operations are permeated by fraud, there is a strong likelihood that assets will be dissipated or documents destroyed during the pendency of this action causing

irreparable injury to the Commission's ability to obtain relief for consumers. Courts in this jurisdiction have thus ordered, *ex parte*, the freezing of assets and other ancillary relief in circumstances similar to those found here. *See e.g., FTC v. Dion, No. 03-40005, slip op. at 2 (*D. Mass. Feb. 6, 2003*)*. A freeze of defendants' assets is essential to prevent the dissipation or waste of assets during the pendency of this litigation and to preserve assets for restitution. *See FTC v. H.N. Singer*, Inc., 668 F.2d 1107, 1113 (9th Cir. 1982) (asset freeze appropriate when Commission objective is "to obtain restitution of moneys fraudulently obtained".)

By temporarily and preliminarily enjoining defendants' illegal practices, this Court will effectuate Congress' intent in enacting Section 13(b). *FTC v. World Travel Vacation Brokers*, 861 F.2d 1020,1028 (in enacting Section 13(b), Congress intended to serve the public interest by protecting consumers from the effects of deceptive trade practices "as quickly as possible"); *see also, FTC v. Southwest Sunsites*, 665 F.2d 711, 719 (5th Cir. 1982). Because harm to the public interest is presumed in a statutory enforcement action such as this one, *World Wide Factors*, 882 F.2d at 346, a preliminary injunction is a particularly appropriate remedy where the Commission shows "some reasonable likelihood of future violations." *CFTC v. Hunt,* 591 F.2d 1211, 1220 (7th Cir.1979), *cert. denied*, 442 U.S. 921 (1979). Past misconduct is "highly suggestive of the likelihood of future violations," especially where there is a pattern of misrepresentations as opposed to an isolated occurrence. *Id.* Defendants' past fraudulent conduct indicates a reasonable likelihood of future violations of the FTC Act.

### C.    The Appointment of a Temporary Receiver is Necessary in this case where Defendants have engaged in fraud.

Appointing a receiver for the defendant corporation is also essential to maintain the status quo, prevent the destruction of documents, and the concealment or dissipation of corporate assets because defendants here are engaged in fraudulent conduct, as shown above. Courts have held that:

19

> [I]n such cases, it is likely that, in the absence of the appointment of a receiver to maintain the status quo, the corporate assets will be subject to diversion and waste to the detriment of those who were induced to invest in the corporate scheme and for whose benefit . . . injunctive action was brought.

*SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 438 (5th Cir. 1981). A temporary receiver can preserve records and make an accounting that will assist the Court in: (1) identifying defendants' assets, (2) determining the size and the extent of the fraud, and (3) identifying the persons injured by defendants' practices.

### D.    The Temporary Restraining Order Should Be Entered *Ex Parte.*

Finally, the FTC requests that the restraining order be entered *ex parte*. This Court has issued *ex parte* TROs in similar circumstances, most recently in the matter of *FTC v. Dion*, No. 03-40005, slip op. at 2 (D. Mass. Feb 5, 2003); *see also, FTC v. Patriot Alcohol Testers, Inc.*, 1991 U.S. Dis. LEXIS 19488 (D.Mass. Dec. 19, 1991). Federal Rule of Civil Procedure 65(b) permits this Court to enter *ex parte* orders upon a clear showing that "immediate and irreparable injury, loss, or damage will result" if notice is given. Proper circumstances for *ex parte* relief include situations where notice would "render fruitless further prosecution of the action." *In re Vuitton et Fils*, 606 F.2d 1, 5 (2d Cir. 1979) (quoting *Carroll v. Princess Anne*, 393 U.S. 175, 180 (1968)). As is set forth in detail in the Rule 65(b) declaration of counsel, notice to defendants would likely cause irreparable injury to the Commission's ability to provide redress to consumers. Providing defendants with notice of this action would most assuredly cause them to destroy documents and dissipate assets before a hearing could be held, thus completely diminishing the chance of recovering any ill-gotten funds whatsoever. Only through the extraordinary measure of *ex parte* relief, can the Court prevent otherwise likely destruction of documents and secretion of assets -- both of which would jeopardize the possibility of final effective relief for consumers.

20

## V.    CONCLUSION

The corporate and individual defendants in this action are operating a thoroughly fraudulent debt negotiation operation that has victimized thousands of consumers nationwide, as a result of defendants' misrepresentations and other unfulfilled promises. Swift *ex parte* action is necessary to halt defendants' deceptive practices and to preserve the availability of final relief for injured consumers pending a hearing on preliminary injunctive relief. Accordingly, the Commission respectfully requests that the proposed temporary restraining order be granted in all respects granted.

Dated: November 2, 2004

Respectfully submitted,

CAROLE A. PAYNTER
ELVIA P. GASTELO
Attorneys for Plaintiff
Federal Trade Commission
Northeast Regional Office
One Bowling Green, Suite 318
New York, New York 10004
(212) 607-2813; 2811

CAROLE A. PAYNTER

21