UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>BETTER BUDGET FINANCIAL SERVICES, INC., JOHN COLON, JR. and JULIE FABRIZIO-COLON,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO. 04-12326 (WGY)<br>)<br>)<br>)<br>)<br>)<br>) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
OPPOSITION TO THE MOTION FOR A PRELIMINARY INJUNCTION
AND CROSS-MOTION PURSUANT TO FED. R. CIV. P. 60 TO CLARIFY THE
EX PARTE TEMPORARY RESTRAINING ORDER**

As this Court has recognized, the "[a]ppointment of a receiver in any situation is an extraordinary remedy, one that ought to be sparingly invoked." *Canney v. City of Chelsea*, 925 F. Supp. 58, 65 (D. Mass. 1996). Considering the evidence provided by the Federal Trade Commission ("FTC") Staff, the preliminary report of the Receiver, and the impact that this remedy has on the business of the Defendants and the unrelated, non-party corporation Unimark, it is patently clear that the appointment of a Receiver and an asset freeze is not warranted in this case.

This case simply does not present the type of routine fraud that would justify the extraordinary and draconian remedy of a receivership or asset freeze on a preliminary basis. The allegations of the Complaint present a straightforward Section 5(a) case of false and deceptive advertising for which the appointment of a receiver is neither routinely sought nor typically granted. Indeed, many of the steps the FTC takes to ensure that assets are identified and preserved have been taken here, or are not opposed by Defendants. However, the evidence

1

presented by FTC Staff does not justify the continuation of receivership and asset freeze over any of the Defendants. For this reason, the FTC's proposed order for a preliminary injunction should be denied to the extent it seeks to continue the receivership and asset freeze over the individual and corporate Defendants.

Similarly, this Court should dissolve the receivership with regard to Unimark, which is not a named party and whose business operations are wholly outside the scope of the allegations of the Complaint. As it stands, Unimark—which is not a named party, and which is not a named relief defendant—is totally and completely operated by the Receiver to the increasing detriment of Unimark. Unimark advertises and markets consumer products having nothing to do with debt settlement, and the Receiver's decision to extend his dominion and control over Unimark is based on insufficient evidence of any meaningful links between Better Budget and Unimark. Unimark markets its own products, has its own separate business operations, its own offices, its own bank accounts, its own employees, its own revenue stream, its own expenditures, and its own customers. Although the Receiver, in his preliminary report, identified certain affiliations between the two companies, the claimed links are woefully insufficient to support extension of the receivership to Unimark. If the receivership is not dissolved, then at the very least the Receiver must be directed to allow Unimark to conduct its business in the ordinary course.

## FACTS

Defendant Better Budget is a debt settlement company that contacts creditors and attempts to settle outstanding, unsecured debt held by Better Budget's clients. The company was founded by Defendants John Colon and Julie Fabrizio-Colon in 2000, and in four years the company grew from its modest investment and operations out of the Colons' home, to a small business with 41 employees. On November 3, 2004, the FTC filed a Complaint against the

2

Defendants for violation of Section 5 of the FTC Act. The Complaint alleged that Better Budget was a fraudulent business venture and asserted that Better Business contacted few, if any, of its clients' creditors, settled few, if any, debts of its clients, and settled few, if any, of those debts for the amounts promised. In short, the Complaint alleges widespread, garden-variety fraud on the part of Defendants.

The actual facts, however, belie those allegations. As described in full in the accompanying Declaration of John Colon, Jr., Better Budget has served almost 10,000 clients since beginning operations in 2000, and of those clients, Better Budget believes that only a few clients ever complained about the services offered by Better Budget. Better Budget's websites and contracts with clients provided ample and realistic presentations of how the services were performed, and the FTC's assertion that Better Budget failed to adequately warn potential clients of the risks involved with debt settlement is simply not true.

