UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FEDERAL TRADE COMMISSION, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>BETTER BUDGET FINANCIAL SERVICES, )<br>INC., JOHN COLON, JR. and JULIE )<br>FABRIZIO-COLON, )<br>)<br>Defendants. )<br>_____ ) | CIVIL ACTION NO. 04-12326 (WGY) |

## DECLARATION OF SCOT H. SARVER

I, Scot H. Sarver, declare as follows:

1. I am the Chief Executive Officer of Unimark Solutions, Inc. ("Unimark"), a Massachusetts corporation incorporated in May 2004. I oversee the day-to-day operations of Unimark. I am over eighteen (18) years of age and am competent to testify as to the statements made in this declaration. Unless otherwise stated, I have personal knowledge of the acts stated below, and if sworn as a witness, I would testify to those facts.

2. Unimark is no way, shape or form involved in the business of debt settlement or debt counseling. Unimark is a direct response marketing company that advertises through television, radio, print and through its website, unimarkhealth.com. Unimark conducts its business by identifying and developing products for direct sale to consumers, producing television commercials and other advertising, processing orders from customers, and fulfilling those orders by shipping product to customers.

3. I met John Colon and Julie Fabrizio-Colon while installing telephone lines for Better Budget. During our conversations, I told them that I had worked for another direct

1

response marketing company. During our conversations we decided to begin a direct response marketing company that would be built on, but not limited to, the Cholestium product. I brought the product to Julie and John, and I wrote a 28-½ minute long-form commercial for the product.

4. To date, Unimark has marketed one product, Cholestium, which is an all-natural cholesterol product. By June 1, 2004, I had finished with the editing of the infomercial of Cholestium and started to purchase television time to test the show. We hired a production company, Counter Productions, to produce our infomercial during mid- to late May of 2004.

5. In mid-May 2004, John, Julie and I incorporated Unimark and began finalizing the set-up of business operations. We established a separate "EIN" number for Unimark, set up a Century Bank and Trust account in Unimark's name, created financial recordkeeping for Unimark, and set up a payroll account for Unimark.

6. Unimark Solutions tested the Cholestium show mid- to late July of 2004 on television. The results proved that we had profitable show and we decided that we needed to get office space and hire employees for Unimark.

7. I applied for a merchant account through Power Pay Merchant Services to process all credit cards and checks by telephone services and was approved for $50,000 per day in transactions. I also hired Transitional Data Services to develop software for Unimark Solutions and purchased a Database Server, which was stored at TDS's facility to handle all transactions made at Unimark Solutions. During this time I put a sales ad for employment in all local papers and started hiring employees for a September 1, 2004, start date. In the month of August, I hired 24 employees to start working for Unimark Solutions for a start date of September 1, 2004. I also hired Backchannel Media to purchase Television time to begin in the first week of September. I ordered 120 lines from XO Communications under Unimark to be installed for the

sole purpose of Unimark. I ordered telephone equipment from Corporate Telecom to handle 120 lines, upgrade equipment for the telephone system processor, telephones and call center equipment for Unimark.

8.  All of Unimark's media is purchased with the assistance of a California company called EURO RSCG. All of our media is paid for in advance and a schedule of the times is forwarded to us by EURO by Friday for the upcoming week. Our sales manager works with the media company to assure that the media that is purchased is profitable.

9.  Our database is "web based" and our server is situated on Transitional Data Services' network, at their facility. A sales representative takes an order and inputs the order into the database, when the order is confirmed, the database checks to see if the credit card is valid and holds the money for our transaction, an invoice and packing slip is then printed at our shipping department where a the shipping personnel fulfill the order and weigh the package for postage. Once the package is scanned, the credit card is processed and the package is picked up the USPS.

10. As of Thursday November 4, 2004, Unimark was sharing an e-mail server with Better Budget Financial Services. The server was handling only the URL of unimarkhealth.com and approximately 30 email addresses assigned to @unimarksolutions.com. The server was shared for no other purpose. Following the imposition of the receivership over Unimark, and knowing that one of the Receiver's concerns is that Unimark shares a server with Better Budget, I have inquired about moving both the website and all the email addresses to another host at a cost of approximately $50.00 per month which can be converted within three days by changing the DNS server accounts.

11. In addition to Cholestium, Unimark is in the final stages of rolling out advertising for a new instructive DVD product tentatively entitled "Champions of Poker," which features world-famous professional poker players. Two commercials (one 60-seconds in length, one 120-seconds in length) were shot in October 2004 and is currently in post-production. Prior to the Receivership and all of Unimark's business being shut down, the commercials were due to run on a limited, test basis starting on or about November 15, 2004.

12. Also in October 2004, a potential investor, Robert Nickerowski, was brought in for a presentation of Unimark's business operations. He attended the shoot for the "World Champions of Poker" commercials, and actually appears briefly in the commercials. Subsequent to this presentation, Mr. Nickerowski agreed to invest in Unimark. On or about October 24, 2004, he invested $250,000 in Unimark to fund the company on a going-forward basis. Those investment funds were paid into Unimark's Century Bank and Trust account. In exchange for his investment, Mr. Nickerowski received 10% of the stock shares in Unimark.

13. I was in Unimark's office on November 4, 2004 at approximately 1:45 p.m. when the Receiver and several attorneys, as well as local police, came into Unimark. The police immediately told every employee to step away from telephones and computers and stand against the wall. The employees were ordered to stay in the office and not leave. During the next four hours that the employees were required to stay, someone—I believe from the FTC—asked us to complete a questionnaire that indicated that we were employees of Better Budget. To my knowledge all of the employees either crossed out or otherwise told the attorneys present that they were Unimark employees, not Better Budget employees. In addition, the Receiver ordered the locks changed on the office doors. Accounts held solely in the name of Unimark were

frozen, and Unimark was prevented from processing any credit card purchases of Unimark's product. After I met with the Receiver, I was told to leave the office.

14. After the Receiver came in, he informed me that he would allow employees to staff the phones to handle orders only through the coming weekend. Because he limited this staffing to the weekend, media had to be pulled. Of the media that was not pulled, the Receiver allowed us only five employees for limited shifts. We normally staff 20 employees to handle orders on a 24-hour basis. Since the Receiver came in, we have been unable to routinely take any customer calls.

15. At the time the Receiver came in, we had approximately 12 full-time sales employees, and approximately 18 to 25 part-time employees. Approximately 15 new employees had been hired shortly before the Receiver came in, and they were prevented from attending training on Friday, November 5. Of those sales associates employed by Unimark, only five were also employed by Better Budget.

16. I have also been prohibited from placing any new media buys as a result of the Receivership. Indeed, I was told that I could not call anyone to conduct Unimark's business, and I could not access or answer my e-mails. Moreover, we have been unable to process any credit cards for orders placed. With regard to orders that were placed and for which credit card purchases were processed just prior to the Receiver coming in, we were told we could not ship any product to customers who paid for it. We were also prevented from ordering any new product from the manufacturer. In short, the business of Unimark was shut down completely.

17. Because the business was shut down, Unimark has not been able to generate revenue, nor pay vendors or any other bills. Although payroll was completed, with checks signed, no payroll was made the Friday following the Receiver coming in.

18. In my experience in the field of direct response advertising, if this situation remains, Unimark will quickly lose its employees, it will damage its relationship with the manufacturer, it will damage its relationship with its investor Mr. Nickerowski, and its ability to operate in the future will very quickly end.

Executed this 10th day of November, 2004.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

_____
Scot H. Sarver