IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>BETTER BUDGET FINANCIAL SERVICES, INC.,<br>JOHN COLON, JR., and JULIE FABRIZIO-COLON,<br><br>    Defendants. | Case No. 04-CV-12326 (WGY) |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Plaintiff Federal Trade Commission submits the following statement of material facts as to which Plaintiff contends there is no genuine issue, in support of Plaintiff's Motion for Summary Judgment:

## I. PARTIES

1. Plaintiff FTC is an independent agency of the United States government created by the FTC Act. 15 U.S.C. § 41 *et seq.* The FTC is charged with enforcement of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair and deceptive acts and practices in or affecting commerce, among other duties. The FTC is authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate federal district court proceedings to enjoin violations of the FTC Act in order to obtain consumer redress and to secure such equitable relief as may be appropriate in each case. 15 U.S.C. §§ 53(b).

2. Defendant Better Budget Financial Services Inc., ("BBFS") is a Massachusetts corporation that was incorporated on August 21, 2000. (PX-1, Exh. A)[1].

3. Defendant John Colon, Jr. is the President and a director of BBFS. Colon executed the company's application for membership in the BBB, ( PX-1, Exh. H) and is a signatory to at least one corporate bank account. (PX-1, Exh. B).

4. Defendant Julie Fabrizio-Colon is the wife of defendant John Colon, Jr. and serves as the Treasurer, Clerk and a director of BBFS. Fabrizio-Colon is also a signatory to at least one corporate bank account (PX-1, Exh. B). Fabrizio-Colon has also responded to consumer complaints filed against BBFS with the BBB and the office of the Massachusetts Attorney General. (PX-1, Exh. H).

5. In May 2004, BBFS's membership in the Boston Better Business Bureau was revoked due to the numerous complaints received by the Better Business Bureau against BBFS about their failure to provide promised services to consumers. (PX-1, Exh. H).

6. In May 2004, defendants John Colon and Julie Fabrizio-Colon incorporated Debt Management Solutions ("DMS") in the state of Massachusetts. DMS marketed and sold the same debt settlement services as BBFS. (Kapadia Dec.-II, Exh; Deposition Transcript of John Colon, dated December 29, 2004 ("Colon Tr."), pp 72:8-73:17 and 78:5-17).

## II. DEFENDANTS' PRACTICES

7. Defendants marketed their services nationwide on two Internet websites, through Internet advertising, in Pennysaver type newspapers and through telemarketing. (Colon Tr. p.

---

[1] The exhibits with the prefix "PX" are contained in the Exhibits submitted in support of Plaintiff's Motion for an Ex Parte Temporary Restraining Order, filed on November 2, 2004 and the remaining exhibits and declarations referred to herein are found in the Appendix to Plaintiff's Motion for Summary Judgment, referred to hereafter as ("App.1")

196:6- 197:5 and Deposition Transcript of Julie Fabrizio-Colon, dated December 30, 2004 ("Fabrizio-Colon Tr."), p. 28:3-7).

8. Defendants' debt settlement program purported to help consumers "eliminate anywhere between 50 and 70 percent"(PX-1, Exh.. E, p. 6) of the consumers' debts through "creditor negotiation," (PX-1, Exh.. C) in exchange for the payment of various fees from the consumers.

9. Defendants claimed that they had good relationships with many creditors which is why their negotiations are successful. (Colon Tr. pp. 93:25-94:10). However, at least one major creditor, CitiCards (a subsidiary of Citibank) has a policy of refusing to work with debt settlement companies like BBFS. CitiCards maintains a policy of immediately referring to collection any account where a debt settlement company is involved. CitiCards does this because it wants to ensure that it collects all monies owed to it rather than settling for the lesser amount that a debt settlement will bring.( PX-2, ¶ 7).

10. In exchange for their services, defendants required consumers to pay: 1) a retainer fee that ranged from hundreds to thousands of dollars, 2) a monthly administrative fee, and 3) 25% of any savings realized in a settlement with a creditor. (PX-1, Exh. E).

11. In numerous instances, defendants promised consumers that, in exchange for these fees: defendants would contact all of a consumers' creditors to stop them from making harassing debt collection calls; would negotiate and settle with each of a consumer's creditors when the consumer had accumulated one-half of the amount owed to the creditor; and actions taken by defendants on consumers' behalf would enable them to pay off all of their unsecured debts for a reduced amount. (PX-1, Exh. E.).

12. Based on these material claims, consumers were induced to purchase defendants'

services.

13. Defendants instructed consumers to stop paying their creditors so that their accounts could become delinquent since creditors would generally only negotiate on delinquent accounts. (PX-1, Exh.. F, p. 9). Defendants instructed consumers to open a bank account ("BBFS account") in which they would save a specific sum of money monthly and this money would be used to pay Defendants' administrative fee and any settlements negotiated with creditors. (PX-3, ¶ 7).

14. Defendants also instructed consumers to sign power of attorney forms that defendants represented would enable defendants to contact all of the consumers creditors and inform them that defendants represent the consumer and that the creditors and debt collectors should cease all contact with the consumer. (PX-3, ¶¶ 6 and 8). Defendants informed consumers that this practice would stop creditors from contacting them. (Alajoki Dec. ¶ 9 and Starksspear Dec. ¶¶ 7-8). Defendants instructed consumers to refuse to speak with any creditors who might contact them.

