# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

FEDERAL TRADE COMMISSION,    )

    )

            Plaintiff    )

    )

v.    )     **Civil Action No. 04-12326 (WGY)**

    )

BETTER BUDGET FINANCIAL    )

SERVICES, INC., JOHN COLON, JR. and    )

JULIE FABRIZIO-COLON,    )

    )

            Defendants.    )

_____)

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

STATEMENT OF FACTS..................................................……………………     2

   I.  BBFS' Business Practices ..........................................................     2

      A.  BBFS' Websites.............................................................…..     4

      B.  Client Contact and Enrollment.............................................     5

      C.  The Enrollment Packet ......................................................     6

          1.  The Client Briefing Letter................................................     6

          2.  The Contract for Services................................................     7

      D.  Establishing and Monitoring Client Accounts ...........................     8

  II. BBFS' RECORD IN SETTLING DEBTS .....................................     8

ARGUMENT....................................................................…......     10

   I.  THERE IS A GENUINE FACTUAL DISPUTE BETWEEN THE
      PARTIES OVER THE THRESHOLD ISSUE OF WHETHER BBFS
      MADE MATERIAL MISREPRESENTATIONS THAT WERE
      LIKELY TO MISLEAD CONSUMERS....................................     10

      A.  The FTC mischaracterizes the BBFS websites and the
         conversations with BBFS employees, and Defendants therefore
         dispute that the alleged representations were made by BBFS.........     11

          1.  Disclosures in the website................................................     11

          2.  Disclosures in recorded conversations with BBFS employees ....     12

      B.  The FTC ignores disclosures made to consumers in other written
         Materials .....................................................................     15

      C.  Evidence of substantial performance by BBFS contradicts the
         FTC's assertion that BBFS made misrepresentations
         that were likely to mislead consumers....................................     17

  II. THERE EXISTS A SUBSTANTIAL FACTUAL DISPUTE AS TO
      RESTITUTION.................................................................     18

  CONCLUSION  ......................................................................     20

# TABLE OF AUTHORITIES

*Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317 (7th Cir. 1988) ..................... 14

*Beneficial Corp. v. FTC*, 542 F.2d 611 (3d Cir.1976) ......................................11,15,17

*Carr v. Cigna Securities, Inc.*, 95 F.3d 544 (7th Cir. 1996) ................................. 14

*In re Cliffdale Associates, Inc.*, 103 F.T.C. 110 (1984) ..................................... 10

*Federal Trade Commission v. 1263523 Ontario, Inc.*, 205 F. Supp 2d 205
(S.D. N.Y. 2002) ..................................................................... 18

*Federal Trade Commission v. Amy Travel Service*, 875 F.2d 564 (7th Cir. 1989) ........ 19

*Federal Trade Commission v. Atlantex Assoc.*, 1987-2 Trade Cas. (CCH)
¶ 67, 788, 1987 WL 20384, * 10 (S.D. Fla. 1987), *aff'd*, 872 F.2d 966
(11th Cir. 1989) ..................................................................... 10

*Federal Trade Commission v. Figgie Int', Inc.*, 994 F.2d 595 (9th Cir. 1993) ............ 18

*Federal Trade Commission v. National Business Consultants*, 781 F. Supp.
1136, 1144 (E.D. La. 1991) ............................................................ 18

*Federal Trade Commission v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994),
*cert. denied*, 514 U.S. 1083 (1995) .................................................... 10

*Federal Trade Commission v. Renaissance Fine Arts*, 1995-2 Trade Cas.
(CCH) ¶71,086 (N.D. Ohio Aug. 10, 1995) ............................................ 18

*Federal Trade Commission v. Tashman*, 318 F.3d 1273 (11th Cir. 2003) ................. 15

*Federal Trade Commission v. U.S. Sales Corp.*, 785 F. Supp. 737 (N.D. Ill.),
*opinion modified*, 1992 WL 104819 (N.D. Ill. 1992) ..................................... 17

*Federal Trade Commission v. World Travel Vacation Brokers, Inc.*,
861 F.2d 1020 (7th Cir. 1988) ......................................................... 10

*First Union Discount Brokerage Services v. Milos*, 997 F.2d 835
(11th Cir. 1993) ...................................................................... 14

*Martin v. Funtime, Inc.*, 963 F.2d 110 (6th Cir. 1992) ................................... 18

*Mandavilli v. Maldonado*, 38 F. Supp. 2d 180 (D. P.R. 1999) ............................ 18

*Mullenix v. Forsyth Dental Infirmary for Children*, 965 F. Supp. 120
(D. Mass., 1996) ……………………………………………………….. 18

*Removatron Int'l Corp. v. FTC*, 884 F.2d 1489 (1st Cir.1989) …………………………11,15,17

*Sears, Roebuck & Co. v. FTC*, 676 F.2d 385 (9th Cir. 1982) ………………………… 17

*Thompson Medical Co., Inc. v. FTC*, 791 F.2d 189, 193 (D.C. Cir. 1986)
cert. denied, 479 U.S. 1086 (1987) ……………………………………………….. 12,17

*Trans World Accounts, Inc. v. FTC*, 594 F.2d 212 (9th Cir.1979) …………………… 15

Defendants Better Budget Financial Services, Inc. ("BBFS"), John Colon, Jr., and Julie Fabrizio-Colon submit this memorandum in opposition to the Federal Trade Commission's ("FTC") motion for summary judgment.

The FTC's motion for summary judgment should be denied for three reasons:

- First, there is a genuine factual dispute between the parties regarding the representations BBFS made to consumers before they purchased BBFS' services.

- Second, there is a genuine factual dispute between the parties as to whether BBFS met the representations it made to consumers.

