# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

FEDERAL TRADE COMMISSION,    )
    )
           Plaintiff    )
    )
v.    )    **Civil Action No. 04-12326 (WGY)**
    )
BETTER BUDGET FINANCIAL    )
SERVICES, INC., JOHN COLON, JR. and    )
JULIE FABRIZIO-COLON,    )
    )
           Defendants.    )
    )

## DEFENDANTS' RESPONSE TO
## PLAINTIFF'S STATEMENT OF MATERIAL FACTS

Defendants Better Budget Financial Services, Inc. ("BBFS"), John Colon, Jr., and

Julie Fabrizio-Colon submit the following responses to Plaintiff the Federal Trade

Commission's ("FTC") Statement of Material Facts as to which there is No Genuine

Issue. Reference is made to specific paragraphs of Plaintiff's Statement of Facts.

### Statement of Facts ¶ 1

Plaintiff FTC is an independent agency of the United States government created by the FTC Act. 15 U.S.C. § 41 *et seq.* The FTC is charged with enforcement of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair and deceptive acts and practices in or affecting commerce, among other duties. The FTC is authorized by Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), to initiate federal district court proceedings to enjoin violations of the FTC Act in order to obtain consumer redress and to secure such equitable relief as may be appropriate in each case. 15 U.S.C. §§ 53(b).

### Defendants' Response

Defendants agree that there is no dispute that the FTC is an independent agency of

the United States government, and that it is charged with enforcement of the FTC Act.

Much of the remainder FTC's first paragraph constitutes legal conclusion, but Defendants do not dispute the FTC's scope and authority as described in that paragraph.

**Statement of Facts ¶ 2**

Defendant Better Budget Financial Services Inc., ("BBFS") is a Massachusetts corporation that was incorporated on August 21, 2000. (PX-l, Exh. A).

**Defendants' Response**

Defendants do not dispute that BBFS is a Massachusetts corporation incorporated on August 21, 2000, with John Colon, Jr. as its President and a director, and Julie Fabrizio-Colon as Treasurer and a director. Prior to incorporating BBFS, John and Julie Colon worked in the field of debt settlement as collectors for various collection agencies. (Declaration of John Colon ("JC Dec."), ¶ 3; Declaration of Julie Fabrizio-Colon ("JFC Dec.", ¶ 2). While working as debt collectors, they became aware of how unsecured creditors assessed and handled outstanding, unsecured debts, and realized that they could use this experience to negotiate with creditors on behalf of consumers. (JC Dec., ¶ 4; JFC Dec. ¶ 2). With this in mind, the Colons established and incorporated BBFS, investing over $100,000 of their own savings into capitalizing the business. (JC Dec., ¶ 4; JFC Dec., ¶ 2). BBFS was thus established to help consumers who found it difficult or impossible to manage their unsecured debt settle those debts with their creditors. (JC Dec., ¶ 5; Declaration of Paul Bartlett ("Bartlett Dec."), ¶ 3).

**Statement of Facts ¶ 3**

Defendant John Colon, Jr. is the President and a director of BBFS. Colon executed the company's application for membership in the BBB, (PX-l, Exh. H) and is a signatory to at least one corporate bank account. (PX-l, Exh. B).

**Defendants' Response**

Defendants do not dispute this statement of fact.

**Statement of Facts ¶ 4**

Defendant Julie Fabrizio-Colon is the wife of defendant John Colon, Jr. and serves as the Treasurer, Clerk and a director of BBFS. Fabrizio-Colon is also a signatory to at least one corporate bank account (PX-l, Exh. B). Fabrizio-Colon has also responded to consumer complaints filed against BBFS with the BBB and the office of the Massachusetts Attorney General. (PX-l, Exh. H).

**Defendants' Response**

Defendants do not dispute the statement of fact.

**Statement of Facts ¶ 5**

In May 2004, BBFS' s membership in the Boston Better Business Bureau was revoked due to the numerous complaints received by the Better Business Bureau against BBFS about their failure to provide promised services to consumers. (PX-1, Exh. H).

**Defendants' Response**

Defendants dispute this assertion.  In late 2003, the Better Business Bureau ("BBB") informed BBFS that it had received complaints from consumers that they had not received services contracted for and that BBFS had not contacted "or paid creditors" as promised.  (JFC Dec., ¶ 9).  At a hearing before the BBB on April 28, 2004, it became clear to BBFS that the BBB was under the mistaken impression that BBFS offered credit counseling services, and not debt negotiation services, and that BBFS made payments to creditors on behalf of consumers.  (JFC, ¶ 9; Deposition of John Colon ("JC Dep."), 219:9 – 221:5).  As explained on BBFS' website, BBFS' debt negotiation services were different from credit counseling because credit counseling services negotiate a periodic payment to creditors, rather than a settlement of the entire outstanding debt owed to each creditor.  (JFC Dec., ¶ 9).  As the FTC is aware from its deposition of John Colon, Jr., Defendants dispute that its termination from the BBB arose from anything other than the BBB's fundamental misunderstanding of BBFS' services as a debt settlement company, and not because BBFS failed to perform under the terms of its contract for services with consumers.  (JC Dep., 219:9 – 221:5).

**Statement of Facts ¶ 6**

In May 2004, defendants John Colon and Julie Fabrizio-Colon incorporated Debt Management Solutions ("DMS") in the state of Massachusetts. DMS marketed and sold the same debt settlement services as BBFS. (Kapadia Dec.-II, Exh; Deposition Transcript of John Colon, dated December 29, 2004 ("Colon Tr."), pp 72:8-73:17 and 78:5-17).

**Defendants' Response**

Defendants agree that DMS was incorporated in Massachusetts in May 2004, but

dispute that DMS marketed and sold the same settlement services as BBFS. As described

by John Colon, Jr. during his deposition, BBFS had been contacted by two other debt

settlement companies and negotiations began between BBFS and those companies for an

arrangement whereby BBFS would provide "back end" services for those companies.

