UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br><br>　　　　　　　　　　Plaintiff<br><br>v.<br><br>BETTER BUDGET FINANCIAL<br>SERVICES, INC., JOHN COLON, JR. and<br>JULIE FABRIZIO-COLON,<br><br>　　　　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　Civil Action No. 04-12326 (WGY) |

## DECLARATION OF JOHN COLON, Jr.

JOHN COLON, Jr., states as follows:

1. I am the former President of Better Budget Financial Services, Inc. and Debt Management Solutions (collectively "BBFS"). I am over eighteen (18) years of age and am competent to testify as to the statements made in this declaration. Unless otherwise stated, I have personal knowledge of the acts stated below, and if sworn as a witness, I would testify to those facts. I make this declaration in support of the Opposition to the Federal Trade Commission's Motion for Summary Judgment.

2. I am aware that the Federal Trade Commission ("FTC") has alleged that BBFS has engaged in false and deceptive trade practices because BBFS (1) promised consumers that BBFS would settle all of an enrolled consumer's debts; (2) promised consumers that BBFS would settle all debts for 50% to 70% of the outstanding debt value; and (3) that BBFS promised consumers that they would no longer receive calls from creditors. I am aware that the FTC has also alleged that BBFS typically failed to

meet these alleged promises. Based on my knowledge of the information BBFS provided to consumers before they contracted for BBFS' debt negotiation and settlement services, the FTC has mischaracterized the representations that BBFS made to consumers. Additionally, based on my knowledge of BBFS' business activities and performance, BBFS settled debts for a great majority of its clients, contacted and negotiated with BBFS clients' creditors, and for most clients, settled debts for 50% or more of the outstanding amount of the debts settled.

**BBFS' Business Practices**

3.    As the Federal Trade Commission correctly states, BBFS is a Massachusetts corporation incorporated on August 21, 2000. I was its President and a director of the corporation. Prior to incorporating BBFS, I had extensive experience in the field of debt collections and debt settlement. I served as a debt collector for Sears and then moved into a position as a debt collector for a company called Accelerated Bureau of Collections. My clients at that time included Chase, MBNA, Discover, American Express, First USA, and Bank One. Accelerated Bureau of Collections had eight of the 16 largest creditors between 1996 and 1999. After serving as the collections manager, I became a general manager of the Danvers office, and then was promoted to regional manager for six offices on the East Coast, and managed approximately 1,800 collectors. In my position as regional manager, my responsibilities included dealing with executives at various banks that were responsible for selling debt or placing large debts with collection agencies. After working for Accelerated Bureau of Collections, I took a position with the Cambece Law Office. I then went to work for Mims, Wurman & Fischer, another law office. Both were affiliates of Collect America, the third largest

debt buyer in the United States.

4. While working with these various agencies and firms in the field of debt collections, I learned how unsecured creditors assessed, bought, settled and otherwise handled outstanding, unsecured debts. I realized that I could use this experience to negotiate with creditors on behalf of consumers. With this in mind, my wife Julie Fabrizio-Colon and I established and incorporated BBFS, investing over $100,000 of our own savings into capitalizing the business.

5. BBFS was established as a for-profit corporation with the goal of helping consumers who found it difficult or impossible to manage their unsecured debt settle those debts with their creditors.

### BBFS' Advertising

6. BBFS primarily advertised through its websites, but a small part of BBFS' client base also came from the purchase of leads from third party brokers. Brokers provided BBFS with the names and addresses of consumers who had made specific inquiries regarding debt settlement or credit counseling services over the internet. The broker would contact the consumer lead and inform them that BBFS would contact them within 24 to 48 hours. BBFS would then follow up on the inquiry by contacting the consumer by telephone and e-mail.

7. I am familiar with BBFS' website advertising, and the representations it made to consumers. The websites, which contained the same information, informed consumers that by using BBFS' services, they could save 50% on their unsecured debt, but cautioned that that figure was based on average negotiated settlements experienced by Better Budget's clients, and that a consumer's individual results may vary. The websites

represented that BBFS would typically reduce the consumer's debt by 30 – 50%. The websites explained that BBFS would work with consumers to identify a monthly amount that each client can afford to pay, and that the amount worked out would be deposited by the consumer in a bank account (which the client controlled). The websites explained that when the consumer had accumulated enough money to cover the settlement and BBFS' fee, BBFS would contact one of the creditors and make them an offer. The websites explained that offers are submitted until the consumer and the creditor both agree on the amount of settlement. BBFS' website advertising further explained that BBFS would then get written or electronic approval on the total settlement (including fees), and that once the settlement was paid, the consumer will draw down the amount accumulated in their program account. The websites further explained that this process would repeat as money became available for the next settlement, and that BBFS would continue in this way until all of the accounts were settled.

