UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| FEDERAL TRADE COMMISSION, )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>BETTER BUDGET FINANCIAL )<br>SERVICES, INC., JOHN COLON, JR. and )<br>JULIE FABRIZIO-COLON, )<br>)<br>Defendants. )<br>_____ ) | Civil Action No. 04-12326 (WGY) |

## DECLARATION OF PAUL BARTLETT

PAUL BARTLETT states as follows:

1.  I am a former employee of Better Budget Financial Services, Inc. and Debt Management Solutions (collectively "BBFS"). I am over eighteen (18) years of age and am competent to testify as to the statements made in this declaration. Unless otherwise stated, I have personal knowledge of the acts stated below, and if sworn as a witness, I would testify to those facts. I make this declaration in support of the Opposition to the Federal Trade Commission's Motion for Summary Judgment.

2.  I was hired by BBFS in March 2001 as a consultant. From that time until October 2003, I served as General Manager of Operations. I left the company in October 2003, and subsequently rejoined the company in March 2004 as an employee, holding the title of Director of Business Development.

3.  BBFS' business purpose was to help consumers who found it difficult or impossible to manage their unsecured debt settle those debts with their creditors. I am aware that the Federal Trade Commission has accused BBFS of falsely promising consumers that BBFS would settle all their debts, falsely promising consumers that BBFS

would contact and negotiate with clients, and falsely promising consumers that BBFS would settle their debts for 50% of the amount owed to creditors. I understand that the Federal Trade Commission has claimed that BBFS typically failed to contact creditors, typically failed to settle consumers' debts, and typically failed to settle debts at the promised amount. Based on my knowledge and operation of BBFS, and as detailed below, those claims are not true.

4. In performing debt negotiation and settlement services for clients, BBFS followed a standard operating procedure. BBFS advertised primarily through two internet websites, both of which contained the same detailed information about BBFS' services.

5. Generally, consumers who contacted BBFS and were interested in debt negotiation and settlement services were put in contact with a debt counselor. Typically, the first step in each case was a discussion between a potential client and a debt counselor to determine the potential client's debt status, to identify the potential client's creditors, and to calculate, based on income and other factors, how much a potential client could save towards paying off a possible settlement. This information was normally written down on a worksheet by the debt counselor.

6. Potential clients were told by debt counselors that they would need to establish a separate bank account, and that a monthly amount (calculated by BBFS and agreed to by the potential client) would need to be set aside by the potential client and saved in that account. Potential clients were also told that they would be required to pay (1) a retainer fee equal to one month of the amount to be set aside by the potential client; (2) a monthly administrative fee, which was $29.95, $39.95, and most recently, $19.95; and (3) in the event of a settlement, a settlement fee equal to 25% of the savings realized through settlement.

7. If a potential client agreed to proceed, an application packet was then sent

to the potential client. The application contained (1) a contract for services that the potential client was required to review and sign; (2) a copy of any worksheet identifying the potential client's creditors and the amount to be saved; (3) an ACH authorization form to be completed by the potential client; and (4) a power of attorney to be completed by the potential client.

8.  Once BBFS received the completed application packet back from the potential client, an account was set up at BBFS, and information about the client's account was inputted into a computerized client account management program. From 2000 to approximately May 2004, BBFS used a client management software program called Collect. In or around May 2004, that data was then transferred to a software program called CreditSoft.

9.  An account was created in CreditSoft for clients when they decided to enroll in the BBFS program. After receiving the completed application packet, the Administrative Department scanned the entire package into the client's CreditSoft record and entered other information into the account, including: the client's contact information and creditor information, which included the creditor, credit card account balances and credit card account numbers. The ACH would be arranged so that the initial fee could be withdrawn from the client's bank account. In the first month of the enrollment, the initial fee was withdrawn from the client's bank account. Subsequently, the monthly administrative fee would be withdrawn.

10. The BBFS receptionist would then fax or send to each of the client's identified creditors the completed power of attorney. The client's power of attorneys were scanned and appended to the client's CreditSoft record as well.

11. Once enrolled, the client was then expected to deposit the determined set-aside amount in the client's bank account. At no time did BBFS ever hold any of the settlement monies in trust for any client.

12. It was the responsibility of the BBFS Settlement Department to negotiate settlements with creditors. There were approximately eight employees in this department who were supervised by the Settlement Department Manager. I supervised the Settlement Department Manager. Together, the Settlement Department Manager and I closely tracked active client accounts to ensure that those accounts that were ready to be settled were settled. We typically ran reports on the active accounts and asked representatives in the Client Services Department to check the status of those accounts. The Settlement Department Manager also kept detailed paper records on settlements that were due to be negotiated with creditors.

