UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---------------------------------------------------------------x
:
FEDERAL TRADE COMMISSION, :
: **CIVIL ACTION NO.:**
Plaintiff, : 04-12326 (WGY)
:
v. :
:
BETTER BUDGET FINANCIAL SERVICES, :
INC., JOHN COLON, JR., and JULIE :
FABRIZIO-COLON, :
:
Defendants. :
:
---------------------------------------------------------------x

**FINAL REPORT OF HERNAN SERRANO, JR.,
THE RECEIVER OF BETTER BUDGET FINANCIAL SERVICES, INC.**

**HERNAN SERRANO, JR.**, being duly sworn, deposes and says:

1.  I am the receiver (the "Receiver") of Better Budget Financial Services, Inc. ("BBFS"). I make this affidavit as my final report to the Court (the "Final Report"). Except where stated upon information and belief, I have personal knowledge of the facts and circumstances set forth in this affidavit.

**INTRODUCTION**

**My Appointment As Receiver of BBFS and My Team of Professionals**

2.  I was appointed the temporary Receiver of BBFS pursuant to an *Ex Parte* Temporary Restraining Order With Asset Freeze, Appointment Of Receiver, Immediate Access To Defendants' Business Premises, Expedited Discovery, And Order To Show Cause Why A Preliminary Injunction Should Not Issue, entered by this Court on November 3, 2004 (the

"TRO"), as modified by a Stipulation Modifying *Ex* Parte Temporary Restraining Order, signed by counsel for each of the parties hereto and "So Ordered" by this Court on or about November 18, 2004 (the "Stipulated TRO"). Copies of the TRO and Stipulated TRO are respectively annexed hereto as Exhibits A and B.

3. On or about March 10, 2005, the parties to this action settled their dispute by executing and filing a Stipulated Final Judgment and Order for Permanent Injunction and Other Equitable Relief Against All Defendants, which the Court "So Ordered" (the "Final Judgment"). A copy of the Final Judgment is annexed hereto as Exhibit C. Pursuant to Section VIII of the Final Judgment, the parties agreed and this Court directed that my appointment as Receiver be continued, except my duties were extended to require me to complete the BBFS receivership (the "Receivership") by taking all steps necessary and advisable to locate and liquidate any and all assets of BBFS.

4. As described in this Final Report, my team of professionals and I have now accomplished this difficult and complex assignment.

5. I was formerly the Director of Corporate Recovery Services for the firm of Weinick, Sanders, Leventhal & Co. ("WSL") and am currently a Managing Director and shareholder of Executive Sounding Board Associates, Inc. ("ESBA").

6. The team of professionals which I have engaged includes my former employer, the forensic accounting firm, WSL, my current firm, ESBA, as well as the law firm of Mintz Levin Cohn Ferris Glovsky & Popeo, P.C. ("Mintz Levin").

2

**The Relief I Seek In Conjunction With The Final Report**

7.      In conjunction with this Final Report, we respectfully seek an Order granting, among other things, the following relief: (a) authorizing the payment of reasonable compensation, including professional fees and disbursements for the twelve-month period from January 1, 2005 through December 31, 2005 (the "Application Period"); (b) discharging, releasing and dismissing the Receiver and the professionals I have engaged from any and all of their respective duties and obligations in connection with the Receivership of BBFS, as well as from any claims, judgments, charges, assertions, impositions or assessments arising out of or in connection with the performance of our duties or obligations pursuant to the TRO or the Final Judgment (as that term is defined herein); (c) modifying the Final Judgment as set forth herein; (d) authorizing the Receiver to convey BBFS and each of its subsidiaries and affiliates, together with their corporate books and records, back to Defendants John Colon and Julie Fabrizio-Colon (collectively, the "Colons"), provided that neither BBFS nor any of its subsidiaries or affiliates shall hold in their own name or have any rights or interests in or to any of the assets or property currently in the Receivership estate, except those necessary to complete the dissolution and winding down of the company; (e) authorizing me, as Receiver, to transfer any and all funds that were held in that certain Uniform Transfers to Minors Act ("UTMA") account number 41073460 in the name of "Taylor Marie Colon" at Century Bank (the "UTMA Account") to the Federal Trade Commission (the "FTC") if the Colons do not comply with each of their obligations concerning the UTMA Account as set forth at Section VI.C of the Final Judgment within five (5) business days of the entry of the Order, granting the relief requested herein; (f) directing the Colons, jointly and severally, to take all measures necessary and appropriate to dissolve, wind