Similarly, the evidence offered by the Receiver in his preliminary report is insufficient to warrant receivership and asset freeze over Unimark. Unimark sells an all-natural supplement for cholesterol, and has shot and is prepared to roll out advertising for a new, five DVD product featuring world-famous poker players offering their skills and techniques at various card games. As described in the accompanying declaration of Unimark's CEO, Scot Sarver, Unimark's operations are wholly separate from those of Better Budget. Unimark maintains its own records and bank accounts, its own employees, its own payroll, its own database, its own phone lines, its own equipment, its own customers, and its own liabilities.

In his preliminary report, the Receiver cites certain inter-company loans as justifying the extension of the Receivership over Unimark. However, as Mr. Sarver describes, these transactions were at arm's length, and the specific loans identified by the Receiver have been

repaid thanks in part to a recent injection of funds by an independent investor, Rob Nickerowski, who also owns 10% of the shares of Unimark. The Receiver's preliminary report acknowledges this investment and acknowledges that Better Budget and Unimark are different businesses. It does not provide the number of clients who had debts settled by Better Budget, nor does it provide any information regarding the number of clients who settled for less than the 50% figure asserted by the FTC. Moreover, the report makes no comment regarding the representations made with regard to the challenged advertising or the terms of the contracts with clients.

## ARGUMENT

### I. THE BALANCE OF HARMS WEIGHS HEAVILY IN FAVOR OF THE IMMEDIATE LIFTING OF THE RECEIVERSHIP AND ASSET FREEZE NOW IN PLACE AGAINST THE DEFENDANTS.

This Court has repeatedly held that the appointment of a receiver is an extraordinary remedy and should never be made except where an emergency exists and in order to protect the interests of the plaintiff. *Atla Subordinated Debt Partners II, L.P. v. Tele-Media Co.*, No. Civ. A. No. 95-11105-GAO, 1995 WL 464925, at *1 (D. Mass. July 26, 1995) (denying receivership because no evidence of mismanagement by fraud or incompetence and no evidence that the receiver will manage the business better than incumbent management); *Commodity Futures Trading Comm'n*, 481 F. Supp. 438, 441-442 (D. Mass. 1979) (receivership motion denied because no evidence that those whose interests are to be protected would be better served by a receiver rather than management). Indeed, this Court has stated that "the appointment of a receiver in any situation is an extraordinary remedy, one that ought be sparingly invoked." *Canney*, 925 F. Supp. at 65-66 (*citing Lopez v. Medford Community Center, Inc.*, 384 Mass. 163, 169 (1981)) (interpreting the Massachusetts Receivership Act). Receivership orders under Mass. R. Civ. P. 66 "should be employed with the utmost caution and granted only in cases of clear

necessity to protect plaintiff's interests in the property." *Lopez*, 384 Mass. at 169 (citing 12 C.A. Wright & A.R. Miller, Federal Practice and Procedure §2983 at 21 (1973)).

Courts have generally appointed a receiver only in cases involving fraud by a defendant or an imminent danger that the property securing any debt will be lost or squandered. *Atla Subordinated Debt*, 1995 WL 464925, at *1. The mere threat of insolvency or the doubtful financial standing of the debtor is not enough. *Id.* at *1 (*citing Garden Homes, Inc. v. United States*, 200 F.2d 299, 301 (1st Cir. 1952)). Courts also may look to the plaintiff's probability of success in the action, the possibility of irreparable harm and the likelihood that harm to the plaintiff by denial would be greater than the injury to a defendant by appointing the receiver. *Atla Subordinated Debt*, 1995 WL 464925, at *1 (citations omitted).

### A. Our Courts recognize that the appointment of a receiver is an extraordinary remedy and this is not a case where the allegations of fraud merit such draconian relief.