15. Defendants calculated how long it would take consumers to pay off all of their debts through this settlement process, with programs of varying lengths like twenty-four months, thirty-six months and forty-eight months. (PX-3, ¶ 4 (36 months); PX-4, ¶ 5 (48 months); PX-5, ¶ 7 (40 months); PX-7, ¶ 5 (30 months); PX-8, ¶ 6 (36 months).

### III. DEFENDANTS' MISREPRESENTATIONS

16. Defendants represented to consumers, expressly or by implication, that actions taken by defendants would enable consumers to pay off all of their unsecured debts for a reduced amount. (PX-3, ¶7; PX-4, ¶12).

17. Defendant John Colon admitted that the goal of the defendants' program is to settle all of

the consumers' debts: "successful completion" of the defendants' program "means that all of the accounts they gave us (defendants) are settled." (Colon Tr. p. 90:3-9). Further, "unsuccessful means they - means if they enrolled ten accounts and only nine were settled, then they did not successfully complete the program. However, they did complete the program, but not what we would consider to be successful. We only consider ourselves successful when every account that they give to us is settled." (Colon Tr., p. 90:3-9).

18. In numerous instances, the actions taken by defendants did not enable consumers to pay off all of their unsecured debts for a reduced amount, as claimed. Defendants claim to have no idea of the number of consumers that have successfully completed the program, (Colon Tr. p. 92:1), but admit that typically consumers who enrolled in their program did not have all of their accounts settled by defendants. (Colon Tr. p. 216:17-19).

19. Defendants often settled some consumer accounts but not others. (PX-4, ¶ 7; PX-6, ¶ 8; PX-10, ¶ 10; PX-16, ¶ 11), while some consumers saw none of their accounts settled. (PX-5, ¶ 10; PX-8, ¶¶ 13-14; PX-9, ¶ 8).

20. Defendants' records show that consumers typically do not remain enrolled in defendants' program for more than seven months after they begin the program. (Declaration of Peter Dykstra, dated January 25, 2005, ("Dykstra Dec."), Exh. A). After that time, there is a steady decline in the number of consumers who remain enrolled. (Dykstra Dec., Exh. A). Of the 9981 customers who have been enrolled in defendants' program, only 224 are identified in defendants' records as having had all of their debts settled and having completed the program. (Dykstra Dec., Exh. B).

21. Consumers contacted defendants daily with complaints about their failure to provide

promised services. (Kapadia Dec-II Exh. E). Defendants recorded these complaints on a form called a "Complaint Follow-Up Form" which was "used for the client service representatives in which they speak to a client who is upset with our service or is upset with any issues regarding our service." (Colon Tr. p. 203:16-23).

22. Defendants' complaint follow-up form captured the following specific complaints: 1) Creditors calling, 2) Received summons/arbitration, 3) Unreturned phone calls, 4) Credit issue, 5) has funds/requesting settlement, 6) Not understanding our fees (retainer, admin, settlements), 7) does not understand the program, felt they were mislead, 8) Administration fee issue and 9) Other. (Kapadia Dec-II, Exh. ). This form captured the most common complaints made about the defendants' services. (Fabrizio-Colon Tr. p. 80:5-12)

23. The purpose of defendants' complaint follow-up form was "to eliminate complaints" (Colon Tr. p. 217:3-9) and keep customers from leaving program. Defendants provided various monetary incentives to their customer representatives to retain customers who wanted to leave the program because they were dissatisfied with defendants' services. (Colon Tr. p. 214:3-19 and Fabrizo-Colon Tr. P. 85:12-86:87:4).

24. Defendants represented to consumers that they would settle each creditor's account once the consumer had accumulated one-half of the amount owed to that creditor. (PX-1, Exh. F, p. 13; PX-8 ¶7; PX-13, ¶6; Starksspear Dec. ¶6; Alajoki Dec. ¶6). However, defendants in numerous instances did not settle consumers' accounts as promised. (PX-15, ¶ 7 and PX-3 at ¶13; Starksspear Dec. ¶ 11; Alajoki Dec., ¶¶ 10 and 12; Kapadia Dec II, Exh. C). In fact, consumers typically were forced to call defendants to inform them that they had accumulated one-half of the amount owed, and thus have available funds for

settling the account, and in numerous instances the defendants did not settle these accounts after this one-half amount had been accumulated by the consumer. (PX-5, ¶ 10; PX-8, ¶ 10; PX-15, ¶ 7).

25. Defendants represented that they would contact all of a consumer's unsecured creditors to ensure that creditors do not call or harass consumers about their payments that may be overdue. (PX-11, ¶11; PX-12, ¶¶ 7-9 and PX-13, ¶ 8; Alajoki ¶ 5; Starksspear ¶ 7 and Kapadia Dec.-II, Exh. C). However, consumers continued to receive harassing calls from their creditors despite defendants' promises, even though consumers had been enrolled in the program for many months.(PX-14, ¶ 9, PX-3,¶¶ 9-12; Alajoki Dec. ¶ 9; and Starksspear Dec. ¶ 8).