- Third, there is a genuine factual dispute as to the appropriate measure of damages in this action.

The FTC has alleged that BBFS made various promises to consumers through its website advertising and through oral statements to consumers. However, in arguing that BBFS made the alleged representations to consumers, the FTC ignores numerous statements in BBFS' websites and other written materials that fully explained BBFS' services, and ignores a contract for services that each client was required to sign and which detailed the services BBFS would provide. These documents show that BBFS made representations to consumers that are different than those alleged by the FTC. The existence of this fundamental, factual dispute over what BBFS told consumers is enough to support denial of the FTC's motion.

There is also a genuine dispute between the parties regarding BBFS' performance. The FTC argues that BBFS typically failed to live up to the representations made to consumers, and thus they misrepresented their services. But information in the FTC's hands shows that for a vast majority of its clients—up to 80%—BBFS settled one or more debts in accordance with the representations made to consumers in its advertising and other written material, and in accordance with the contract for services. The FTC completely ignores this fact in its brief.

Finally, there is a genuine dispute as to the damages that could be awarded if liability is found. The FTC, relying on data not provided to Defendants either in discovery (even though requested) or to the Court in its motion, asserts that the measure of damages is every penny charged to consumers by BBFS, regardless of whether their debts were settled or not, and that the amount of damages is $11.9 million. Although there is a legal dispute as to the measure of damages, that dispute gives rise to a factual one. If the proper measure of restitution accounts for the benefit of services contracted for and received by consumers, then the measure of damages is far below the $11.9 million claimed by the FTC.

These disputes surround the three major issues to be presented at trial, and are not appropriately decided on summary judgment. The FTC's motion should be denied.

## STATEMENT OF FACTS

### I.    BBFS' Business Practices

BBFS was a for-profit debt negotiation and settlement company with approximately 40 employees and officers.[1] In short, BBFS provided debt negotiation and settlement services to consumers by negotiating with their creditors to settle outstanding balances on accounts. BBFS followed a standard and routine procedure for enrolling and serving clients. First, consumers were put in contact with a debt counselor.[2] A BBFS debt counselor would speak with the consumer about the program, and would work with the consumer to determine the consumer's debt status and creditors, and to estimate—based on income and other factors—how much a

---

[1]  On November 3, 2004, this Court entered an Order granting the FTC's *Ex Parte* Motion for a Temporary Restraining Order. Under the terms of that Order, a broad asset freeze was imposed and a Receiver was appointed to take control of all of Defendants' corporate and personal assets, as well as the assets of another corporation, UniMark, which engages in an entirely separate business. Since the entry of that Order, BBFS has not operated, its employees have been terminated, some of its assets have been sold off by the Receiver, and its premises have been vacated.

[2]  DSOF, ¶¶ 10-11, 13-14, 16.

potential client could save through debt settlement.[3]  BBFS explained (through advertising and

other materials) that the client would establish a new bank account and would deposit an agreed-

to amount each month in that account.[4]  When that account reached a pre-determined amount

(sufficient to pay 50% of the first outstanding debt to be settled, plus BBFS' settlement fee), the

client would inform BBFS.[5]  BBFS would then follow up with a creditor to negotiate a

settlement, and if a settlement was reached, BBFS would inform the consumer that the consumer

needed to make payment to the creditor.[6]  Consumers were also told that each of the consumer's

debts would be settled one at a time.[7]

Consumers who wanted to enroll in this program were sent an enrollment packet that

contained a Client Briefing Letter that explained BBFS' services and fees, a contract for services

that the consumer was required to execute before enrollment would commence, a limited power

of attorney (which authorized BBFS to act on the consumer's behalf and instructed the receiving

creditor to contact BBFS rather than the consumer regarding any account), and other materials.[8]

Once a consumer completed and returned the application, the limited power of attorney,

and an electronic payment authorization form, they were enrolled as clients of BBFS.[9]  Only then

were they expected to pay any fees to BBFS.  Over time—and consumers were told this was not

an overnight process and would take several months before the first debt could be settled—BBFS

negotiated with creditors and obtained settlements for its clients.[10]  This was not, as the FTC's

Complaint suggests, a "boiler room" operation.  BBFS settled one or more debts (on average for

approximately 50% or better of the outstanding debt amount) for 6,859 clients, which is more

---

[3]  DSOF, ¶¶ 10-11, 13-14, 16.
[4]  DSOF, ¶¶ 10-11, 13-14, 16.
[5]  DSOF, ¶¶ 10-11, 13-14, 16.
[6]  DSOF, ¶¶ 10-11, 13-14, 16.
[7]  DSOF, ¶¶ 10-11, 13-14, 16.
[8]  DSOF, ¶¶ 10-11, 13-14, 16.
[9]  DSOF, ¶¶ 10-11, 13-14, 16.
[10]  DSOF, ¶¶ 10-11, 13-14, 16; PX-1, Exh. C thereto.

than 80% of its active, enrolled client base.[11]

As described below, and contrary to the Federal Trade Commission's assertions, BBFS' oral statements, advertisements, and other written materials provided to consumers represented to consumers that BBFS (1) would take steps to help reduce or eliminate creditors' calls to clients, but stated that creditors may continue to call; (2) would attempt to negotiate with each creditor one at a time in an attempt to negotiate a settlement, but stated that settlements were not guaranteed; (3) that consumers' credit may be adversely affected while using BBFS' services and that fees may be charged to the accounts; and (4) that BBFS clients experienced a reduction of up to 50 – 70% of their debts using BBFS services.[12]

### A.    BBFS' Websites

BBFS advertised primarily through two internet websites, both of which contained the same description and explanation of BBFS' services.[13]   The websites operated by BBFS provided consumers with a description of BBFS' services, the benefits offered, the limitations of BBFS' services, and answers to questions the consumer may have.[14]   The websites (which were identical in content) included the following statements:[15]

- "Save 50%* on your unsecured debt (* Based on average negotiated settlements experienced by Better Budget's clients.  Individual results may vary)."