Those "back end" services were limited to customer service and negotiating settlement on

behalf of those companies, but did not include client enrollment. (JC Dep., 72:8-73:17).

DMS was established to take over the client enrollment services for BBFS, and at the

time of its incorporation, BBFS stopped enrolling clients. (JC Dep., 72:8 – 73:17).

Therefore, beginning in May 2004, BBFS and DMS engaged in different business

operations.

**Statement of Facts ¶ 7**

Defendants marketed their services nationwide on two Internet websites, through Internet advertising, in Pennysaver type newspapers and through telemarketing. (Colon Tr. p. 196:6- 197:5 and Deposition Transcript of Julie Fabrizio-Colon, dated December 30, 2004 ("Fabrizio-Colon Tr."), p. 28:3-7).

**Defendants' Response**

Defendants actually marketed their services through the internet, and they placed

a small number of ads in local "penny saver" and other publications. (JFC Dec., ¶ 3).

Defendants dispute that they engaged in any unsolicited "telemarketing" services. A

small part of BBFS' client base came from the purchase of leads from third party brokers.

(JC Dec., ¶ 6). The leads consisted of the names and addresses of consumers who had

made specific inquiries regarding debt settlement or credit counseling services over the

internet. (JC Dec., ¶ 6). The lead broker would contact the consumer lead and inform

them that BBFS would contact them within 24 to 48 hours. (JC Dep. 196:6 – 197:5).

BBFS would then follow up on the inquiry by contacting the consumer. (JC Dec., ¶ 6).

## Statement of Facts ¶ 8

Defendants' debt settlement program purported to help consumers "eliminate
anywhere between 50 and 70 percent" (PX-l, Exh.. E, p. 6) of the consumers' debts
through "creditor negotiation," (PX-l, Exh.. C) in exchange for the payment of various
fees from the consumers.

## Defendants' Response

Defendants first note that the statement quoted above does not appear in the

transcript cited by the FTC, but instead appears in PX-1, Exhibit F, at p. 6. In support of

this purportedly undisputed statement of fact, the FTC relies solely on the transcript of a

telephone conversation between an FTC investigator, posing as a consumer, and

Christina Creel, a former BBFS employee who was employed as a debt counselor. (PX-

1, Exh. F). Defendants dispute the FTC's characterization of BBFS' representations to

consumers.

First, the FTC takes out of context the cited portion of the conversation between

the FTC Investigator (calling BBFS as "Jennifer Shaw") and Christina Creel. The FTC

failed to point the Court to a significant portion of the transcript where Ms. Creel fully

explained the 50% to 70% savings representation:

> Creel: Do you have any other questions?
> Shaw: Yes. So, I mean, how much would I be saving using your
>          services?

> Creel:  You would be saving anywhere between 50 and 70%, okay?  But normally because I – like I actually came over from Client Services, okay, normally we can settle anywhere between 35 percent –
> Shaw:  Um-hum.
> Creel:  Less than 50.
> Shaw:  Um-hum.
> Creel:  Just about 55 or 60 percent.
> Shaw:  Um-hum.
> Creel:  Okay?  I've never really seen anybody settle for 70 percent.

(PX-1, Ex. F, p. 15:10 – 15:24).  Ms. Creel then went on to explain that in her experience the savings could be more or less than 50 percent.  (*Id.*, p. 16:6 – 16:9).[1]

Second, the FTC's characterization ignores numerous statements made in BBFS' advertisements and other materials provided to consumers that the savings amount was an estimate, and was based on average results.  On almost every page of the BBFS website, the statement "Save 50%* on your unsecured debt" is followed by the statement "* Based on the average negotiated settlements experienced by Better Budget's clients.  Individual results may vary." (PX-1, Exh. C).  Consumers were also informed by a pre-enrollment letter that settlements may range from 20% of the outstanding debt to more than 50%, but that it depended on the circumstances.  (JC Dec., ¶ 12).

Third, BBFS made regular efforts to ensure that its website advertising was accurate by determining the average settlement amount for clients on debts settled.  (JC Dec., ¶ 15).  The advertised average was based upon reviews of the client account data in BBFS' computerized client account database, CreditSoft.  (JC Dec., ¶ 15).  Mr. Colon regularly reviewed estimates of client savings through settlement.  (JC Dep.,  51:24 –

---

[1] In its brief (but not in its statement of facts), the FTC also offers the declarations of Janice Hoffman (PX-6, ¶ 4) as evidence that BBFS' website promised that consumers could "save up to 70% with our debt reduction program," but the website printouts submitted as Exhibit PX-1 C contains no such quoted language.

54:11). He did this primarily to determine how much in settlement fees BBFS could

expect to receive based on negotiated settlements, but he also used that information for

marketing purposes. (JC Dep., 54:12 – 56:11).

Evidence at trial will show that the data found in CreditSoft supports Mr. Colon's

testimony. Specifically, that data demonstrates that on average, 61% of BBFS clients

obtained settlements for 50% or greater over the original amount of those debts. (Bartlett

Dec., ¶ 24).

### Statement of Facts ¶ 9

Defendants claimed that they had good relationships with many creditors which is
why their negotiations are successful. (Colon Tr. pp. 93:25-94: 10). However, at least one
major creditor, CitiCards (a subsidiary of Citibank) has a policy of refusing to work with
debt settlement companies like BBFS. CitiCards maintains a policy of immediately
referring to collection any account where a debt settlement company is involved.
CitiCards does this because it wants to ensure that it collects all monies owed to it rather
than settling for the lesser amount that a debt settlement will bring.( PX-2, ¶ 7).