8.    With regard to creditors calling consumers, the BBFS websites informed consumers that even though they were enrolled in the program, creditors would call consumers and "harass" them. The websites explained that as accounts went delinquent, especially in the beginning, consumers would get creditor calls. However, the websites also informed consumers that BBFS had developed tools that consumers could use that were effective in minimizing and often eliminating telephone calls from creditors.

9.    With regard to the impact on consumers' credit, BBFS' websites also informed consumers that when a payment to a creditor is missed or late, there can be negotiate consequences to your credit score, and that it was important to understand that there may be adverse effects to your credit. Specifically, BBFS advised consumers that

late payment or delinquent account information can appear on a credit report for up to seven years.

### Client Enrollment

10.  I was involved in training BBFS' debt counselors and client services representatives in how to respond to consumer inquiries about the services offered by BBFS. In 2004, client service representatives and debt counselors were provided with brief, written talking points to help answer questions consumers may ask, and the training provided to debt counselors and client service representatives was consistent with these comments. Debt counselors and client services representatives were trained that consumers should inform consumers that BBFS can save you between 30 – 50% on their debt balances. Debts counselors and client services representatives were told that each case was individual, but that on average, consumers who used BBFS' services saw savings of 50% on average for their settled debts. They were trained regarding BBFS' services, and how BBFS would settle accounts one at a time. They were instructed to advise clients that they would have to sign a limited power of attorney that would be sent to creditors and request that their accounts be closed. They were instructed to inform consumers that, while enrolled, their credit would be affected, and that they would be unable to secure any more unsecured credit. They were instructed to advise clients that fees and charges may accrue on the accounts. They were also instructed to inform consumers who called with questions that they may receive calls from creditors.

### The Enrollment Packet

11.  In addition to the websites that generated telephone inquiries, consumers who expressed interest in BBFS' services and who qualified for BBFS' debt settlement

program received an enrollment and application packet that contained additional explanations of BBFS' services.

12. In addition to the contract for services, the limited power of attorney and an ACH authorization form, beginning in February 2004 the enrollment package contained a multi-page Client Briefing Letter that described BBFS' services in detail. The letter instructed each potential client to read the letter carefully because those instructions were critical to the success of the client's program. The letter provided the potential client with an overview of BBFS' services, and provided potential clients with information regarding particular aspects of BBFS' services. For example, the letter informed potential clients that

> "[BBFS] will contact your creditors to inform them that you should have enrolled in our program and that all further communications should be directed to our office. Your creditors will usually attempt to apply their routine collection tactics to pressure you into sending them money."

(Client Briefing Letter, attached hereto as Exhibit A). The letter described in detail the several steps BBFS would take to "help reduce or eliminate" such calls. (Exh. A). Additionally, the letter warned potential clients that they may receive calls from creditors denying that they had received a "proposal" from BBFS, but that by "proposal," creditors meant an offer to pay in full. (Exh. A). BBFS was aware that creditors may try to falsely convince clients that they had not heard from BBFS in an effort to collect the full amount, and the letter advised clients in advance that such claims by creditors were not accurate. (Exh. A). The letter also informed the potential client that negotiations with creditors would begin after the client had accumulated the money in their account to

make a reasonable settlement offer (usually 50%) to one or more creditors, and that for the average BBFS client, such negotiations would not begin until three to six months had elapsed. (Exh. A). The letter informed clients that settlements may range from 20% of the outstanding debt to more than 50%, but explained that it depended on the circumstances. (Exh. A). The letter also informed the potential client that most of the accounts placed with BBFS would "charge off," meaning that the creditor would write it off as a bad debt and report it to credit reporting agencies as such, and informed potential clients that even though an account had "charged off," it did not mean that the creditor would stop trying to collect on the debt. (Exh. A). Finally, the letter also informed the potential client that creditors have the legal right to continue accruing interest, late fees, and over-limit penalties while the potential client's debts are with BBFS. (Exh. A). The letter went on to explain, however, that these fees usually stopped at the point of charge-off, and that by continuing in the program, the potential client would likely be in a better financial situation after the debts were settled. (Exh. A).