13. As part of my duties and responsibilities as General Manager and then as Director of Business Development for BBFS, I supervised and oversaw the general operations of BBFS' day-to-day business activities. As of November 3, 2004, there were approximately 35 employees of BBFS. In my capacity as Director of Business Development, I oversaw and supervised the performance of BBFS' client service representatives and debt counselors, and kept tabs on their performance with regard to individual accounts and with regard to their communications with clients and potential clients. It was the responsibility of the debt counselors to enroll new clients into the BBFS program, while it was the client services representatives' responsibility to place courtesy calls to clients, respond to client complaints, and answer summonses and arbitration notices.

14. I also participated in training client service representatives and debt counselors. Client service representatives and debt counselors were trained to answer questions of clients or potential clients who called with questions about BBFS' services. In 2004, client service representatives and debt counselors were provided with a written list of talking points to help answer frequently asked questions. A copy of this list is attached as Exhibit A to my declaration.

15.  I am familiar with CreditSoft, the computerized client account management software used by BBFS to maintain client account files. I regularly used CreditSoft in fulfilling my duties and responsibilities, and as Director of Business Development, I was aware of the information debt counselors, client service representatives, and representatives in the Administrative Department and their supervisors entered into the system. It was standard practice and procedure that certain information be entered into CreditSoft. Among other information, CreditSoft had data-entry fields for:

   A.  Client name, address, telephone number and email address;

   B.  Creditors, credit balances, interest rates;

   C.  Retainer and administrative fees paid;

   D.  The settlement amount negotiated, and settlement fee owed to BBFS;

   E.  Status of the account (for example, whether the account was settled or whether a settlement was pending);

   F.  Client Activity Notes, in which any BBFS employee who had any contact with the client or their creditors was required to document that contact in the client's CreditSoft record. This was a mandatory policy that I strictly enforced.

In addition, all written communication between the client and BBFS, the client and their creditors, and BBFS and the client's creditors was scanned and appended to the client's CreditSoft record. Moreover, the client's entire enrollment package, which included the contract, ACH form and power of attorney, was scanned into the client's CreditSoft record as well. Thus, CreditSoft served as a comprehensive database and primary information source for each client's entire client record.

16.  I am aware that the Federal Trade Commission has asserted that Citigroup

and its credit card issuing affiliates (collectively "Citibank") had a policy of not dealing with debt settlement companies, and therefore BBFS did not settle any debts where Citibank was the creditor. This is not true. BBFS settled numerous Citibank debts for clients, and I am aware that the CreditSoft data shows that there were at least 200 settlements with Citibank between 2001 and 2004.

17. With regard to the Federal Trade Commission's assertion that BBFS typically did not contact creditors or settle clients' debts, that is not true. I am aware that CreditSoft data shows that there were 10,417 client records created between 2000 and 2004, and of that number, there were 435 "null" accounts for which an account number was assigned but which contained no account information. This was typically attributable to a data entry error by a BBFS employee. I am aware that, not counting the null accounts, there are actually 9,982 client accounts in the CreditSoft database.

18. I am aware that the CreditSoft database shows that for the 9,982 clients associated with these accounts, BBFS was able to settle debts for 6,859 of these clients, or approximately 70 percent of BBFS' total client base. This figure was reached by having CreditSoft run a report identifying all accounts for which settlements were recorded. However, this figure does not fully reflect the degree to which BBFS performed for its clients, for a number of reasons.

19. First, with regard to the remaining 3,123 client accounts, 363 of those accounts have a client name associated with them, but there is no other information. No documents associated with the application packet were scanned or included in these files, and there is no record of these individuals having paid any fees. Indeed, except for a name, the account record is empty.

20. Second, of the 2,760 CreditSoft records in which more information than a name was inputted, BBFS closed a total of 839 accounts because client representatives could not reach the client at the address or telephone number provided by the client (439

accounts), or because the client bounced or did not pay required fees, typically administrative fees (400 accounts).

21. Third, 161 clients voluntarily left the program because they decided on alternative debt management solutions (e.g., obtained home equity or other loans, they decided to simply pay their creditors, decided to go into credit counseling).

22. Fourth, 575 of BBFS' clients terminated for reasons unrelated to the performance of BBFS' services (e.g., client lost job and could not afford to be in the program, client stated they no longer needed the program, client moved out of the country, client had a death in the family, etc.).

23. Therefore, of the 8,044 clients who enrolled in the program and who were not terminated by BBFS or quit for the above-described reasons, BBFS obtained settlements for 85% of enrolled clients. This figure, however, does not take into account the fact that a number of clients were actively enrolled and had contracted for BBFS' services shortly before November 3, 2004, and it does not take into account clients who left the program for no reason stated.

24. With regard to the Federal Trade Commission's assertion that debts were not settled at 50% or greater, this is not true. In fact, I specifically instructed employees in, and the manager of, the Settlement Department not to accept settlements for less than 50%. I am aware that 61% of the settlements BBFS was able to negotiate were in the 50-70% savings range.

Executed on February 4, 2005.

I declare that the foregoing is true and accurate under penalty of perjury.

*[signature]*

Paul Bartlett