down and terminate BBFS and its subsidiaries and affiliates immediately after they have fully and finally paid, settled and/or compromised any outstanding federal, state or local tax obligations of BBFS; (g) upon transferring the Receivership assets held by the Receiver in one or more segregated Receivership trust accounts (the "Receivership Cash") to a non-interest bearing trust account, authorizing the Receiver to terminate and discontinue the federal tax identification number that the Receiver has established for the purpose of marshaling and securing the Receivership Cash; and (h) authorizing and directing the Receiver and the professionals he has engaged to take such other and further actions as, in the Receiver's reasonable judgment and discretion, may be necessary and appropriate to terminate promptly the Receivership, including, but not limited to, the following: (i) setting aside and holding back a reasonable reserve fund, pursuant to Section X.C of the Final Judgment in the amount of $5,000.00 to compensate the Receiver and his professionals, without the necessity of having to make any additional fee applications to the Court (the "Reserve Fund"), for any other and further professional services they may have to render and expenses they may incur in connection with the completion of their duties and obligations as set forth in this application, the Final Judgment or any prior Orders entered by the Court in this action; and (ii) transferring to the FTC or its designee for consumer redress all of the books, records, funds and other property or assets of BBFS, except those books, records, funds and other property or assets of BBFS to be conveyed to the Colons pursuant to this application, including, but not limited to, any portion of the Reserve Fund which is not applied to pay for professional services or expenses of the Receiver or his professionals or which are not otherwise designated by the Receiver to be applied in a particular manner or for a particular purpose.

## BACKGROUND FACTS

8.  On November 3, 2004, the FTC filed a complaint (the "FTC Complaint") and related affidavits and exhibits with the Court against the Defendants seeking restitution, permanent and preliminary injunctions, a temporary restraining order, the appointment of a receiver and other extraordinary provisional relief. The FTC Complaint alleged, among other things, that each of the Defendants, including BBFS, engaged in acts and practices that violate Section 5(a) of the FTC Act, 15 U.S.C. § 45(a). In particular, the FTC has alleged that Defendants have engaged in unfair and deceptive trade practices in connection with the advertising, promotion, offering or sale of services providing debt consolidation, debt reduction, debt negotiation or credit repair by telephone, on or through the Internet, the World Wide Web, various websites or otherwise in interstate commerce, by making or assisting in the making of statements or representations of material fact that are false or misleading, including, but not limited to, the following:

   a.  That consumers who purchase Defendants' services will be able to fully repay unsecured credit card debts for a reduced amount;

   b.  That Defendants will settle each creditor's account once a consumer accumulates one-half of the amount owed to that creditor; and

   c.  That Defendants will ensure that creditors do not call or harass consumers about payments on the consumers' debts that may be or may become overdue.

9.  During the Application Period, my professionals and I opposed the motion of Cummings Properties, LLC ("Cummings") to intervene in the BBFS proceeding. Cummings, the landlord of BBFS, sought to intervene, among other things, for the purpose of protecting its rights in and to certain leases that BBFS had entered into with it at 800 Cummings Center, Beverly, Massachusetts (the "BBFS Premises"). Rather than engaging in costly motion practice

with Cummings, my counsel, other members of my team and I successfully negotiated and entered into an amicable settlement agreement with Cummings in connection with its motion.

10. The Cummings settlement agreement was executed by me, as Receiver of BBFS, Cummings, the FTC, and a third party, Sensitech, Inc. ("Sensitech"), which was purchasing certain office furnishings, fixtures and equipment from BBFS. The agreement was then filed with and "So Ordered" by this Court.