Beyond bald assertions that the Defendants' business is "permeated with fraud," (Plaintiff's Memorandum, at 18), the FTC cannot make the necessary showing that the continued involvement of a receiver is appropriate in this circumstance. In fact, even a casual review of the FTC's papers makes clear that the agency is largely relying on actions of other defendants in other FTC actions to essentially suggest that they are entitled to this extraordinary relief as a matter of right, without regard to the facts and circumstances of this case. The FTC's allegations of fraud are highly selective. They rely on excerpts of Defendants' materials and leave out the important disclaimers to consumers in those very same materials. Other allegations simply do not match up to the documents that the FTC submits in support of their motion. Notable examples include the following:

| Allegation | Rebuttal Evidence within the FTC's Papers |
|---|---|
| "During the sales conversation, consumers are instructed to immediately stop making any payments to their unsecured creditors." Complaint, ¶ 15 | "Better Budget Financial is not advocating that you stop paying your creditors. We do not encourage you to default on any payments that you have with your creditors. When a payment to a creditor is late, there can be negative consequences to your credit score." Index of Attachments, PX1, Exhibit C (excerpt from website)<br><br>"Client acknowledges that participation in the BBFS program is voluntary and that any decision to stop making payments to existing creditors is voluntary and made at the sole discretion of Client." Index of Attachments, PX1, Exhibit C (Contract for Services, paragraph 6) |
| "Defendants represent that [enrollment in the program] will immediately halt all calls the consumers may have been receiving from their creditors or debt collectors." Complaint, ¶ 16. | "[W]e have developed steps that our clients can use that are effective in minimizing and often eliminating telephone calls from creditors." Index of Attachments, PX1, Exhibit C (excerpt from website)<br><br>"It is also understood that BBFS will use its best efforts to minimize creditor communications directly to you." Index of Attachments, PX1, Exhibit C (Contract for Services, paragraph 6) |
| "Defendants' debt settlement program purports to help consumers 'eliminate anywhere between 50 and 70 percent' of the consumers' debts...." Plaintiff's Memorandum, at 4. | "[50-70% savings] Based on the average negotiated settlements experienced by Better Budget's clients. Individual results may vary." Index of Attachments, PX1, Exhibit C (disclaimer contained on website) |

Lastly, even were we to assume that each of the 124 complainants have truthfully represented their circumstance to the FTC, which does not appear to be the case,[1] these

---

[1] There are a number of things which cast serious doubt on the veracity of the individual consumer declarants. For one, even a cursory review of the chart presented by the FTC (Index of

6

complaints amount to roughly 1% of all of Defendants' customers over time. When the Defendants finally gain access to their files they are confident that they will be able to demonstrate that in a large percentage of their cases the customer (and even the credit card companies) are fully satisfied with the outcome of the program, thereby demonstrating the lack of FTC's likelihood of success on the merits.[2]

In short, every business has complaints, and the Defendants' are no different. However, to paint the business as a "simple but effective fraudulent scheme" based on what amounts to a handful of complaints from people who enter the Defendants' program with outlandish expectations defies the scope and purpose of the FTC Act.

**B.     The FTC has failed to prove that there is a threat of asset dissipation such that a receivership or asset freeze is merited.**

In support of their *Ex Parte* relief, the FTC represented that the Defendants may be motivated to destroy documents or hide assets. Declaration of Attorney Paynter, at ¶ 9. The FTC failed to flesh out what fueled those suspicions, but there can be no doubt that the vantage point they have now makes clear that those beliefs are wholly unfounded.

---

Attachments, PX1, Exhibit J) reveals that in many instances the consumers claimed their total consumer debt as "fees paid to the defendants," which suggests that these consumers somehow see the defendants as a guarantor of their financial obligations. Further, one has to seriously question the allegations as to the defendants' responsiveness when the Better Business Bureau's own Reliability Report shows that in a 36-month period the defendants resolved 11 complaints and "made every reasonable effort to resolve" all of the other remaining claims with the BBB. *See* Index of Attachments, PX1, Exhibit D.

[2] As noted in defendants' attached Motion for Leave to File an Opposition and Supporting Declarations Outside the TRO deadlines, the defendants remain unable to present substantive evidence on the merits of many factual allegations asserted by the FTC due entirely to the fact that they have not had sufficient and timely access to their business records and computer database information. Included among this material are reports from the defendants' proprietary software that is expected to rebuff the allegations of the individual declarants and otherwise demonstrate the *de minimus* percentage that the total complaints represent with respect to Better Budget's overall volume of business.