26. Moreover, the defendants were aware that it was unlikely that they could stop all creditors from calling consumers, because many "bill collectors tell consumers that they have not heard from a third party simply because bill collectors work on a commission basis; and if they obeyed the [FDCPA], they they would not be allowed to contact our clients." (Colon Tr. p. 221:14-20). Further, "...the creditor would let a client know or the creditor would tell a client in most of these cases that they have not heard from Better Budget when, in fact, we know that the bill collector 90 percent of the time ripped up the power of attorney and said to the consumer we haven't heard from Better Budget. They lie, they rip up power of attorneys. They do anything they can to collect debt. And I know I ripped up power of attorneys as a collector." (Colon Tr. pp. 221:25-222:11 and Fabrizio-Colon Tr. pp. 65:16 - 66:9).

## V. DEFENDANTS JOHN COLON AND JULIE FABRIZIO-COLON ARE INDIVIDUALLY LIABLE

27. The undisputed facts show that defendants John Colon and Julie Fabrizio-Colon, at all

times material to the Commission's Complaint, acting alone or in concert with others, formulated, directed, controlled, or participated in the acts and practices of corporate defendant BBFS. The Colon defendants' control of the actions of BBFS is predicated upon their positions as the officers and directors of BBFS, as well as their being signatories to at least one corporate bank account, during the entire course of their business. (PX-1, Exh. B).

28. Furthermore, the individual defendants admittedly made all major decisions for BBFS, as their following testimony confirms: John Colon "handled most of [BBFS's] marketing." (Fabrizio-Colon Tr. P. 28:5-7), and he was in charge of monitoring how many consumers successfully completed the program (Fabrizio-colon Tr. P. 155:25-156: 5). John Colon typically met "at least three times a week" with the company's general manager, to whom all other supervisors reported, including the supervisors for client services and account settlement departments. (Colon Tr. P. 57:19-58:18). In addition, defendant John Colon executed the company's application for membership in the BBB, (PX-1, Exh.. H).

29. Apart from serving as Treasurer of BBFS, defendant Julie Fabrizio-Colon "enrolled clients" in the program (Fabrizio-Colon Tr. p. 39:8-12), and has always had the responsibility for responding to customer complaints (Fabrizio-Colon Tr. p. 39:15-45:9). Defendant Fabrizio-Colon also represented BBFS before the Boston Better Business Bureau in a meeting held to address the pattern of unresolved complaints that BBFS had generated. (Colon Tr. p. 220:7-13).

## VI. CONSUMER INJURY

30. Consumers suffered substantial injury as a result of defendants' misrepresentations, in terms of both increased debt (see, e.g., Alajoki Dec. ¶12 and Starksspear Dec. ¶11), and fees paid for promises not kept. When consumers terminated their contracts because

defendants were not performing as promised, consumers often found that their overall debt had actually <u>increased,</u> because they owed interest and late fees due to not paying creditors, as required by defendants' program. (PX-11, ¶ 11).

31. Many consumers, prior to entering the program, were paying their creditors on time but found that enrolling in defendants' debt settlement scheme caused their financial situation to deteriorate (Alajoki ¶12 and Starksspear ¶¶ 10-11). Some consumers find their financial situation deteriorated to the point of their being forced to file bankruptcy. (PX-9, ¶ 8; PX-16, ¶ 13; and PX-16, ¶ 11).

32. Since beginning their operations, defendants have generated $11,978,249 in revenues from the collection of retainer fees, monthly fees and settlement fees, as a result of their misrepresentations made to consumers. (Dysktra Dec., Exh. C).

Dated: *January 25*, 2005

Respectfully submitted,

JOHN D. GRAUBERT
Acting General Counsel

BARBARA ANTHONY
Regional Director

_____
Carole A. Paynter
Elvia Gastelo
Theodore Zang
Attorneys for Plaintiff
Federal Trade Commission
One Bowling Green, Suite 318
New York, New York 10004
(212) 607-2813 (phone)
(212) 607-2811 (phone)
(212) 607-2816 (phone)
(212) 607-2822 (facsimile)

## CERTIFICATE OF SERVICE

The undersigned certifies that on January 25, 2005, she served a true and correct copy of the of Plaintiff's:1) Notice of Motion for Summary Judgment, 2) Plaintiff's Statement of Material Facts as to Which There is No Genuine Issue, and 3) Plaintiff's Memorandum of Points and Authorities in Support of Its Motion for Summary Judgment, via facsimile and regular mail on:

    Theodore W. Atkinson (*pro hac vice*)
    Venable, LLP
    575 7th Street, N.W.
    Washington, DC 20004-1601
    (Counsel for Defendants)

    Peter B. Zlotnick, Esq.
    Seth Goldstein, Esq.
    Mintz Levin Cohn Ferris
      Glovsky and Popeo, PC
    666 Third Avenue
    New York, NY 10017
    (Counsel for Receiver)

/s/ Carole A. Paynter
Carole A. Paynter