- "We manage your outstanding debt for your interests and obtain the best settlement for you, typically reducing your debt 30 – 50%, and typically saving you hundreds of dollars."

- "We work out a monthly amount that each client can afford to pay.  The amount is

---

[11]   DSOF, ¶¶ 18-19.
[12]   DSOF, ¶¶ 10-11, 13-14, 16.
[13]   DSOF, ¶¶ 10-11, 13-14, 16.  BBFS also purchased the identification of consumers, or "leads" from brokers (who obtained the information from consumers who made internet inquiries on debt settlement or credit counseling services), and the leads would then contact the consumer lead and inform them that BBFS would contact them within 24 to 48 hours. DSOF, ¶ 7.  BBFS also occasionally advertised through print ads in "penny saver" newspapers with small circulations.
[14]   DSOF, ¶¶ 10-11, 13-14, 16.
[15]   DSOF, ¶¶ 10-11, 13-14, 16.

deposited in your program bank account. This account can either be a savings or a checking account."

- "When the client has accumulated enough money to cover the settlement and our fee, we contact one of the creditors and make them an offer. Offers are submitted until the client and the creditor both agree on the amount. We then get written or electronic approval on the total settlement (including fees). Once this settlement is paid, the client will [draw down the] accumulation of funds in their program account and the process will repeat as money becomes available for the next settlement. We continue in this way until all of the accounts are settled. It is important to note that we do not make any monthly payments to the creditors."

- **"Will the creditors start calling and harassing me?** Yes. As accounts go delinquent, especially in the beginning, clients will get creditor calls. However, we have developed [tools] that our clients can use that are effective in minimizing and often eliminating telephone calls from creditors."

- "When a payment to a creditor is missed or late, there can be negative consequences to your credit score."

- "What happens to my credit? ...At the end of our program your debt to income ratio will be greatly improved and you will once again be able to build credit. It is important to understand that there may be adverse effects to your credit. Late payment or delinquent account information can appear on a credit report for up to seven years."

## B.    Client Contact and Enrollment

Clients often communicated with BBFS by telephone before deciding to enroll and before paying any fees. Debt counselors and client service representatives who communicated with clients after they had enrolled and their accounts were established were trained and instructed to provide consumers with answers to their questions consistent with "talking points" that provided information to be used to respond to questions about the amount of savings consumers may expect, the negative impact the program may have to consumers' credit rating, how the program works, what happens to consumers' accounts while in the program, and whether they may expect to receive creditors' calls while in the program.[16]

---

[16]  DSOF, ¶¶ 10-11, 13-14, 16.

### C.    The Enrollment Packet

If a potential client agreed to proceed and enroll in the program, an enrollment packet was then sent to the potential client.[17]  The application contained the contract for services, a worksheet identifying the potential client's creditors and the estimated amount to be saved, an ACH authorization form to be completed by the potential client, and a power of attorney to be completed by the potential client.[18]  The enrollment packet also contained a letter detailing BBFS' services.

### 1.    The Client Briefing Letter

The Client Briefing Letter sent to each potential client provided the potential client with a detailed overview of BBFS' services, and information regarding the settlement process, the issue of creditor calls, and other matters.[19]  Specifically, the letter informed potential clients that BBFS would contact creditors to inform them that all further communications should be directed to BBFS, but cautioned that "[y]our creditors will usually attempt to apply their routine collection tactics to pressure you into sending them money."[20]  The letter described the several steps BBFS would take to "help reduce or eliminate" such calls, and advised clients how to respond.[21]

The letter also informed potential clients that negotiations with creditors would begin after the client had accumulated the money in their account to make a reasonable settlement offer (usually 50%) to one or more creditors, and that for the average BBFS client, such negotiations would not begin until three to six months had elapsed.[22]  The letter informed clients that settlements may range from 20% of the outstanding debt to more than 50%, but that it depended

---

[17]  DSOF, ¶¶ 10-11, 13-14, 16.
[18]  DSOF, ¶¶ 10-11, 13-14, 16.
[19]  DSOF, ¶¶ 10-11, 13-14, 16.
[20]  DSOF, ¶¶ 10-11, 13-14, 16.
[21]  DSOF, ¶¶ 10-11, 13-14, 16.
[22]  DSOF, ¶¶ 10-11, 13-14, 16.

on the circumstances.[23]

Finally, the letter told potential clients that most of the accounts placed with BBFS would "charge off," meaning that the creditor would write it off as a bad debt and report it to credit reporting agencies as such.[24] BBFS informed potential clients that even though an account had "charged off," it does not mean that the creditor would stop trying to collect on the debt, and that creditors have the legal right to continue accruing interest, late fees, and over-limit penalties while the potential client's debts are with BBFS.[25]

### 2.    The Contract for Services

The Contract for Services BBFS sent to consumers, and which consumers were required to sign (and, in many cases, initialize after each paragraph) again provided consumers with a description of BBFS' services, fees, and client requirements.