### Defendants' Response

Contrary to the assertion by the Federal Trade Commission, one of the creditors

that BBFS worked with to settle debts was Citigroup and its credit card issuing affiliates

(collectively "Citibank"). Defendants dispute the assertion of the Federal Trade

Commission's Statement of Facts that CitiCards (a subsidiary of Citibank) refused to

work with debt settlement companies like BBFS. Evidence presented at trial will show

that BBFS negotiated numerous Citibank debts for clients, and that there were at least

200 settlements with Citibank between 2001 and 2004. (Bartlett Dec., ¶ 16).

### Statement of Facts ¶¶ 10 – 11, 13 – 14, 16

10.    In exchange for their services, defendants required consumers to pay: 1) a
retainer fee that ranged from hundreds to thousands of dollars, 2) a monthly
administrative fee, and 3) 25% of any savings realized in a settlement with a creditor.
(PX-1, Exh. E).

11.    In numerous instances, defendants promised consumers that, in exchange for these fees: defendants would contact all of a consumers' creditors to stop them from making harassing debt collection calls; would negotiate and settle with each of a consumer's creditors when the consumer had accumulated one-half of the amount owed to the creditor; and actions taken by defendants on consumers' behalf would enable them to pay off all of their unsecured debts for a reduced amount. (PX -1, Exh. E.).

13.    Defendants instructed consumers to stop paying their creditors so that their accounts could become delinquent since creditors would generally only negotiate on delinquent accounts. (PX-1, Exh.. F, p. 9). Defendants instructed consumers to open a bank account ("BBFS account") in which they would save a specific sum of money monthly and this money would be used to pay Defendants' administrative fee and any settlements negotiated with creditors. (PX-3, ¶ 7).

14.    Defendants also instructed consumers to sign power of attorney forms that defendants represented would enable defendants to contact all of the consumers creditors and inform them that defendants represent the consumer and that the creditors and debt collectors should cease all contact with the consumer. (PX-3, ¶¶ 6 and 8). Defendants informed consumers that this practice would stop creditors from contacting them. (Alajoki Dec. ¶ 9 and Starksspear Dec. ¶¶ 7-8). Defendants instructed consumers to refuse to speak with any creditors who might contact them.

16.    Defendants represented to consumers, expressly or by implication, that actions taken by defendants would enable consumers to pay off all of their unsecured debts for a reduced amount. (PX-3, ¶7; PX-4, ¶12).

**Defendants' Response**

In paragraphs 10-11, 13-14, 16 of its Statement of Undisputed Facts, the FTC

makes various characterizations of BBFS' business practices and representations to

consumers that Defendants dispute.  As described below, given the complex nature of the

service offered, BBFS made significant efforts to fully apprise consumers of the services

offered by BBFS, and described what BBFS would attempt to accomplish, and what

services it would not perform.  Additionally, the FTC has mischaracterized or failed to

accurately describe BBFS' business practices and efforts made by BBFS with regard to

consumers.

## I.    *BBFS' Websites*

The websites operated by BBFS, and which were produced by the Federal Trade Commission in this case, provided consumers with a description of BBFS' services, the benefits offered, answers to questions the consumer may have, and various statements outlining what BBFS could and could not do for the consumer.  (PX-1, Exhibit C; JC Dec., ¶ 7-9).  Statements on the website include the following:

- "Save 50%* on your unsecured debt (* Based on average negotiated settlements experienced by Better Budget's clients.  Individual results may vary)."
- "We manage your outstanding debt for your interests and obtain the best settlement for you, typically reducing your debt 30 – 50%, and typically saving you hundreds of dollars."
- "We work out a monthly amount that each client can afford to pay.  The amount is deposited in your program bank account.  This account can either be a savings or a checking account."
- "When the client has accumulated enough money to cover the settlement and our fee, we contact one of the creditors and make them an offer.  Offers are submitted until the client and the creditor both agree on the amount.  We then get written or electronic approval on the total settlement (including fees).  Once this settlement is paid, the client will [draw down the] accumulation of funds in their program account and the process will repeat as money becomes available for the next settlement.  We continue in this way until all of the accounts are settled.  It is important to note that we do not make any monthly payments to the creditors."
- "**Will the creditors start calling and harassing me?**  Yes.  As accounts go delinquent, especially in the beginning, clients will get creditor calls.  However, we have developed [tools] that our clients can use that are effective in minimizing and often eliminating telephone calls from creditors."
- "When a payment to a creditor is missed or late, there can be negative consequences to your credit score."
- "**What happens to my credit?**  …At the end of our program your debt to income ratio will be greatly improved and you will once again be able to build credit.  It is important to understand that there may be adverse effects to your credit.  Late payment or delinquent account information can appear on a credit report for up to seven years."

(PX-1, Exhibit C).

## II.    *Client Contact and Enrollment*

In performing debt negotiation and settlement services for clients, BBFS followed a standard operating procedure. (Bartlett Dec., ¶ 4). Generally, consumers who contacted BBFS and were interested in debt negotiation and settlement services were put in contact with a debt counselor. (Bartlett Dec., ¶ 5). Typically, the first step in each case was a discussion between a potential client and a debt counselor to determine the potential client's debt status, to identify the potential client's creditors, and to calculate, based on income and other factors, how much a potential client could save towards paying off a possible settlement. (Bartlett Dec. ¶ 5). This information was normally written down on a worksheet by the debt counselor. (Bartlett Dec., ¶ 5).

Potential clients were then told by debt counselors that they would need to establish a separate bank account, and that a monthly amount (calculated by BBFS and agreed to by the potential client) would need to be set aside by the potential client and saved in that account. (Bartlett Dec., ¶ 6). Potential clients were also told that they would be required to pay (1) a retainer fee equal to one month of the amount to be set aside by the potential client; (2) a monthly administrative fee, which was $29.95, $39.95, and most recently, $19.95; and (3) in the event of a settlement, a settlement fee equal to 25% of the savings realized through settlement. (Bartlett Dec., ¶ 6).