### Negotiations with Creditors

13. Negotiations with creditors were conducted by the various client service representatives employed by BBFS who reported to the Settlement Department Manager and to Paul Bartlett, who was a manager for BBFS. After the completed limited power of attorney was faxed to a client's creditors, and after each client informed BBFS that the client had saved approximately 50% of the outstanding debt for that creditor, a client service representative would then contact the creditor in writing or by telephone to negotiate settlement. BBFS developed and maintained a system of recording communications with creditors through the entry of client service representative notes in

CreditSoft, and by scanning and appending to CreditSoft copies of written communications with creditors.

14. Over the course of BBFS' operations, BBFS' client service representatives developed and maintained good relationships with a number of major creditors, with contacts ranging from the first line of collectors for those creditors to executives who supervised or oversaw collections departments. Contrary to the assertion by the Federal Trade Commission, one of the creditors that BBFS worked with to settle debts was Citigroup and its credit card issuing affiliates (collectively "Citibank"). Defendants dispute the assertion of the Federal Trade Commission's Statement of Facts that CitiCards (a subsidiary of Citibank) refused to work with debt settlement companies like BBFS. I am aware that BBFS settled a number of clients' debts with Citibank. As I testified in my deposition, BBFS experienced a problem with Citibank in dealing with Citibank's debt collectors—who work on commission—would ignore or claim never to have received the limited power of attorney completed by clients and faxed by BBFS. In those situations, however (and the FTC never asked me about this), there were more senior Citibank employees that we could deal with to begin and complete settlement negotiations. Moreover, beginning in 2003, when Citibank found out that a debt was being handled by a debt settlement company such as BBFS, it began sending its collections accounts to third party collection agencies. BBFS developed a standard method of approach when it came to a Citibank account, and with that approach we were able to settle Citibank accounts.

**BBFS' Record of Settlement**

15. Although Paul Bartlett was primarily responsible for reviewing BBFS'

CreditSoft and other data to track and oversee BBFS' settlement performance, I regularly met with Paul Bartlett to discuss how BBFS was progressing in settling debts for clients. I also made sure that the marketing materials matched BBFS' performance in settling debts. For example, I made sure that settlements were typically coming in on average at 50%, and based on client account information I received, I determined that, on average, clients debts were being settled at approximately 50%. I am also aware that a great majority of our clients had debts settled, and, based on my experience with BBFS and in talking to others in the field, BBFS' performance was better than most other debt settlement companies in the industry. Based on my estimate, between 2002 and 2004 BBFS saved consumers over $10 million, and earned settlement fees for those settlements in an amount of approximately $2.5 million. BBFS also waived many settlement fees for clients who demonstrated an inability to pay.

### Tracking Consumer Communications

16. I am aware that the FTC has claimed that consumers complained daily, and that these complaints were reflected in client communication forms entitled "Complaint Follow Up Forms." Although it is true that the Complaint Follow Up Forms were used to record complaints consumers had with BBFS' service, they were also used by client service representatives to record the subject matter of routine communications from consumers. For example, the form had a place where the client service representative could check "Has funds/requesting settlement" if a client called to inform BBFS that the client had saved the agreed-to amount in his or her personal account. There was also a place to check if a client had called to inform BBFS that it had received a call from a creditor, just as BBFS asked clients to do. The form also had a place for

noting that a client had called and informed BBFS that it had received a summons, just as BBFS asked clients to do. Consequently, these forms were used to track information clients provided to BBFS regarding their accounts, and not just to report complaints.

17. I am not aware of consumers calling BBFS on a daily basis with complaints regarding BBFS' services. To the contrary, BBFS received few complaints when compared to its overall client base, and I am aware of fewer than 1% of all BBFS clients ever complaining to BBFS (or to the Better Business Bureau) about its service.

Executed on February 10, 2005.

I declare that the foregoing is true and accurate under penalty of perjury.

John Colon, Jr.