11. Upon information and belief, contemporaneously with its entry into the settlement agreement, Cummings immediately leased the BBFS Premises to new tenants. Upon further information and belief, Cummings has fully mitigated any claims it might have against BBFS in connection with BBFS' leasehold interests in the BBFS Premises and, therefore, has no further rights or interests in or to any portion of the Receivership estate.

12. It is my understanding and belief that one of the new tenants was or is another company of which defendant John Colon was either an employee or a principal. It is also my understanding and belief that the company is in the mortgage brokerage business.

13. The other new tenant is Sensitech. Sensitech already occupied the premises directly adjacent to the second floor offices of BBFS in the Cummings Center.

14. In connection with the new lease that Cummings entered into with Sensitech, in or about January 2005, my professionals and I negotiated a "turnkey" sale to Sensitech in which Sensitech received a fully furnished office space with high end, approximately one year old office furnishings, equipment and trade fixtures for the purchase price of $60,000. Upon information and belief, Sensitech occupied and promptly began paying rent to Cummings for that

portion of the BBFS Premises occupied by Unimark Solutions, Inc., one of the Receivership companies that were not named as a defendant in the FTC Action.

15. At the inception of the Receivership when we took physical possession of the BBFS Premises, we secured all of those Receivership assets located at the BBFS Premises, including but not limited to furniture and fixtures, as well as BBFS' books, records, supplies and inventory, as well as its proprietary electronic software, servers and databases. We simultaneously caused those assets to be photographed, catalogued, forensically preserved them arranged for their appraisal and long term storage. We also caused each of the Defendants' bank accounts located at Century Bank and St. Jean's Credit Union to be frozen and we then took possession, custody and control of the money and assets located in each of those accounts.

16. Furthermore, during the Application Period, we negotiated with Defendants to take possession of additional assets of the Receivership estate, including but not limited to the following: (a) the real properties located at 4 Conifer Way, Beverly, Massachusetts (the "Conifer Way Property") and 405R Elliott Street, Beverly, Massachusetts (the "Elliott Street Property"); (b) a number of vehicles (including a customized, convertible 2002 Porsche Carrera 911 Turbo Coupe, several Lexus vehicles, including a customized, convertible 2004 Lexus SC430 coupe, as well as four pick-up trucks leased in the name of BBFS but in possession of other family members of the Colons); and (c) various pieces of fine jewelry acquired by the Colons.

17. On or about January 27 and 28, 2005, the Colons delivered to the Receiver (i) a Men's Rolex Two-Tone Sub-Mariner Watch with Blue Face from Alfred F. De Scienza & Sons, Inc. Jewelers of Beverly, MA ("De Scienza"), (ii) a Ladies' 18 kt. White Gold Topaz Ring from De Scienza Jewelers, (iii) Two Ladies' 14 kt. White Gold Diamond Stud Earrings from De Scienza

Jewelers, (iv) a Ladies' 14 kt. Gold Double Row Diamond Collar Necklace from De Scienza Jewelers; (v) a White Gold Diamond Tennis Bracelet, and (vi) a Diamond Wedding Band.

18. During the Application Period, the Colons also delivered to the Receiver the following items relating to the various automobiles: (a) various keys, license plates, tags, registrations and other title documents, which they claimed were all of the same that they had within their possession, custody or control concerning the Porsche and the customized Lexus; and (b) all of the same items, together with the remaining Lexus itself. The Colons also delivered to the Receiver what they represented to be all of the keys in their possession, custody or control concerning the home at the Elliott Street Property.

19. At my request and in the presence of Defendants' counsel, the Colons also prepared a written inventory of every item that they kept in the safe at the Conifer Way Property and produced that inventory to the Receiver. A copy of that inventory is annexed hereto as Exhibit D. The Receiver also requested that Defendant Julie Fabrizio-Colon turn over to him all jewelry purchased since 2000 in her possession that had an estimated value of $100 or more. Upon information and belief, Ms. Fabrizio-Colon turned over to the Receiver all such jewelry in her possession during the January 27-28, 2005, meetings with the Defendants.