7

As the FTC presumably now knows, Better Budget is not a "boiler room" operation that they perhaps expected to find. Instead, Better Budget is a well-established company with a structured management and clear ties to the community. Better Budget and the individual Defendants, do their banking with two local institutions and maintain separate accounts for both the business and personal funds. Neither the company nor the individual Defendants maintain any off-shore accounts or real property overseas.

Since being served with the TRO last Thursday, the Defendants have cooperated fully with the Receiver and his counsel, including attending interviews on both Thursday, November 4 and Friday, November 5, 2004. Moreover, in the short time between being served with the TRO and the attendance of this hearing, the Defendants have also produced both personal and corporate financial statements (attachments B and C to the TRO) as well as various sworn statements, tax returns, and the deeds to their homes in Beverly, Massachusetts. The Defendants have also willingly assisted the Receiver's counsel in having counsel for the bank initiate the retrieval of Defendants' bank statements.

Further, as set forth in the report submitted by the Receiver, there is absolutely no evidence that the Defendants dissipated or otherwise concealed assets, let alone engaged in the type of nefarious conduct that is highlighted in the cases relied upon by the FTC in its Memorandum. In short, there is no imminent threat that the Defendants' assets will be lost, squandered, transferred or destroyed. As a precautionary measure, the Defendants are even willing to provide any further reporting the Court deems reasonable to protect the interests of the FTC.

Accordingly, there is clearly no basis for continuing the draconian relief now in place against the Defendants. Indeed, as the FTC has stated in *FTC v. Seismic Entertainment*

8

*Productions, Inc., et al.*, receivership and asset freeze is not always necessary to identify and protect the assets of defendants:

> An order requiring Defendants to retain records and conduct an accounting, and allowing for expedited discovery, will preserve the possibility of redress for victimized consumers and accurate disgorgement of defendants' ill-gotten gains. An accounting of defendants' assets and an order preserving documents is necessary to identify defendants' assets, calculate the amount of defendants' proceeds from their illegal marketing activities, and to fully determine the size and extent of the injuries. Although at this juncture the FTC does not seek an asset freeze or restriction, to maintain the status quo and preserve the potential for a monetary remedy, we request an order requiring defendants' to provide an accounting and to retain their business and financial records. *See FTC v. Direct Marketing Concepts, Inc.* 2004 WL 1399185, slip op. (D. Mass. June 23, 2004) (court ordered asset restrictions and accounting); *FTC v. Patriot Alcohol Testers, Inc.*, No. 91-11812-C, 1992 WL 27334 *3 (D. Mass. 1992) (court issued asset freeze); *FTC v. Dion*, Civ. No. 03-40005-NMG, slip op. at 4 (D. Mass. 2003) (TRO order with asset freeze converted to preliminary injunction) (Ex. B). *See also SEC v Fife*, 311 F.2d 1 (1st Cir. 2002) (affirmed order freezing defendants' assets).

*Federal Trade Commission v. Seismic Entertainment Prod., Inc.*, Memorandum in Support of Pl.'s Motion for Temporary Restraining Order, at pp. 26-27. Defendants will stipulate to an order requiring them to maintain all records and to preserve assets to the extent consumed in the ordinary course of business.

### C. Lastly, the evidence suggests that the receiver will harm rather than assist the interests of Better Budget and its existing customers and employees.

Another important consideration with respect to the appointment of a receiver is whether the appointment would be harmful to the financial status of the corporation. *GA Enterprises, Inc. v. Leisure Living Communities, Inc.*, 355 F. Supp. 947, 949 (D. Mass. 1973) (denying appointment of receiver because the company was able to meet its financial obligations absent a receiver and the receiver would have a detrimental effect on the financial status of the company). The Receiver in this matter has taken the broad view that the TRO effectively bans all operations of Better Budget. Per his order, the business has remained closed since last Thursday and is

likely to remain closed if a preliminary injunction is entered by this Court. To be clear, no one is serving Better Budget's existing 3,000 customers, let alone answering the phones, checking emails, and even making payroll. The hardship this has caused and will continue to cause Better Budget's employees, customers, and other third parties is real and significant. In fact, if there is any irony in this matter it is that the continued receivership stands to create exponentially more consumer harm than that conduct which purportedly forms the basis of the FTC's complaint against the Defendants here.