For example, the Contract required clients to establish a separate bank account and authorize BBFS to directly withdraw the agreed-to fees from that account. Regarding fees, the Contract provided that (1) the client's first monthly payment is made to BBFS as a retainer fee to enter the program, and was non-refundable; (2) BBFS is entitled to a fee in an amount equal to 25% of the difference between the creditors claim amount and the amount BBFS negotiated as settlement with the creditors to accept as final payment; and (3) the client agrees to pay $29.95 (or, later, $39.95) per month as an administrative fee to be drawn directly from the account established by the client.[26] The Contract also contained a number of other provisions detailing the types of services that were not provided by BBFS, stating that individual results may vary and that creditors may refuse to settle, that creditors may continue to call or take legal action, and

---

[23]  DSOF, ¶¶ 10-11, 13-14, 16.
[24]  DSOF, ¶¶ 10-11, 13-14, 16.
[25]  DSOF, ¶¶ 10-11, 13-14, 16.
[26]  DSOF, ¶¶ 10-11, 13-14, 16.

stating that BBFS would use efforts to minimize creditor communications with clients.[27]

### D.    Establishing and Monitoring Client Accounts

After BBFS received the completed application packet back from a client, BBFS would

set up an account in a computerized client account management program called CreditSoft.[28]

Once the account was established, BBFS would send the completed Limited Power of Attorney

to each creditor, informing them that they should contact BBFS regarding the client's debt. That

power of attorney, the Contract, and other materials would then be scanned into an image file

and appended to CreditSoft.[29] Negotiations with creditors were then conducted by BBFS' client

service representatives after each client notified BBFS that the client had saved the agreed-to

amount in their separate account.[30] Communications with creditors were recorded in

CreditSoft.[31] Over the course of BBFS' operations, BBFS' client service representatives

developed and maintained good relationships with a number of major creditors,[32] and were able

to secure debt settlements for most BBFS clients.

## II.    BBFS' RECORD IN SETTLING DEBTS

It was standard practice and procedure that certain information be entered into CreditSoft

by the client service representatives, debt counselors and representatives in the Administrative

Department and their supervisors.[33]  Such information included client name, address, telephone

number and email address; client creditors, credit balances, and interest rates; retainer and

---

[27]    DSOF, ¶¶ 10-11, 13-14, 16.
[28]    DSOF, ¶¶ 10-11, 13-14, 16.
[29]    DSOF, ¶¶ 10-11, 13-14, 16.
[30]    DSOF, ¶¶ 10-11, 13-14, 16.
[31]    DSOF, ¶¶ 10-11, 13-14, 16.
[32]    Contrary to the assertion by the Federal Trade Commission, one of the creditors that BBFS worked with to settle debts was Citigroup and its credit card issuing affiliates (collectively "Citibank"). Defendants dispute the FTC's assertion that Citibank refused to work with debt settlement companies like BBFS. (FTC SOF, ¶ 9). BBFS settled numerous Citibank debts for clients, and Defendants are prepared to put on testimony that there were at least 200 settlements with Citibank between 2001 and 2004. DSOF, ¶ 9.
[33]    DSOF, ¶¶ 10-11, 13-14, 16.

administrative fees paid; the settlement amount negotiated, and settlement fee owed to BBFS; and status of the account (for example, whether the account was settled or whether a settlement was pending).[34]

The CreditSoft data shows that there were 9,982 client accounts in the CreditSoft database.[35] The CreditSoft database also shows that for the 9,982 clients associated with these accounts, BBFS was able to settle debts for 6,859 of these clients, or approximately 70% of BBFS' <u>total</u> client base.[36] However, this 70% figure does not fully reflect the degree to which BBFS performed for its clients, because a number of the remaining accounts can be discounted for a number of reasons.[37] Consequently, of the 8,044 clients who enrolled in the program and who were not terminated by BBFS or quit for the above-described reasons, BBFS obtained settlements for 85% of enrolled clients. (This figure, however, does not take into account the fact that a number of clients were actively enrolled and had contracted for BBFS' services shortly before November 3, 2004, and it does not take into account clients who left the program for no reason stated.)[38] For these clients, the CreditSoft data demonstrates that 61% of the settlements BBFS negotiated were in the 50-70% savings range.[39]

---

[34] DSOF, ¶¶ 10-11, 13-14, 16.
[35] DSOF, ¶ 8, 19; Bartlett Dec., ¶ 24.
[36] DSOF, ¶ 8, 19; Bartlett Dec., ¶ 24.
[37] Of the remaining accounts, 363 have a client name associated with them, but no other information; 839 accounts were terminated because BBFS could not reach the client at the contact information provided by the client, or because the client bounced or did not pay required fees, typically administrative fees; 161 clients voluntarily left the program because they decided on alternative debt management solutions (e.g., obtained home equity or other loans, they decided to simply pay their creditors, or decided to go into credit counseling, etc.); and 575 of BBFS' clients terminated for reasons unrelated to the performance of BBFS' services (e.g., client lost job and couldn't afford to be in the program, client stated they no longer needed the program, client moved out of the country, client had a death in the family, etc.). DSOF, ¶ 19; Bartlett Dec., ¶ 24.
[38] DSOF, ¶ 19; Bartlett Dec., ¶ 24.
[39] DSOF, ¶ 19; Bartlett Dec., ¶ 24.

## ARGUMENT

I.  **THERE IS A GENUINE FACTUAL DISPUTE BETWEEN THE PARTIES OVER THE THRESHOLD ISSUE OF WHETHER BBFS MADE MATERIAL MISREPRESENTATIONS THAT WERE LIKELY TO MISLEAD CONSUMERS.**

The FTC has the burden of proving that Defendants violated Section 5 of the FTC Act.[40] To meet this burden of proof, the FTC is required to prove that: (1) Defendants made a representation, omission, or practice; (2) such representation, omission, or practice was likely to mislead customers acting reasonably under the circumstances to their detriment; and (3) such representation, omission, or practice was material.[41]  If the FTC failed to prove any one of the foregoing elements, Defendants cannot be held to have violated Section 5 of the FTC Act.