Debt counselors were also trained to answer any initial questions consumers may have had. (Bartlett Dec., ¶ 14; JC Dec., ¶ 10). In 2004, client service representatives and debt counselors were provided with a written list of talking points to help answer frequently asked questions. (Bartlett Dec, ¶ 14; JC Dec., ¶ 10). Among the written talking points, debt counselors (and client service representatives, who communicated with clients after they had enrolled and their accounts were established) were provided with the following:

- "I know that as long as you qualify for the program, we can save you between

30 – 50% on these balances."

- "**What happens to my credit?** …While you are enrolled in our program, your credit will be affected to the point where you will not be able to obtain any more unsecured credit."

- "**What happens to my accounts when they are in your program?**   Once enrolled, our client services department will notify all of your creditors and let them know that you are a client and that we are handling your financial situation.  They will also request that the creditor close the account.  Your creditors in most cases will cease all phone calls; however there are some that will continue to call you, in which at that point you would send them a simple letter we would provide you."

- "**Exactly how does your program work?**  Once enrolled, we have you establish a bank account just for the program, and every month you deposit your program payment into that account.  We monitor that account until there is enough money to settle one of your creditors and pay our settlement fee.  At that point, someone from our client services department will notify you by mail and telephone to make sure that you are aware of the settlement, and also to make sure that you have a copy of the settlement letter from the bank for your records.  We will then have you send a check to our office to pay the creditors and our settlement fee.  The process will happen all over again until finally all of your accounts are settled in full."

- "**Will my creditors call me?** You may get calls from creditors, but everyone's situation is different.  Some clients that are enrolled don't receive any calls, some receive calls every month.  It is more reliant on which person at the bank is handling your account."

(Bartlett Dec., ¶ 14).  Debt counselors and client services representatives were also trained how to respond to consumer inquiries, and what information to provide consumers.  (JC Dec., ¶ 10).

If a potential client agreed to proceed with enrollment, an application packet was then sent to the potential client.  (Bartlett Dec. ¶ 7; JFC Dec., ¶ 3).  The application contained (1) a contract for services that the potential client was required to review and sign; (2) a copy of any worksheet identifying the potential client's creditors and the estimated amount to be saved; (3) an ACH authorization form to be completed by the potential client; and (4) a power of attorney to be completed by the potential client.  (Bartlett Dec., ¶ 7; JFC Dec. ¶ 3).  Beginning in 2004, the enrollment packet also

contained a letter detailing BBFS' services. (JFC Dec. ¶ 3; JC Dec., ¶ 12). Before consumers were charged a retainer fee, they were required to complete and return the documents contained in the enrollment package. (JFC Dec., ¶ 3).

### 1.    The Client Briefing Letter

Beginning in February 2004, the application packet also contained a multi-page Client Briefing Letter that again described BBFS' services in detail. (JC Dec., ¶ 12). The letter instructed each potential client to read the letter carefully because those instructions were critical to the success of the client's program. (JC Dec., ¶ 12). The letter provided the potential client with an overview of BBFS' services, and raised a number of important points. Specifically, the letter informed potential clients that

> "[BBFS] will contact your creditors to inform them that you should have enrolled in our program and that all further communications should be directed to our office. Your creditors will usually attempt to apply their routine collection tactics to pressure you into sending them money."

(JC Dec., ¶ 12). The letter described in detail the several steps BBFS would take to "help reduce or eliminate" such calls. (JC Dec., ¶ 12). Additionally, the letter warned potential clients that they may receive calls from creditors denying that they had received a "proposal" from BBFS, but that by "proposal," creditors meant an offer to pay in full. (JC Dec., ¶ 12). BBFS was aware that creditors may try to falsely convince clients that they had not heard from BBFS in an effort to collect the full amount, and advised clients in advance that such claims were not accurate. (JC Dec. ¶ 12).

The letter also informed the potential client that negotiations with creditors would begin after the client had accumulated the money in their account to make a reasonable settlement offer (usually 50%) to one or more creditors, and that for the average BBFS client, such negotiations would not begin until three to six months had elapsed. (JC Dec.,

¶ 12). The letter apprised clients that settlements may range from 20% of the outstanding debt to more than 50%, but that it depended on the circumstances. (JC Dec. ¶ 12).

Finally, the letter also informed the potential client that most of the accounts placed with BBFS would "charge off," meaning that the creditor would write it off as a bad debt and report it to credit reporting agencies as such. (JC Dec., ¶ 12). BBFS informed potential clients that even though an account had "charged off," it does not mean that the creditor would stop trying to collect on the debt. (JC Dec., ¶ 12). Finally, the letter also informed the potential client that creditors have the legal right to continue accruing interest, late fees, and over-limit penalties while the potential client's debts are with BBFS. (JC Dec., ¶ 12). The letter went on to explain, however, that these fees usually stopped at the point of charge-off, and that by continuing in the program, the potential client would likely be in a better financial situation after the debts were settled. (JC Dec., ¶ 12).

### 2.    The Contract for Services

BBFS used two different contracts for services at different times in the life of the company, but each contract sent to a consumer (the "Contract") provided that the client would establish a separate bank account and would authorize BBFS to directly withdraw the agreed-to fees from that account. (JFC, ¶ 4). Regarding those fees, the Contract provided that (1) the client's first monthly payment is made to BBFS as a retainer fee to enter the program, and was non-refundable; (2) BBFS is entitled to a fee in an amount equal to 25% of the difference between the creditors claim amount and the amount BBFS negotiated as settlement with the creditors to accept as final payment; and (3) the client agrees to pay $29.95 (or, later, $39.95) per month as an administrative fee to be drawn

directly from the account established by the client.  (JFC Dec., ¶ 4).