20. Ms Fabrizio-Colon also refused to turn over to the Receiver a diamond wedding ring and wedding band that her husband had purchased from De Scienza for $26,500. Instead, the Receiver's counsel and Ms. Fabrizio-Colon's counsel agreed to have Ms. Fabrizio-Colon take the rings, with the Receiver and Counsel present, to an independent appraiser to determine the jewelry's value and composition. The parties had the rings appraised by John Caruso of Gemological Evaluation & Marketing Services, Inc., who concluded that the rings were of the

value and composition that the Defendants represented them to be. At the conclusion of the appraisal, the Receiver permitted Ms. Fabrizio-Colon to re-take possession of the rings, but only after she and her husband had both provided declarations under penalty of perjury to him, stating, in pertinent part, that: (a) the Colons agreed that the items seized by the Receiver fell within the definition of "assets" for purposes of the TRO; and (b) that the Colons were specifically on notice and understood that any loss, sale or other dissipation of the value of the wedding ring or band would subject them to potential criminal penalties for violating the TRO.

21. Thereafter, within a few days after the FTC had the Colons had filed the Final Judgment with the Court, my counsel was contacted by an insurance investigated. As part of the Final Judgment, Ms. Fabrizio-Colon was permitted to retain possession of the wedding band and ring. The investigator advised my counsel that, on the day following the filing of the Final Judgment, Ms. Fabrizio-Colon filed a claim with his insurance company, claiming to have lost these very valuable items in the women's restroom of a dance club in Boston. We do not know what happened concerning this investigation.

22. We also questioned the Colons concerning two other pieces of jewelry, which appeared on records produced to us by De Scienza Jewelers. Those pieces included a Ladies' Chopard Happysport Watch, which De Scienza's records indicated was purchased by the Colons in February 2004, as well as a pair of White Gold Davide Molina Pave Diamond Earrings. The Colons declared under penalty of perjury that they lost the watch in November 2004 and that they never purchased the earrings from De Scienza's. The watch was valued at approximately $3,100 and the diamond earrings were valued at approximately $1,600. A copy of the records produced by De Scienza Jewelers is annexed hereto as Exhibit E.

23. Throughout the Application Period, we held several conferences with the Defendants' and their counsel (and, frequently, just with their counsel) in connection with the Colons' failure to comply with the terms and conditions set forth in the stipulated TRO. For instance, during the Application Period, we discovered that, despite express prohibitions set forth in the Section IV.C of the TRO, enjoining the Colons from incurring any further credit card debt, they had been doing just that for a period of months without disclosing this activity to the Receiver or his counsel. Consequently, the Receiver and his counsel had to devote necessary resources and time to ensure that the Colons' credit card usage immediately stopped and that all necessary measures were put into place to ensure that no future credit card expenditures would occur.

24. Counsel for the parties also made numerous requests for documents and access to the BBFS Premises and electronic databases in preparation for trial. Moreover, once the parties entered into the Final Judgment, issues arose concerning the actual mechanics of effectuating the Final Judgment and my team and I found ourselves in the heart of a number of significant disputes between the parties.

25. Our activities were frequently memorialized in e-mail communications. By way of illustration, copies of various e-mails exchanged by counsel for the Receiver and counsel for the Colons concerning, among other things, the Colons' unauthorized credit card usage, discovery requests, Mr. Colon's attempt to interfere with my sale of the Porsche automobile, are annexed hereto as Exhibit F.

### The Parties Enter Into The Final Judgment

26. In accordance with Sections VI and VIII of the Final Judgment, I was charged with, among other things, the following: (a) liquidating the Conifer Way Property; (b) liquidating

certain of the vehicles, including the Porsche; (c) resolving certain Massachusetts state court proceedings in which Defendant BBFS was involved; (d) returning the jewelry to the Colons; (e) disposing of the corporate books and records of BBFS; (e) entering into any insurance contracts that the Receiver deemed necessary or appropriate; and (f) taking all steps necessary or advisable to locate and liquidate any other assets of the Receivership estate.