## II. THE APPOINTMENT OF A RECEIVER AND AN ASSET FREEZE OVER THE ASSETS OF THE UNRELATED, NON-PARTY CORPORATION UNIMARK IS NOT WARRANTED.

The activities of the Receiver did not stop with Better Budget or with the individual Defendants. As soon as the Court entered the *ex parte* Order, and on the claim that Unimark was a "Receivership Defendant" – a term so broad in scope as to encompass a whole host of entities whether directly involved in the targeted business activities or not – the Receiver swiftly and immediately moved to completely seize Unimark's operations.

The effect of this action was enormous and devastating. As detailed in the accompanying declaration of Scot Sarver, Unimark's CEO, the Receiver moved into the offices of Unimark and shut down the entire operation of the business. (Declaration of Scot H. Sarver, ¶¶ 13 – 18). Employees who were busy processing customer orders were told by local police to step away from their computers and hang up the telephones. (Sarver Decl., ¶13). The offices were immediately locked down, and locks on all of the offices within Unimark were changed. (*Id.*). Accounts held solely in the name of Unimark were frozen, and Unimark was prevented from processing any credit card purchases of Unimark's product. (*Id.*). The Receiver prohibited Unimark from ordering more product from the manufacturer. (*Id.*, ¶ 16). Unimark was also

ordered to pull whatever advertising was running at the time. (*Id.*). Finally, orders generated by those ads that could not be pulled back were taken (but not permitted to be processed) by a skeletal crew of five Unimark employees working limited shifts, far below the number employees or shifts Unimark typically employed. (*Id.*, ¶¶14 – 15). At present, Unimark is prohibited by the Receiver from placing any advertising or conducting any marketing, it is prohibited by the Receiver from processing any orders already placed, and it is prohibited from shipping any product ordered by customers. In short, Unimark's ability to conduct its business – which FTC Staff has acknowledged is <u>not</u> within the scope of the allegations of the Complaint – has been choked off completely. The damage caused to Unimark's business is profound and ultimately may cripple Unimark permanently. (*Id.*, ¶ 18).

The Receiver seized Unimark on the most thin and uncertain of facts. The Receiver's preliminary report offers no reasons that justify the extraordinary, last resort remedy of seizing and shutting down Unimark's unchallenged business operations. In that report, the Receiver cited unspecified personal loans from the individual Defendants to start up Unimark; inter-company loans from Better Budget to Unimark in the amount of approximately $50,000; and that Better Budget purchased Unimark's furniture and equipment. (Preliminary Report of the Receiver, ¶¶ 11 - 12 ). There is reason to believe that the loan was repaid. And nothing in the report suggests that these were anything less than arm's length transactions.

Other reasons cited for seizing Unimark are equally thin. Although the Receiver admitted that "[m]ost of Unimark's employees are separate from Better Budget," the report nevertheless makes much of the fact that there was an "overlap" in Better Budget and Unimark employees. (*Id.*, ¶ 12). But of the approximately 40 individuals employed by Unimark, Unimark's CEO could identify only five that also were employed by Better Budget. (Sarver

11

Decl., ¶ 15). The report identified only four. (Report, ¶ 12). And while it is true that John Colon and Julie Fabrizio-Colon were officers of both corporations, the report utterly ignores the fact that Scot H. Sarver is Unimark's CEO and runs the day-to-day operations of Unimark, or that 10% of the shares in Unimark were held by an investor who has not been brought into the receivership. (Sarver Decl., ¶¶ 1, 12). Finally, the fact that the lease for Unimark's premises was signed by Better Budget is insignificant in light of the fact that Unimark pays the lease for its premises (Sarver Decl., ¶ 5), and that Unimark plans to move to different premises under its own lease. (Declaration of John Colon, ¶ __).