There is a fundamental, factual dispute between the parties over the threshold issue of what representations were in fact made to consumers.  The FTC's Complaint alleges that BBFS represented to consumers that BBFS (1) "will enable consumers to pay off all their unsecured debts for a reduced amount;"[42] (2) "will settle each creditor's account once the consumer accumulates one-half of the amount owed to the creditor;"[43]  and (3) "will contact all of a consumer's unsecured creditors on the consumer's behalf to ensure that creditors do not call or harass consumers about their payments that may be overdue."[44]  The FTC broadly alleges that Defendants made these representations "[o]n their websites and in the course of sales conversations,"[45] and offers, in the present motion, the BBFS website and a transcript of two telephone conversations with BBFS employees as evidence that the alleged representations were

---

[40]  *See Federal Trade Commission v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994), *cert. denied*, 514 U.S. 1083 (1995).
[41]  *See Pantron*, 33 F.3d at 1095; *Federal Trade Commission v. World Travel Vacation Brokers, Inc.*, 861 F.2d 1020, 1029 (7th Cir. 1988); *Federal Trade Commission v. Atlantex Assoc.*, 1987-2 Trade Cas. (CCH) ¶ 67, 788 at 59,252, 1987 WL 20384, * 10 (S.D. Fla. 1987), *aff'd*, 872 F.2d 966 (11th Cir. 1989); *In re Cliffdale Associates, Inc.*, 103 F.T.C. 110,165(1984).
[42]  Complaint, ¶ 24.
[43]  Complaint, ¶ 26.
[44]  Complaint, ¶ 29.
[45]  Complaint, ¶ 10.

made. Defendants dispute that the representations alleged by the FTC were made, for two

reasons. First, the FTC's broad description of the alleged claims made in the websites and in the

telephone conversations mischaracterize the representations actually made. Second, the FTC

ignores other disclosures provided to consumers that contribute to the net impression of the

representations made.

### A. The FTC mischaracterizes the BBFS websites and the conversations with BBFS employees, and Defendants therefore dispute that the alleged representations were made by BBFS.

In determining whether an alleged representation has been made, the Court must consider

the representation as a whole and focus on the "common-sense net impression" created by

statements to consumers.[46] As detailed in the Defendants' response to the FTC's statement of

facts, the websites and the telephone conversations inform consumers in detail what services

BBFS offers, and what services BBFS does not offer.[47] Defendants dispute that the websites and

recorded conversations submitted to the Court make the pat representations asserted by the FTC,

but instead convey to the consumer that success is not guaranteed, that the process is lengthy,

and that creditors may continue to call and harass clients for payment.

### 1. Disclosures in the website

The website does not promise, as the FTC claims, that BBFS will enable clients to pay

off all of a consumer's debts. This characterization implies a "miracle pill" type quality of

BBFS' services that are belied by clear and express representations to consumers that the process

of saving to settle the first client's debt can take "several months," and that at that time, BBFS

would "contact one of [the client's] creditors and inform them of [the client's] hardship and

---

[46] *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir.1989); *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir.1976).
[47] DSOF, ¶ 8, 10 – 11, 13, 14 – 16.

intention to 'settle' the account."[48]  The website informed consumers that "[i]n some instances

the creditor refuses to settle a client's debts."[49]  Regarding those debts that creditors did settle,

the website informed consumers that "[s]ometimes it can take up to 6 months or more to reach a

mutually agreeable settlement," an that "debts are negotiated ONE AT A TIME, based on [the

client's] budget and ability to handle the settlements."[50]  Finally, the website provided an

example of a hypothetical client whose debts were settled in two years, but advised clients that

"[t]o be completely fair, the above example is simplified and ignores some of the complexities

that can arise."[51]

    Nor does the website promise consumers that BBFS will ensure that creditors will stop

calling, as the FTC asserts.  Indeed, the website states exactly the opposite:

> **Will the creditors start calling and harassing me?**  Yes.  As
> accounts go delinquent, especially in the beginning, clients will get
> creditor calls.  However, we have developed [tools] that our clients can
> use that are effective in minimizing and often eliminating telephone
> calls from creditors.[52]

The FTC flatly mischaracterizes the representation regarding creditor calls and other

representations made in the website.  At the very least, the issue of whether the website

makes the representations alleged by the FTC is a factual issue[53] that is disputed and must

be resolved at trial.

### 2.    Disclosures in recorded conversations with BBFS employees

    The FTC also cites the transcript of two telephone conversations between an FTC

investigator, posing as a consumer, and Christina Creel, a former BBFS employee who was

---

[48] PX-1, Exh. C thereto.
[49] PX-1, Exh. C thereto.
[50] PX-1, Exh. C thereto.
[51] PX-1, Exh. C thereto.
[52] DSOF, ¶ 10 – 11, 13, 14 – 16.
[53] *See, e.g., Thompson Medical Co., Inc. v. FTC*, 791 F.2d 189, 193 (D.C. Cir. 1986) *cert. denied*, 479 U.S. 1086
(1987)(determining whether representations were made treated as an issue of fact).

employed as a debt counselor.[54] Defendants dispute the FTC's characterization of BBFS' oral representations. First, these two telephone conversations are, at best, anecdotal evidence that is of little probative value, standing alone, in determining whether BBFS employees routinely made similar representations to consumers. Defendants flatly dispute that BBFS employees were instructed to make any representations other than those consistent with the website disclosures and similar disclosures found in other materials provided to consumers.[55]