The Contract also contained the following terms and conditions:

- "**Services Not Provided by BBFS:**  Client understands that BBFS does not make monthly payments to Client's creditors.  Monies paid directly to BBFS are for BBFS fees only and not for payment of the Client's debts....By entering into this Agreement, Client acknowledges that BBFS has not advised Client to stop or reduce payments to existing creditors."  (JFC Dec., ¶ 5).

- "**Individual Results May Vary:**  Client understands that all calculations contained in this Agreement are estimates using debt the Client listed at the time of enrollment.  Client also understands that the length of the Client's program is an estimate based on the information provided by the Client....The Client understands that at any time a creditor may refuse the settlement of a debt.  In this case, BBFS will negotiate, to the best of its abilities, a hardship payment plan that is within your budget."  (JFC Dec., ¶ 5).

- "**Creditor Action and Creditor Disclaimer:**  It is understood that no representation about any aspect of your credit rating can or will be made by BBFS.  Depending upon individual circumstances, credit can be enhanced, damaged or altered, but in any case such effect is beyond the control and scope of the program.  Client acknowledges that participation in the BBFS program is voluntary, and made at the sole discretion of the Client.  Additionally, Client understands that participation in this program will likely have an adverse effect on Client's credit score and some accounts may charge off."  (JFC Dec., ¶ 5).

- "It is also understood that BBFS will use its best efforts to minimize creditor communications directly with you....It is understood that communications by creditors, collections agencies and/or collection law offices directly with you may continue for the period of time you are enrolled in the program."  (JFC, ¶ 5).

- "**Customer Satisfaction Guarantee:**  At any time during the term of the program, Client may cancel this agreement without penalty and without further obligation for administrative fees.  Except as provided herein, BBFS makes no guarantees, representations, warranties, or predictions as to the outcome of its services.  BBFS's expressions about the outcome of any matter are at best professional estimates only and are limited by its knowledge of Client's financial circumstances as provided by Client to BBFS."  (JFC Dec., ¶ 5).

In the most recent version of the Contract, used in 2004, the client was required to initial

each provision.  (JFC Dec., ¶ 6).  The earlier version of the Contract contained the same,

or virtually the same, terms and conditions.  (JFC Dec., ¶ 6).

### 3.    The Limited Power of Attorney

The client was also required to complete a Limited Power of Attorney and return

it to BBFS.  Through it, clients authorized that

> "**all** necessary communications, correspondence, and negotiations
> regarding my account(s) be conducted by Better Budget Financial
> Services, Inc. (BBFS).  I instruct you to close any open accounts and
> suspend any privileges that go along with them.  Any and all
> communications directed to me will be referred to BBFS, and only they
> will be authorized to deal with your company and or your company
> representatives."

(JFC Dec., ¶ 7).  The Limited Power of Attorney also directed consumers to direct any

collections communications to BBFS so that BBFS could handle those communications

directly.  (JFC Dec., ¶ 7).

## III.    *Establishment of and Monitoring Client Accounts*

### A.    Creation of CreditSoft Account and Arranging Payment

From 2000 to approximately May 2004, BBFS used a client management

software program called Collect to maintain records for each individual client.  In or

around May 2004, that data was then transferred to a software program called CreditSoft.

(Bartlett Dec., ¶ 8).  Consequently, once BBFS received a completed application packet

from a potential client, an account was set up for the client in CreditSoft, and information

about the client's account was inputted into that database.  (Bartlett Dec., ¶ 8).

Specifically, the Administrative Department at BBFS scanned the entire client

application package into the client's CreditSoft record and entered other information into

the account, including: the client's contact information and creditor information, which

included the creditor, credit card account balances, and credit card account numbers.

(Bartlett Dec., ¶ 9). BBFS would then implement the ACH authorization so that the agreed-to retainer fee could be withdrawn from the client's bank account, and in the first month of the enrollment, the retainer fee was withdrawn from the client's bank account. Subsequently, the agreed-to monthly administrative fee would be withdrawn. (Bartlett Dec., ¶ 9). Once enrolled, the client was then expected to deposit the agreed-to monthly amount in the client's bank account. (Bartlett Dec., ¶ 11). At no time did BBFS ever hold any of the settlement monies in trust for any client. (Bartlett Dec., ¶ 11).

**B.    Negotiations with Creditors**

As was standard procedure, once the account was established, BBFS would then fax or send to each of the enrolled client's identified creditors the completed power of attorney. (Bartlett Dec., ¶ 10). The client's power of attorney forms were scanned and appended to the client's CreditSoft record as well. (Bartlett Dec., ¶ 10).

It was the responsibility of the BBFS' Settlement Department to negotiate settlements with creditors. (Bartlett Dec., ¶ 12). There were approximately eight employees in this department who were supervised by the Settlement Department Manager. (Bartlett Dec., ¶ 12). Paul Bartlett, a manager at BBFS, supervised the Settlement Department Manager and with the Settlement Department Manager, Mr. Bartlett closely tracked active client accounts to ensure that those accounts that were ready to be settled were settled. (Bartlett Dec., ¶ 12). BBFS typically ran reports on the active accounts, and Mr. Bartlett and the Settlement Department Supervisor routinely asked representatives in the Client Services Department to check the status of those accounts. (Bartlett Dec., ¶ 12). The Settlement Department Manager also kept detailed

paper records on settlements that were due to be negotiated with creditors. (Bartlett Dec., ¶ 12).