    27. Pursuant to the Final Judgment, my professionals and I have now performed and completed all or substantially all of the tasks required of us, except those obligations from which we now seek to be released.  In particular, we have not formally dissolved BBFS or any of its subsidiaries or affiliates or taken any measures to wind them down.  We now respectfully seek a modification of the Final Judgment with respect to those matters, because, absent such a change to the Final Judgment, this Receivership may have to remain in existence for many years to come until all federal, state and local income and payroll tax obligations of BBFS and its affiliates are satisfied.  We have diligently attempted to assemble a forensic picture of BBFS' tax obligations; however, we have not received cooperation from the Colons or the accountant that previously prepared the tax returns for BBFS and its affiliates.  Consequently, for the simple reason that the Colons are in the best position to know all of the necessary information to file the requisite tax returns for the Receivership companies and to answer any questions or provide information to any federal, state or local taxing authorities, we believe that the request we are now making is reasonable under the circumstances and the most cost-effective and efficient manner by which the tax requirements of BBFS and its related entities can be managed.

    28. Moreover, neither my counsel nor I were parties to or involved with the negotiation of the stipulated Final Judgment.  Had we been included in that process, we would have insisted

that the burden of undertaking the tax obligations of the Receivership companies rest with the Colons for the reasons stated above.  Otherwise, it will become necessary for the Court to authorize me, in my capacity as Receiver of BBFS, to set aside a reserve of funds from the Receivership estate to cover, among other things, any taxes, fines or penalties that the Receivership companies may have to pay in the future, as well as the legal and professional costs associated with preparing the companies' tax returns and resolving any tax issues that do arise.  Under those circumstances, it is conceivable that the consumers could receive little or no redress.

### The Steps Taken By The Receiver To Comply With The Final Judgment

29. Aside from the foregoing, my team of professionals and I have fulfilled our remaining duties under the Final Judgment.  For instance, we have marketed and sold for a purchase price of $1,087,500, enlisting the aid and assistance of a local real estate brokerage firm to complete the sale.  A copy of the Conifer Way Property Purchase and Sale Agreement is annexed hereto as Exhibit G.

30. To accomplish this sale, in early March 2005, we caused the Colons to transfer title to the home to me, as Receiver of BBFS, by quitclaim deed, a copy of which is annexed hereto as Exhibit H.  At or about the same time we also arranged, through a local realtor, to market the home to prospective buyers.

31. Through the efforts of the realtor, Carlson GMAC Real Estate ("Carlson"), we received an offer to purchase the Conifer Way Home in August 2005.  We worked with Carlson to ensure that the sale process moved as expeditiously as possible, and we also drafted all of the necessary agreements and documents relating to the sale.  Ultimately, we consummated the sale of the Conifer Way Property on October 24, 2005.

32. Likewise, my counsel and I marketed and sold the Porsche, the Lexus sedan and the customized Lexus convertible to the highest bidder for those vehicles for a combined sale price of $180,000.00.  To do so, we arranged with the Colons to transfer title to the vehicles into my name as Receiver of BBFS.  We then made the necessary arrangements to ensure that the vehicles were properly registered and insured and then received offers from prospective purchasers who wished to buy one or both of the vehicles.

33. During this process, we discovered that, once again, Defendant John Colon had been interfering with the my team's efforts to sell the Porsche by deceptively marketing the vehicle on an Internet website without advising my counsel or me that he was doing so and by failing to disclose to prospective purchasers that I, as Receiver, was the registered owner of the vehicles and would be conducting the sale (See e-mails and photographs that comprise part of Exhibit F).  Mr. Colon also failed to provide us with all of the necessary (and costly) accessories that accompanied the vehicle, causing us to have to offer a concession on the ultimate purchase price to the successful bidder.