Whether Unimark is treated as an undefined "receivership defendant" or as a potential relief, or nominal, defendant, it is abundantly clear that the facts cited by the Receiver in his report provide no sufficient factual predicate for the extraordinary remedy of appointing a Receiver and freezing assets. Yet, the standard developed in the case law for naming a relief defendant is clear. The burden is squarely on the plaintiff, who in this case does not and cannot meet it. First, a nominal defendant must be named in the action. That has not occurred here. Second, the plaintiff "must show that the nominal defendant has received ill gotten funds and that he does not have a legitimate claim to those funds." *See SEC v. Collello*, 139 F.3d 674, 677 (9th Cir. 1998) (*citing Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1137 (W.D. Mich. 1996). The relief defendant itself is not accused of any wrongdoing and acts merely as an "agent" or "depositary" for funds that are the subject of litigation. *See SEC v. Cherif*, 933 F.2d 403, 414 (7th Cir. 1991). They cannot be treated as a "necessary" or "indispensable" party to the action as they have no interest relating to the subject of the action. *See id.* Courts have, for example, frozen assets of relief defendants who were the recipients of fraudulently obtained proceeds but who otherwise did not engage in fraudulent activity. *See*

*Commodity Futures Trading Commission v. IBS, Inc.*, 113 F. Supp. 2d 830, 852 (W.D. N.C. 2000) (Nominal defendants properly subject to *ex parte* TRO freezing assets received by them from defendants' fraudulent telemarketing of illegal futures contracts which violated the Commodity Exchange Act.); *see also Colello*, 139 F.3d at 674, 676-677 (ill- gotten gains held by nominal defendants may be recovered if gains resulted from an underlying fraud).

The simple fact is that the FTC absolutely cannot prove at this stage (or any other, for that matter) that the start-up funds provided to Unimark were ill gotten simply because they may have been derived from Better Budget. It cannot prove that Unimark has no legitimate claim to the start up funds. It cannot prove that Unimark was but a "depositary" for ill gotten funds. The facts actually suggest otherwise. Further, plaintiff cannot prove that Unimark has no legitimate claim to the funds provided by the Colons and Better Budget. Whether loan papers were provided or not, the fact is that the Colons started a new business and loaned that new business capital until it began to function independently. There is nothing surreptitious or even suspicious about this – let alone fraudulent. And, to come full circle, since the FTC cannot show that garden variety fraud has occurred in this case, it cannot by definition show that Unimark received fraudulently obtained funds from either the Colons or Better Budget.

In short, even assuming plaintiff were to attempt to name Unimark as a relief defendant – it cannot meet the standard set forth in the case law. It cannot justify the freezing of Unimark's assets, the imposition of the receivership over it and the ensuing stranglehold that would result from the Temporary Receiver's involvement in the business. Neither the plaintiff nor the Temporary Receiver can merely hint or insinuate alleged facts that appear to support Unimark's nominal status to justify the imposition of the asset freeze and receivership on Unimark. More than a bare insinuation is required.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dissolve the Receivership, maintain certain provisions of the *ex parte* TRO in place, and specifically permit Unimark to conduct business in the ordinary course.

Respectfully submitted,

BETTER BUDGET FINANCIAL
SERVICES, INC., JOHN COLON, JR.,
and JULIE FABRIZIO-COLON

By their attorney,

_____
Christian H. Pedersen (BBO #644016)
METAXAS, NORMAN & PIDGEON, LLP
900 Cummings Center, Suite 207T
Beverly, MA 01915
978-927-8000 (p)
978-922-6464 (f)

Dated: November 10, 2004

## CERTIFICATE OF SERVICE

I hereby certify that on this day a true copy of the above document was served upon the attorney of record for each party by mail by hand
Date: 11/10/04