Second, the FTC takes out of context the cited portion of the conversation between the FTC Investigator (calling BBFS as "Jennifer Shaw") and Christina Creel. The FTC alleges that Ms. Creel promised the FTC investigator debts savings of 50% to 70%. However, the FTC failed to point the Court to a significant portion of the transcript where Ms. Creel fully explained the 50% to 70% savings representation:

> Creel:  Do you have any other questions?
> Shaw:   Yes. So, I mean, how much would I be saving using your services?
> Creel:  You would be saving anywhere between 50 and 70%, okay? But normally because I – like I actually came over from Client Services, okay, normally we can settle anywhere between 35 percent –
> Shaw:   Um-hum.
> Creel:  Less than 50.
> Shaw:   Um-hum.
> Creel:  Just about 55 or 60 percent.
> Shaw:   Um-hum.
> Creel:  Okay? I've never really seen anybody settle for 70 percent.[56]

Ms. Creel then went on to explain that in her experience the savings could be more or less than 50 percent.[57]

The FTC also cites the transcript of a conversation with Michael Delcore as evidence that BBFS represented to consumers that BBFS would ensure that creditors would stop calling

---

[54] PX-1, Exh. F.
[55] DSOF, ¶ 10 – 11, 13 – 14, 16.
[56] PX-1, Ex. F (Creel Transcript), p. 15:10 – 15:24.
[57] PX-1, Ex. F (Creel Transcript), p. 16:6 – 16:9.

clients.[58] But Mr. Delcore, despite the rather transparent attempts by the FTC investigator to

lead him to a different answer, informed the investigator that creditors may continue to call, and

that BBFS would help the consumer to try and stop the calls:

>Delcore:  Then we contact your creditors and we let them know you are a client
>          of ours, that you've enrolled in our program --
>Shaw:     Um-hum.
>Delcore:  --and to refer any questions over to us.
>Shaw:     Oh, I see.  So, do you contact the creditors immediately as soon as you
>          receive my first payment and – and then they would not contact me?
>Delcore:  Well, they may contact you, okay?
>Shaw:     Um-hum.
>Delcore:  I can't—I can't promise you that they won't contact you, because they
>          just may, but we can give you the information and provide – to get
>          them to stop calling.[59]

The transcript goes on for several pages with a conversation between Mr. Delcore and the FTC

investigator, and with Mr. Delcore explaining that creditors would likely continue to call and "try

and use strong-arm tactics towards you.  They're going to try and convince you to pay them

because they get a percentage of whatever they collect from you."[60]  The transcript of the

conversation, taken as a whole, demonstrates that BBFS did not make the misrepresentations the

FTC alleges.  There exists a factual dispute between the parties as to the representations made by

BBFS in these transcripts, and this factual dispute should be resolved at trial.

Moreover, the Court should give these transcripts little weight when compared to written

disclosures made to consumers in the BBFS websites and elsewhere.  Courts have held that

documented disclosures carry far greater weight than the unverifiable testimony of a customer

who later claims a contrary oral statement was made.[61]  Therefore, even if verbal statements by

---

[58] PX-1, Exh. E thereto.
[59] PX-1, Ex. F (Delcore Transcript), p. 7:8 – 7:25.
[60] PX-1, Exh. F (Delcore Transcript), p. 8:1 – 8:17.
[61] *See, First Union Discount Brokerage Services v. Milos*, 997 F.2d 835, 846 (11th Cir. 1993) (citing *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1322-23 (7th Cir. 1988) (finding that "a written disclosure trumps an inconsistent oral statement.")).  *See also, Carr v. Cigna Securities, Inc.*, 95 F.3d 544, 547 (7th Cir. 1996) ("If a literate, competent adult is given a document that in readable and comprehensible prose says X (X might be, 'this is

BBFS employees regarding BBFS' services contradicted the written statements in BBFS'

website and other documents regarding the services BBFS offered, the written statements trump

the verbal statements.

### B.    The FTC ignores disclosures made to consumers in other written materials

Not only has the FTC mischaracterized the website and the two telephone conversations

with BBFS employees, it has also ignored two other sources of information provided to

consumers before they made any decision to purchase: a letter sent to prospective clients, and the

contract for services. As described in Defendants' response to the FTC's statement of material

facts, the websites identified by the FTC contain detailed explanations of BBFS' services that go

beyond the two quoted portions of the websites found in the FTC's brief,[62] and consumers were

provided with other information that explained BBFS' services in detail. In determining the "net

impression" of the advertisements and other materials provided to consumers,[63] Courts have

determined that in the context of business opportunity products or services, to which BBFS' debt

settlement services are analogous, both the advertisements and the disclosure documents must be

construed together to evaluate the net impression of the representations to consumers.[64]

Every consumer who enrolled in BBFS' services was required to execute a Contract for

Services before any fees were charged or services provided.[65] The Contracts for Services used

by BBFS, which are attached as Exhibit A to the Declaration of Julie Fabrizio-Colon, contain

numerous disclosures regarding the services provided by BBFS. Among those disclosures,

BBFS informed consumers, and clients agreed, that

---

a risky investment'), and the person who hands it to him tells him, orally, not X ('this is a safe investment'), our literate, competent adult cannot maintain an action for fraud against the issuer of the document.").
[62] FTC Brief, p. 2.
[63] *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1497 (1st Cir.1989)(claims must be evident by looking at the "net impression" of the representations); *Beneficial Corp. v. FTC*, 542 F.2d 611, 617 (3d Cir.1976).
[64] *FTC v. Tashman*, 318 F.3d 1273, 1283 (11th Cir. 2003)(*citing Trans World Accounts, Inc. v. FTC*, 594 F.2d 212, 214 (9th Cir.1979)).
[65] DSOF, ¶ 10 – 11, 13 – 14, 16.