Negotiations with creditors were conducted by the various client service representatives employed by BBFS who reported to the Settlement Department Manager and to Mr. Bartlett. (JC Dec., ¶ 13). After the power of attorney was faxed to a creditor, and after each client informed BBFS that the client had saved approximately 50% of the outstanding debt for that creditor, a client service representative would then contact the creditor in writing or by telephone to negotiate settlement. (JC Dec., ¶ 13). BBFS developed and maintained a system of recording communications with creditors through the entry of client service representative notes in CreditSoft, and by scanning and appending to CreditSoft copies of written communications with creditors. (JC Dec., ¶ 13).

Over the course of BBFS' operations, BBFS' client service representatives developed and maintained good relationships with a number of major creditors, with contacts ranging from the first line of collectors for those creditors to executives who supervised or oversaw collections departments. (JC Dec., ¶ 14).

**Statement of Facts ¶ 12**

Based on these material claims, consumers were induced to purchase defendants' services.

**Defendants' Response**

Defendants dispute that the "material claims" as asserted by the FTC were, in fact, made to consumers. *See* Defendants' Response to Statement of Facts, ¶¶ 10-11, 13-14, 16. Defendants otherwise dispute that this is an undisputed statement of "fact." Instead, it is a contested conclusion of law.

**Statement of Facts ¶ 18**

In numerous instances, the actions taken by defendants did not enable consumers to pay off all of their unsecured debts for a reduced amount, as claimed. Defendants claim to have no idea of the number of consumers that have successfully completed the program, (Colon Tr. p. 92: 1), but admit that typically consumers who enrolled in their program did not have all of their accounts settled by defendants. (Colon Tr. p. 216:17-19).

**Defendants' Response**

The FTC cites testimony by John Colon, Jr. at page 216 of his deposition transcript for the admission that "typically consumers who enrolled in their program did not have all of their debts settled." The cited testimony contains no such admission. The cited testimony shows only that Mr. Colon was asked what BBFS' success rate was (to which he testified that 60% to 80% of BBFS clients had debts settled), and that he did not know, at the time of his deposition, how many clients successfully completed the BBFS program. (JC Dep., 216: 1 – 216:24). The FTC simply mischaracterizes his testimony.

Moreover, Defendants dispute that it did not or could not perform the services contracted for, and did not or could not provide the services advertised to consumers. Defendants dispute that BBFS promised consumers that it would settle every debt presented to BBFS. (*See See* Defendants' Response to Statement of Facts, ¶¶ 10-11, 13-14, 16).

**Statement of Facts ¶ 19**

Defendants often settled some consumer accounts but not others. (PX-4, ¶ 7; PX-6, ¶ 8; PX-I0, ¶ 10; PX-16, ¶ 11), while some consumers saw none of their accounts settled. (PX-5, ¶ 10; PX-8, ¶¶ 13-14; PX-9, ¶ 8).

**Defendants' Response**

BBFS agrees with the broad, general statement that BBFS settled "some" consumer accounts, but "not others." But BBFS disputes the FTC's inference from those broad statements that BBFS typically failed to perform the services it offered to and contracted to provide to consumers. The evidence at trial will show that BBFS contacted creditors and negotiated debt settlements for the vast majority of its consumers, and that most of the settlements were 50% of the outstanding debt total or higher. (Bartlett Dec., ¶ 24).

**Statement of Facts ¶ 20**

Defendants' records show that consumers typically do not remain enrolled in defendants' program for more than seven months after they begin the program. Declaration of Peter Dykstra, dated January 25, 2005, ("Dykstra Dec."), Exh. A). After that time, there is a steady decline in the number of consumers who remain enrolled. (Dykstra Dec., Exh. A). Of the 9981 customers who have been enrolled in defendants' program, only 224 are identified in defendants' records as having had all of their debts settled and having completed the program. (Dykstra Dec., Exh. B).

**Defendants' Response**

To support this statement, the FTC presents the Declaration of Peter Dykstra, who was not identified as a potential witness or otherwise in response to Defendants' First Set of Interrogatories. Instead, the FTC identified "IT expert" James Whitelaw as a potential witness. Mr. Dykstra purports to base his analysis and opinions on tables prepared by James Whitelaw, which were purportedly created by running Microsoft SQL searches of Mr. Whitelaw's own design. The tables upon which Mr. Dykstra bases his analysis and opinions were never provided to Defendants, either in discovery (even though requested)

or in the FTC's motion for summary judgment. Consequently, it is impossible at this time to determine if Mr. Dykstra's analysis and opinions—which have never before been disclosed to Defendants—are correct.

## Statement of Facts ¶ 21 - 23

21.    Consumers contacted defendants daily with complaints about their failure to provide promised services. (Kapadia Dec-II Exh. E). Defendants recorded these complaints on a form called a "Complaint Follow-Up Form" which was "used for the client service representatives in which they speak to a client who is upset with our service or is upset with any issues regarding our service." (Colon Tr. p. 203:16-23).

22.    Defendants' complaint follow-up form captured the following specific complaints: 1) Creditors calling, 2) Received summons/arbitration, 3) Unreturned phone calls, 4) Credit issue, 5) has funds/requesting settlement, 6) Not understanding our fees (retainer, admin, settlements), 7) does not understand the program, felt they were mislead, 8) Administration fee issue and 9) Other. (Kapadia Dec-II, Exh. ). This form captured the most common complaints made about the defendants' services. (Fabrizio-Colon Tr. p. 80:5-12).

23.    The purpose of defendants' complaint follow-up form was "to eliminate complaints" (Colon Tr. p. 217:3-9) and keep customers from leaving program. Defendants provided various monetary incentives to their customer representatives to retain customers who wanted to leave the program because they were dissatisfied with defendants' services. (Colon Tr. p. 214:3-19 and Fabrizo-Colon Tr. P. 85:12-86:87:4).