34. Even more disturbing, on the day that the vehicles' purchaser came to the Conifer Way Property to receive delivery of the vehicles, we learned that someone had unlawfully entered the Conifer Way home's garage and had vandalized the Lexus convertible, causing substantial damage to the front end of the vehicle and to one of the doors.  During the days preceding the transfer of the vehicles, we had washed the vehicles in preparation for the transfer and the purchaser advised us that a footprint was clearly visible on the door where a large indentation was freshly evident.  To resolve this predicament, we offered the purchaser an additional $5,000 reduction off the purchase price, thereby lowering the price for the vehicles to

13

$175,000.00. A copy of the executed bill of sale and related documents is annexed hereto as Exhibit I.

35. At the time that I was appointed as Receiver of BBFS, BBFS was engaged in a number of lawsuits that were pending in Massachusetts Superior Court. Pursuant to the Final Judgment, we amicably resolved three state court actions that had been pending in Essex Superior Court, Salem, Massachusetts, entitled (a) Better Budget Financial Services, Inc. v. Venetsanakos, *et al.* (Case No. ESCV2004-01577); (b) Better Budget Financial Services, Inc. v. Milton, *et al.* (Case No. ESCV2003-0584D); and (c) Better Budget Financial Services, Inc. v. Ramos, *et al.* (Case No. ESCV2004-0141D) (collectively, the Venetsanakos, Milton, and Ramos actions shall be referred to herein as the "State Court Actions"). Copies of the executed settlement agreements that I entered into, as Receiver of BBFS, with the defendants in the State Court Actions are collectively annexed hereto as Exhibits J. In total, the Receivership estate received the aggregate sum of $46,000 from the defendants in the State Court Actions in consideration for my agreement to release the defendants release from liability, which includes the amount contained in the judgment escrow account that was established by the Essex Superior Court, Salem, Massachusetts in the Venetsanakos action.

36. In addition to the foregoing, my professionals and I have taken all steps necessary and advisable to liquidate all other assets of the Receivership estate, and we have taken all steps necessary to terminate any existing contracts to which BBFS is a party and to terminate and dissolve BBFS.

37. Pursuant to the Final Judgment, the Colons were to provide the Receiver with information needed to effectuate the transfer of certain funds that the Colons claimed they had

14

set aside and belonged to their daughter. To date, the Colons have provided no wire or transfer instruction to me, despite repeated requests by me for them to do so, and, the funds remain within the Receivership estate at this time and will be transferred to the FTC in conjunction with the Receivership's entire fund.

38. For Receivership tax purposes, all Receivership Cash has been transferred to a non-interest bearing trust account held at J.P. Morgan Chase Bank, N.A. The purpose of completing this transfer is to discontinue the accrual of any interest income, thereby eliminating any further income tax obligations on the part of the Receivership itself. Accordingly, I can now proceed to discontinue the Receivership's federal tax identification number. At this juncture, all necessary returns relating to the Receivership estate tax identification number will be filed with the IRS with no tax liability determined to be owed. In addition all filings necessary to remove the Receivership estate tax identification number will be prepared.

39. In connection with the tax obligations of BBFS itself, as well as any of its subsidiaries or affiliates that fall within my purview as Receiver, I hereby respectfully request permission to transfer and convey back to the Colons the corporate shell of BBFS, provided that the company shall not own in its name or have any rights or interests in or to any of the assets currently in the Receivership estate. Rather, I would like to convey BBFS back to the Colons for the purpose of imposing upon them the duty of resolving any outstanding tax liabilities of the company and, thereafter, of immediately dissolving and terminating BBFS. We have included a provision in the proposed Order, which accompanies this Final Report, which we believe effectuates this objective.

40. As Receiver, I intend to transfer back to the Colons all remaining business records and related documents and things previously maintained at a third party storage facility and in the offices of the Receiver.

### The Financial Report Of The Receivership

41. After liquidating all of the assets in the Receivership estate, the aggregate deposits that were made into the Receivership trust account that I established at JP Morgan/Chase since the inception of the Receivership were $1,571,826.47. In addition to the sale of the Conifer Way Property, these deposits include cash that we froze at the outset of the Receivership, as well as the proceeds from the sale of the automobiles and from the state court litigations.