- the client understands that all calculations contained in the Contract are estimates using debt that the client listed at the time of enrollment;

- the client also understands that the length of the client's program is an estimate based on the information provided by the client;

- the client understands that at any time a creditor may refuse the settlement of a debt;

- depending upon individual circumstances, credit can be enhanced, damaged or altered, but in any case such effect is beyond the control and scope of the program;

- the client acknowledges that participation in the BBFS program is voluntary, and made at the sole discretion of the client;

- the client understands that participation in this program will likely have an adverse effect on the client's credit score and some accounts may charge off;

- communications by creditors, collections agencies and/or collection law offices directly with [the client] may continue for the period of time [the client is] enrolled in the program; and,

- BBFS' expressions about the outcome of any matter are at best professional estimates only and are limited by its knowledge of the client's financial circumstances as provided by the client to BBFS.[66]

Many clients also received, prior to enrollment, a Client Briefing Letter that outlined many of these same representations.[67]  These representations and disclosures are ignored by the FTC, but should be considered by the Court in determining what representations were made.  Given the dispute between the parties on this issue, the determination of what representations were actually made should be resolved at trial.

---

[66] DSOF, ¶ 10 – 11, 13 – 14, 16.
[67] DSOF, ¶ 10 – 11, 13 – 14, 16.

**C.    Evidence of substantial performance by BBFS contradicts the FTC's assertion that BBFS made misrepresentations that were likely to mislead consumers**

In determining whether a representation is likely to mislead reasonable customers to their detriment, a court must consider the representation as a whole and focus on the "common-sense net impression" created by the representation.[68]  A representation is likely to deceive reasonable customers to their detriment if the representation is false or is not supported by a reasonable basis.[69]  The test for determining whether a party has a reasonable basis for making a representation is objective; the court must evaluate the substantiality and pertinence of the data, affidavits, and any other source upon which the representation is based.[70]

In this case, the FTC ignores a substantial body of evidence in the form of a computerized database employed by BBFS to track activity on client accounts.[71]  This enormous database shows that 6,859 of BBFS' actively enrolled clients, or greater than 80% of those clients, had debts settled by BBFS.[72]  For these clients, most received debt settlements for 50% (or more) of the outstanding debt balance.[73]  The FTC's only effort to analyze the significant volume of data is to assert that 294 BBFS clients had all of their debts settled.[74]  The FTC offers this purported evidence to show that BBFS has not met its promise of settling all of the debts of

---

[68] *See, Removatron International Corp*, 884 F.2d at 1497 (1st Cir. 1989); *Beneficial Corp.*, 542 F.2d at 617 (3d Cir. 1976), *cert. denied*, 430 U.S. 983 (1977).

[69] *See, Thompson Medical Co., Inc. v. FTC*, 791 F.2d 189, 193 (D.C. Cir. 1986), *cert. denied*, 479 U.S. 1086 (1987); *Sears, Roebuck & Co. v. FTC*, 676 F.2d 385, 394 (9th Cir. 1982).  Both cases were decided prior to the Commission's 1983 Deception Statement, which elevated the showing from "tendency or capacity to deceive" to "likely to deceive," and thus heightening the FTC's burden.

[70] *See Federal Trade Commission v. U.S. Sales Corp.*, 785 F. Supp. 737, 748-750 (N.D. Ill.), *opinion modified*, 1992 WL 104819 (N.D. Ill. 1992). *Accord, World Travel*, at 1029.

[71] DSOF, ¶ 8, 10 – 11, 13 – 14, 16; Decl. of Paul Bartlett, ¶ 17 – 24.  A copy of  BBFS' CreditSoft database was provided to Defendants and to the FTC by CoreFacts, a computer forensics firm that copied the database directly from BBFS' computer server after the imposition of the Receivership.  Declaration of Theodore W. Atkinson, ¶ 2.  It contains over 10,000 separate account records, and each record consists of approximately 4 printable pages of information.  Defendants will certainly make all 40,000 pages available or provide a digital copy of the database and an accompanying computer loaded with the CreditSoft data to the Court at the Court's request.  Atkinson Dec., ¶ 3.

[72] DSOF, ¶ 8, 10 – 11, 13 – 14, 16; Decl. of Paul Bartlett, ¶ 17 – 24.

[73] DSOF, ¶ 8, 10 – 11, 13 – 14, 16; Decl. of Paul Bartlett, ¶ 17 – 24.

[74] Declaration of Peter Dykstra, submitted in support of the FTC's motion for summary judgment.

every client, but Defendants dispute that such a representation was ever made to begin with. Consequently, it only adds to the underlying dispute over the facts, and does not resolve it.[75]

## II.    THERE EXISTS A SUBSTANTIAL FACTUAL DISPUTE AS TO RESTITUTION

Even if the Court were inclined to grant summary judgment on liability (and, as discussed above, there are too many factual disputes to permit granting summary judgment on liability), there remains a significant dispute between the parties as to damages.    The FTC asserts in its brief that the proper measure for restitution is the total amount of consumer payments made to Defendants, less any amounts previously returned to consumers.[76]  In support of the claim that the measure of restitution damages is $11.9 million, the FTC cites the Declaration of Peter Dykstra, and FTC Investigator who provides a "revenue analysis" summary chart, but none of the underlying data supporting that chart.[77]

Courts have usually awarded restitution in the amount equal to total sales, less refunds, but they have done so only where consumers received something entirely different than what was promised (the classic "rhinestone instead of diamond" analogy),[78] or where there was no value or *de minimis* value of the services provided.[79]  However, the FTC is wrong that the Court should