## Defendants' Response

Defendants dispute the assertion that consumers were complaining to BBFS "daily," and dispute the assertion that the limited number of "Complaint Follow Up Forms" cited by the FTC constitutes evidence of daily consumer complaints, or that in every case the consumer called with a complaint.

First, the 30 forms produced by the FTC cover the month of October 2004. This does not establish the FTC's assertion that consumers called daily. More importantly, most of those forms reflect that clients called BBFS without complaints, but to inform

BBFS of creditor calls, as BBFS asked clients to do, and to inform BBFS that they had saved the agreed-to amount for negotiation.

Although the Complaint Follow Up Forms cited by the FTC generally were used to record complaints consumers had with BBFS' service, they were also routinely used by client service representatives to record the subject matter of regular communications from consumers. (JC Dec., ¶ 16). For example, the form had a place where the client service representative could check "Has funds/requesting settlement" if a client called to inform BBFS that the client had saved the agreed-to amount in his or her personal account. (JC Dec., ¶ 16). There was also a place to check if a client had called to inform BBFS that it had received a call from a creditor, just as BBFS asked clients to do. (JC Dec., ¶ 16). The form also had a place for noting that a client had called and informed BBFS that it had received a summons, just as BBFS asked clients to do. (JC Dec., ¶ 16). Significantly, there was a check-box labeled "Does not understand the program/felt they were mislead." (Kapadia Dec. II, Exh. E thereto). None of the Complaint Follow Up Forms produced by the FTC, however, shows that any client called with that concern. (Kapadia Dec. II, Exh. E). Defendants therefore dispute that these forms show a "daily" litany of complaints from consumers, or that these forms demonstrate that assertion. To the contrary, BBFS received few complaints when compared to its overall client base, and is aware of fewer than 1% of all BBFS clients ever complaining to BBFS about its service. (JC Dec., ¶ 17; JFC Dec., ¶ 8).

Second, Defendants dispute the FTC's assertion that "Defendants provided various monetary incentives to their customer representatives to retain customers who wanted to leave the program because they were dissatisfied with defendants' services."

(FTC Statement of Facts, ¶ 23). The inference suggested by the FTC is that BBFS

rewarded employees for keeping clients enrolled who did not want to stay enrolled.

Defendants dispute this alleged fact. First, the incentive program used by BBFS was

instituted less than a year prior to the business being shut down on November 3, 2004.

(JC Dep., 215:2 – 215:12). Second, under the program employees were rewarded with

points "to keep our customers happy and keep them enrolled in the program." (JC Dep.,

214:6 – 214:13). This system was designed by employee Kristin Gecoy, a client

representative supervisor, to ensure that BBFS did "anything necessary to make that

client happy, if it meant refunding them administration fees or if it meant refunding them

a settlement fee or if it meant having them voluntarily disenroll from the program.

Ultimately, she was responsible for making sure that our client base was kept at the best

in terms of standards with quality assurance." (JC Dep., 22:23 – 24:19; 214:8 – 214:13).

### Statement of Facts ¶ 24

Defendants represented to consumers that they would settle each creditor's
account once the consumer had accumulated one-half of the amount owed to that
creditor. (PX-l, Exh. F, p. 13; PX-8 ¶7; PX-13, ¶6; Starksspear Dec. ¶6; Alajoki Dec. ¶6).
However, defendants in numerous instances did not settle consumers' accounts as
promised. (PX-15, ¶7 and PX-3 at ¶13; Starksspear Dec. ¶ 11; Alajoki Dec., ¶¶ 10 and
12; Kapadia Dec II, Exh. C). In fact, consumers typically were forced to call defendants
to inform them that they had accumulated one-half of the amount owed, and thus have
available funds for settling the account, and in numerous instances the defendants did not
settle these accounts after this one-half amount had been accumulated by the consumer.
(PX-5, ¶ 10; PX-8, ¶ 10; PX-15, ¶ 7).

### Defendants' Response

*See* Defendants' Response to Statement of Facts, ¶¶ 10 - 11, 13 -14, 16.

### Statement of Facts ¶ 25

Defendants represented that they would contact all of a consumer's unsecured
creditors to ensure that creditors do not call or harass consumers about their payments

that may be overdue. (PX-11, ¶11; PX-12, ¶¶ 7-9 and PX-13, ¶ 8; Alajoki ¶ 5; Starksspear ¶ 7 and Kapadia Dec.-II, Exh. C). However, consumers continued to receive harassing calls from their creditors despite defendants' promises, even though consumers had been enrolled in the program for many months. (PX-14, ¶ 9, PX-3, ¶¶ 9-12; Alajoki Dec. ¶ 9; and Starksspear Dec. ¶ 8).

**Defendants' Response**

     *See* Defendants' Response to Statement of Facts, ¶¶ 10 - 11, 13 -14, 16.

Moreover, one of the cited sources of evidence for this claim, the second Declaration

from Cindy Kapadia, purports to analyze 79 consumer complaints submitted to the FTC's

Consumer Sentinel system.  (Second Kapadia Dec., Exhibit C).  None of these records

were provided as part of the FTC's motion, and it is impossible to determine whether this

information supports the FTC's assertion.

**Statement of Facts ¶ 26**

     Moreover, the defendants were aware that it was unlikely that they could stop all creditors from calling consumers, because many "bill collectors tell consumers that they have not heard from a third party simply because bill collectors work on a commission basis; and if they obeyed the [FDCPA], they would not be allowed to contact our clients." (Colon Tr. p. 221:14-20). Further, "...the creditor would let a client know or the creditor would tell a client in most of these cases that they have not heard from Better Budget when, in fact, we know that the bill collector 90 percent of the time ripped up the power of attorney and said to the consumer we haven't heard from Better Budget. They lie, they rip up power of attorneys. They do anything they can to collect debt. And I know I ripped up power of attorneys as a collector." (Colon Tr. pp. 221:25-222:11 and Fabrizio-Colon Tr. pp. 65:16 - 66:9).