42. On the other hand, since the commencement of the Receivership, we have withdrawn a total of $1,035,274.22 for a variety of purposes. I have annexed hereto as Exhibit K a copy of a financial schedule, which provides explanatory notes for each deposit and withdrawal. For instance, on April 22, 2005, we paid $5,845.04 to HUB International New England to cover an insurance premium that was due. Moreover, throughout the Receivership, we made monthly mortgage payments to Litten in amounts of $7,867.09 and $8,767.09 for the Conifer Way Property.

43. The net amount that presently exists in the Receivership trust account is $536,552.25 or approximately one third of the total estate.

### RELIEF REQUESTED

44. As Receiver, and on behalf of my firm and my counsel, I submit this Final Report and respectfully request that the Court enter an Order substantially in the form submitted herewith, granting the following relief: (a) authorizing the payment of reasonable compensation, including

professional fees and disbursements, to me, as Receiver, WSL, ESBA and Mintz Levin for the twelve-month period from January 1, 2005 through December 31, 2005 (we will be filing a final joint fee application promptly upon the service and filing of this Final Report pursuant to Section X(A) of the Final Judgment); (b) discharging, releasing and dismissing the Receiver and the professionals I have engaged from any and all of their respective duties, liabilities and obligations in connection with the Receivership of BBFS, as well as from any liabilities, claims, judgments, charges, assertions, impositions or assessments arising out of or in connection with the performance of our duties or obligations pursuant to the TRO or the Final Judgment; (c) modifying the Final Judgment as set forth herein; (d) authorizing the Receiver to convey BBFS and each of its subsidiaries and affiliates, together with their corporate books and records, back to the Colons, provided that neither BBFS nor any of its subsidiaries or affiliates shall hold in their own name or have any rights or interests in or to any of the assets or property currently in the Receivership estate, except those necessary to complete the dissolution and winding down of the company; (e) authorizing me, as Receiver, to transfer any and all funds that were held in the UTMA Account to the FTC if the Colons fail to comply with each of their obligations and duties as set forth in the Final Judgment within five (5) business days of the entry of the Order, granting the relief requested herein; (f) directing the Colons, jointly and severally, to take all measures necessary and appropriate to dissolve, wind down and terminate BBFS and its subsidiaries and affiliates immediately after they have fully and finally paid, settled and/or compromised any outstanding federal, state or local tax obligations of BBFS; (g) upon transferring the Receivership Cash to a non-interest bearing account, authorizing me, as the Receiver of BBFS, to terminate and discontinue the federal tax identification number that the Receiver has

established for the purpose of marshaling and securing the Receivership Cash; and (h) authorizing and directing the Receiver and the professionals he has engaged to take such other and further actions as, in the Receiver's reasonable judgment and discretion, may be necessary and appropriate to terminate promptly the Receivership, including, but not limited to, the following: (i) setting aside and holding back a reasonable reserve fund, pursuant to Section X.C of the Final Judgment in the amount of $5,000.00 to compensate the Receiver and his professionals, without the necessity of having to make any additional fee applications to the Court (the "Reserve Fund"), for any other and further professional services they may have to render and expenses they may incur in connection with the completion of their duties and obligations as set forth in this application, the Final Judgment or any prior Orders entered by the Court in this action; and (ii) transferring to the FTC or its designee for consumer redress all of the books, records, funds and other property or assets of BBFS, except those books, records, funds and other property or assets of BBFS to be conveyed to the Colons pursuant to this application, including, but not limited to, any portion of the Reserve Fund which is not applied to pay for professional services or expenses of the Receiver or his professionals or which are not otherwise designated by the Receiver to be applied in a particular manner or for a particular purpose.

## **CONCLUSION**

45. Thus, as Receiver, I, together with my team of professionals, have undertaken our duties and have devoted a substantial amount of time and effort to the supervision, operation, management and preservation of the Defendants' property and estate from November 4, 2004,

through and including the present, and now present our report to the Court and intend to seek compensation for the services we have rendered during the Application Period.

                                                                      /s/ Hernan Serrano, Jr.
                                                                      Hernan Serrano, Jr.

Sworn to before me this
8th day of February, 2006

_____
Notary Public