---

[75] Affidavits in support of a motion for summary judgment must be set forth on such facts as would be admissible evidence, Fed. R. Civ. P. 56(e).  Consequently, there is another reason to disregard this purported evidence: it is inadmissible under Federal Rule of Evidence 1006.  Under that rule, in order for summary testimony to be admissible, the underlying documents must be available for the opposing party to review (in order to verify accuracy), they must be too voluminous to submit to the court, and they must be the kinds of documents that would be admissible (i.e. business records). *Mullenix v. Forsyth Dental Infirmary for Children*, 965 F. Supp. 120, 157 (D. Mass., 1996); *Martin v. Funtime, Inc.*, 963 F.2d 110, 116 (6th Cir. 1992); *Mandavilli v. Maldonado*, 38 F. Supp. 2d 180, 190 (D. P.R. 1999).  The Declaration of FTC investigator Peter Dykstra—who reached the 294 figure by conducting an analysis of information contained in tables that were prepared by another FTC investigator, James Whitelaw—is inadmissible as summary testimony under this test.  First, none of the tables generated by Mr. Whitelaw have been provided to Defendants, and thus it is impossible to verify his analysis, let alone Mr. Dykstra's summary.  Second, there has been no showing that the tables generated by Mr. Whitelaw are too voluminous for production to the Court or to Defendants.
[76] FTC Brief, p. 13.
[77] Dykstra Dec., ¶ 7.
[78] *Federal Trade Commission v. Figgie Int', Inc.*, 994 F.2d 595 at 606 (9th Cir. 1993)
[79] *Federal Trade Commission v. Renaissance Fine Arts*, 1995-2 Trade Cas. (CCH) ¶71,086 at 75,194 (N.D. Ohio Aug. 10, 1995)(full restitution ordered where all consumers received counterfeit and not original art); *Figgie Int'l, Inc.*, 994 F.2d at 606 (heat detectors were of no use to consumers and thus restitution of all sales was appropriate);

not consider the value of the services received by BBFS' clients in determining an award of restitution. Courts have taken into consideration that the value of services provided—for example, money earned by consumers in Section 5 business opportunity cases—should be deducted from any restitution amount ordered.[80] Indeed, in a case cited by the FTC in its brief, *Federal Trade Commission v. Amy Travel Service*,[81] the Seventh Circuit found that a marketer of discount travel vouchers had violated Section 5 because the vouchers were deceptive, but nonetheless upheld the district court's decision to reduce the amount of restitution by the number of satisfied consumers:

> The magistrate correctly acknowledged the existence of satisfied customers in computing the amount of defendants' liability—customers who actually took vacation trips were excluded when the magistrate computed the amount of restitution awarded.[82]

This approach, rather than the rigid "all fees" approach the FTC proposes, comports with the notion that the award of restitution under Section 13(b) is an equitable remedy.[83] Equity would not require that Defendants provide restitution of all fees—including, as the FTC requests, settlement fees earned for settling debts—for consumers who received value for their services through a settlement and subsequent reduction of outstanding debts (even if not all debts were ultimately settled). What that amount would be (and the FTC does not say) is open to dispute. Defendants dispute that the appropriate amount of restitution, even in the event liability is found, would approach $11.9 million. Considering the fact that BBFS brought in at least $2.5 million

---

*Federal Trade Commission v. 1263523 Ontario, Inc.*, 205 F.Supp 2d 205, 211 (S.D. N.Y. 2002)(restitution of all charges to consumers appropriate because "no consumer received a credit card or a refund...").

[80] *Federal Trade Commission v. National Business Consultants*, 781 F.Supp. 1136, 1144 (E.D. La. 1991)("Generally, the amount of restitution in FTC consumer redress cases is the purchase price of the relevant product or business opportunity, less any refunds or money earned.")(emphasis added).

[81] 875 F.2d 564 (7th Cir. 1989).

[82] *Amy Travel*, 875 F.2d at 572.

[83] *Figgie Int'l.*, 994 F.2d at 605.

19

between 2002 and 2004 in settlement fees,[84] and considering the administrative and retainer fees charged to obtain those settlements, Defendants assert that the figure would be well below the amount claimed by the FTC.

Finally, as discussed above (page 18, n. 75), Mr. Dykstra provides a "summary" of receipts and other data in calculating the amount of restitution, but does not provide any of the underlying data. Moreover, a number of entries on Mr. Dykstra's table are coded entries that offer descriptions with no explanations (e.g., no effort is made to explain what the terms "CERT" or "MO" or "FEE PAYMENT FOR ACCOUNT#Retainer Fee" or other terms mean). Consequently, the Court should not award millions of dollars in restitution on the basis of a summarization chart that cannot be understood, and without the underlying data to support the summarization.

### Conclusion

On the three central issues to be determined in this case, Defendants have offered sufficient evidence to demonstrate that there is a genuine dispute between the parties regarding numerous material facts. Accordingly, the Court should deny the motion for summary judgment.

Date:   February 11, 2005                  Respectfully submitted,


                                           /s/ **Ian D. Volner**
                                           Ian D. Volner
                                           Theodore W. Atkinson
                                           VENABLE, LLP
                                           575 7th Street, N.W.
                                           Washington, D.C. 20004-1601
                                           Tel.: (202) 344-4000
                                           Fax: (202) 344-8300
                                           e-mail: idvolner@venable.com
                                                   twatkinson@venable.com

                                           Counsel for Defendants

---

[84] Decl. of John Colon, Jr., ¶ 15.