**Defendants' Response**

     Defendants dispute that BBFS ever represented to consumers that it would stop all

creditor calls, either in its website, in other materials provided to consumers, or in either

of the two telephone transcripts cited by the FTC.  Defendants informed consumers that

creditors would continue to call, but that there were steps BBFS and clients could take to

help reduce or eliminate creditor calls.  (*See* Defendants' Response to Statement of Facts,

¶¶ 10 - 11, 13 -14, 16; PX-1, Exh D, 7:2 – 9:16).

## Statement of Facts ¶¶ 27 - 29

27.    The undisputed facts show that defendants John Colon and Julie Fabrizio-Colon, at all times material to the Commission's Complaint, acting alone or in concert with others, formulated, directed, controlled, or participated in the acts and practices of corporate defendant BBFS. The Colon defendants' control of the actions of BBFS is predicated upon their positions as the officers and directors of BBFS, as well as their being signatories to at least one corporate bank account, during the entire course of their business. (PX-1, Exh. B).

28.    Furthermore, the individual defendants admittedly made all major decisions for BBFS, as their following testimony confirms: John Colon "handled most of [BBFS's] marketing." (Fabrizio-Colon Tr. P. 28:5-7), and he was in charge of monitoring how many consumers successfully completed the program (Fabrizio-Colon Tr. P. 155:25-156: 5). John Colon typically met "at least three times a week" with the company's general manager, to whom all other supervisors reported, including the supervisors for client services and account settlement departments. (Colon Tr. P. 57:19-58:18). In addition, defendant John Colon executed the company's application for membership in the BBB, (PX-l, Exh.. H).

29.    Apart from serving as Treasurer of BBFS, defendant Julie Fabrizio-Colon "enrolled clients" in the program (Fabrizio-Colon Tr. p. 39:8-12), and has always had the responsibility for responding to customer complaints (Fabrizio-Colon Tr. p. 39:15-45:9). Defendant Fabrizio-Colon also represented BBFS before the Boston Better Business Bureau in a meeting held to address the pattern of unresolved complaints that BBFS had generated. (Colon Tr. p. 220:7-13).

## Defendants' Response

Defendants have previously admitted the positions held by John Colon, Jr. and

Julie Fabizio-Colon, *see* Defendants' Response to Statement of Facts ¶¶ 3 – 4.

Defendants dispute the assertion that the Colons were actively involved in all of the acts

and practices of BBFS.  As described above, a number of practices, such as responding to

consumer complaints, monitoring client account activity, and overseeing employees who

communicated directly with consumers were duties and responsibilities of various

employees, supervisors and managers.  *See* Defendants' Response to Statement of Facts,

¶¶ 10 - 11, 13 -14, 16.

### Statement of Facts ¶ 30 - 31

30.    Consumers suffered substantial injury as a result of defendants' misrepresentations, in terms of both increased debt (see, e.g., Alajoki Dec. ¶12 and Starksspear Dec. ¶11), and fees paid for promises not kept. When consumers terminated their contracts because defendants were not performing as promised, consumers often found that their overall debt had actually <u>increased,</u> because they owed interest and late fees due to not paying creditors, as required by defendants' program. (PX-11, ¶ 11).

31.    Many consumers, prior to entering the program, were paying their creditors on time but found that enrolling in defendants' debt settlement scheme caused their financial situation to deteriorate (Alajoki ¶12 and Starksspear ¶¶ 10-11). Some consumers find their financial situation deteriorated to the point of their being forced to file bankruptcy. (PX-9, ¶ 8; PX-16, ¶ 13; and PX-16, ¶ 11).

### Defendants' Response

Defendants dispute that the two consumer declarations cited by the FTC

constitutes the experience of typical BBFS clients.  Clients were informed that they

would likely see their accounts charged off, and that their creditors would likely continue

to charge late fees and finance charges.  *See* Defendants' Response to Statement of Facts,

¶¶ 10 - 11, 13 -14, 16.  Most BBFS clients saw a reduction in the total amount owed and

realized savings through the settlements of debts presented.  *See* Defendants' Response to

Statement of Facts, ¶ 19.  Defendants maintain that consumers typically received the debt

settlement services they contracted BBFS to provide.  *See* Defendants' Response to

Statement of Facts, ¶¶ 10 - 11, 13 -14, 16, 19.

### Statement of Facts ¶ 32

Since beginning their operations, defendants have generated $11,978,249 in revenues from the collection of retainer fees, monthly fees and settlement fees, as a result of their misrepresentations made to consumers. (Dysktra Dec., Exh. C).

**Defendants' Response**

Defendants dispute that there were any misrepresentations made to consumers. *See* Defendants' Response to Statement of Facts, ¶¶ 10, 12, 14 – 16. Moreover, a significant portion of these revenues were generated as a result of settlement fees earned for performing debt settlement services, and BBFS wrote off or waived many settlement fees to accommodate clients who had an inability to pay. (JC Dec., ¶ 9). In addition, BBFS charged agreed-to retainer and administrative fees for settling debts, which BBFS did for the vast majority of its clients. Consequently, Defendants dispute the FTC' assertion that consumers were "injured" in the amounts claimed.

Date:   February 11, 2005                    Respectfully submitted,


                                            **/s/ Ian D. Volner**
                                            Ian D. Volner
                                            Theodore W. Atkinson
                                            VENABLE, LLP
                                            575 7th Street, N.W.
                                            Washington, D.C. 20004-1601
                                            Tel.: (202) 344-4000
                                            Fax: (202) 344-8300
                                            e-mail: idvolner@venable.com
                                                    twatkinson@venable.com

                                            Counsel for Defendants