**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

---------------------------------------------------------x
                                                         :
FEDERAL TRADE COMMISSION,                                :
                                                         :   **CIVIL ACTION NO.:**
                                      Plaintiff,         :   04-12326 (WGY)
                                                         :
             -against-                                   :
                                                         :
BETTER BUDGET FINANCIAL                                  :
SERVICES, INC., JOHN COLON, JR., and                     :
JULIE FABRIZIO-COLON,                                    :
                                                         :
                                      Defendants.        :
                                                         :
---------------------------------------------------------x


**RECEIVER'S REPLY TO THE OPPOSITION BY THE FTC TO THE**
**RECEIVER'S JOINT APPLICATION FOR AN ORDER AUTHORIZING**
<u>**THE PAYMENT OF FEES AND REIMBURSEMENT OF EXPENSES**</u>

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................ 3

    THE RECEIVER HAS MADE A *PRIMA FACIE* SHOWING OF REASONABLENESS ................... 3

    THE FTC HAS FAILED TO CARRY ITS BURDEN OF EXPLAINING WHAT IS
    UNREASONABLE ABOUT THE JOINT APPLICATION ........................................................ 7

CONCLUSION ................................................................................................... 20

# TABLE OF AUTHORITIES

## FEDERAL CASES

*In re Blackwood Assoc., L.P.*,
    165 B.R. 108 (E.D.N.Y. 1994) .............................................................................3, 7, 8

*In re Cont'l Ill. Sec. Litig.*,
    962 F.2d 566 (7th Cir. 1992) .....................................................................................7

*Fed. Home Loan Mortg. Corp. v. Spark Tarrytown, Inc.*,
    829 F. Supp. 82 (S.D.N.Y. 1993)...............................................................................10

*FTC v. Capital Acquisitions & Management Corp.*,
    No. 04-7781, 2005 WL 3676529 (N.D. Ill. 2005) ....................................3, 4, 7, 15, 16

*Gaskill v. Gordon*,
    27 F.3d 248 (7th Cir. 1994) .....................................................................................13

*In re Hunt's Health Care, Inc.*,
    161 B.R. 971 (Bankr. N.D. Ind. 1993)...............................................................3, 4, 7

*SEC v. Elliott*,
    953 F.2d 1560 (11th Cir. 1992) ...............................................................................13

*VIBIR v. Lansdale*,
    172 F. Supp. 2d 636 (D.V.I. 2001) ...........................................................................10

**<u>Preliminary Statement</u>**

Hernan Serrano, Jr. (the "Receiver"), the Court-appointed Receiver of defendant Better Budget Financial Services, Inc., its subsidiaries and affiliates ("BBFS"), together with the professionals he has engaged, Mintz Levin Cohn Ferris Glovsky & Popeo, P.C. ("Mintz Levin"), Weinick Sanders Leventhal & Co. ("WSL") and Executive Sounding Board Associates, Inc. ("ESBA"), submit this reply to the opposition by the Federal Trade Commission (the "FTC") to the joint application that the Receiver and his professionals filed with this Court on February 24, 2006 (the "Joint Application"), as modified by the affidavit of Peter B. Zlotnick, Esq., sworn to on March 6, 2006, and filed with the Court on March 7, 2006 (the "Zlotnick Affidavit"), for an Order granting, *inter alia*, the following relief: (a) authorizing the payment of compensation at their standard hourly rates together with reimbursement of actual out-of-pocket expenses for the period from January 1, 2005,  through and including December 31, 2005 (the "Application Period"); and (b) discharging, releasing and dismissing the Receiver, Mintz Levin, WSL and ESBA from all of their respective duties and obligations in connection with the Receivership of BBFS.

The FTC asks this Court to reduce the professional fee request of the Receiver and his professionals from $303,361.85, which includes $19,078.97 in actual out-of-pocket expenses incurred by the Receiver and his professionals during the Application Period, to $160,987.97.  As such, the FTC is asking the Court to reduce the professional fees by an extreme rate of 43% of the fees sought (exclusive of expenses), despite the substantial estate that the FTC acknowledges the Receiver has "amassed" and the savings he and his professionals have brought to that estate.  FTC Opposition Papers, p. 1.

The FTC's opposition papers disregard two critical facts, however, relating to the reasonableness of the Joint Application: (a) the Receiver agreed at the outset of the receivership to reduce his hourly rate to $200 per hour from his customary and usual rate and he has charged that rate throughout the receivership; and (b) in the initial joint fee application and now in this Joint Application, Mintz Levin voluntarily agreed to reduce its time charges by a substantial percentage in the interest of preserving the assets of the estate (in connection with the initial application Mintz Levin unilaterally applied a 10% discount to its hourly time charges, while in connection with this Joint Application the firm has already voluntarily reduced the fees it is seeking by approximately $25,000 or 13%). Both the Receiver and Mintz Levin have made these unilateral reductions for no other reason than because they view it as a gesture of good will that is in the public interest.

At its core, the gist of the FTC's objection is not that the quality of the work performed by the Receiver and his professionals was poor; rather the FTC generically argues that the Receiver and his professionals are asking for too much, generally spent too much time on certain matters and charged too much money for their time. Importantly, the FTC does not (and cannot) base its objection on the quality of work the work performed by the Receiver and his professionals. Instead, to support its objection to the fees and expenses, however, the FTC offers nothing more than unsubstantiated dissatisfaction with the Joint Application of the Receiver and his professionals. This is not enough. The burden rests with the FTC to demonstrate why the Joint Application for professional fees and expenses is unreasonable; especially since the Receiver has made a *prima facie* showing of reasonableness, and we respectfully submit that on the record

before the Court, the FTC has failed to satisfy that burden.  The Joint Application for professional fees and expenses should be granted in its entirety.

## ARGUMENT

### The Receiver Has Made A *Prima Facie* Showing of Reasonableness

In seeking approval for the Joint Application, the Receiver and his professionals must make "a *prima facie* case in support of the requested award." FTC v. Capital Acquisitions & Management Corp., No. 04-7781, 2005 WL 3676529 *3 (N.D. Ill. 2005)[1]; In re Blackwood Assoc., L.P., 165 B.R. 108, 111 (E.D.N.Y. 1994).  To make such a showing, a receiver must prepare an application from which the amount of its fees and expenses can be readily and reasonably ascertained.  *Id.*; *In re* Hunt's Health Care, Inc., 161 B.R. 971 980 (Bankr. N.D. Ind. 1993).

> To be proper, the application and its supporting documentation should be complete and self contained and include all of the relevant information the applicant would initially like the court to consider concerning the nature and the value of the services it provided.  This requires the applicant to separately itemize and describe any expenses, the services for which compensation has been sought and the amount of time devoted to them; it must also identify each attorney or paraprofessional involved and their applicable hourly rates.  Depending upon the size and complexity of the application and the range of services covered by it, this may require the applicant to separately categorize the time involved in order to ensure that the application does not become an incomprehensible mass of undifferentiated chronological data.

*Id.*  The applicant should also describe the results that were obtained during the application period and, provided that the application is sufficiently descriptive in detail, "the fee produced by the resulting lodestar calculation will, presumptively, be a reasonable one.  Absent evidence to the contrary, the presumption of reasonableness

---

[1]    A copy of this unreported, slip opinion is annexed hereto as Exhibit A for the Court's benefit.

should be respected and the fee generated by the lodestar calculation should be awarded."
*Id.*

Here, as in Capital Acquisitions, the Joint Application is sufficiently detailed to establish a *prima facie* case of reasonableness. The papers in support of the Joint Application, include, but are not limited to the following: (a) The Final Report of Hernan Serrano, Jr., the Receiver of BBFS, sworn to February 8, 2006, together with each of the exhibits annexed thereto (the "Final Report"); (b) the Affidavit of the Receiver, Hernan Serrano, Jr., sworn to February 16, 2006 (the "Serrano Affidavit"); together with each of the exhibits annexed thereto, which also include but are not limited to the detailed time entries of the Receiver, ESBA, WSL and Mintz Levin respectively; and (c) the Zlotnick Affidavit. Those documents contain detailed invoices for each of the months covered by the Application Period for the Receiver and each of his professional firms. The invoices identify in descriptive detail each of the professionals who performed services on the receivership, a description of the services they rendered, the time they spent and the value of those services (from which their hourly rate can be derived) and are organized chronologically for the Court's ease of reference. The affidavits further summarize the work that was performed and describe the complexity of this receivership, the conditions under which the Receiver and his professionals worked and the substantial benefit that they obtained for the estate.

In addition, we have provided the Court with an overview of the extensive work that was required during the Application Period to administer the estate due to the constraints imposed upon the Receiver by all of the parties and non-parties alike. For instance, the Final Report and the Serrano Affidavit recite in detail the manner in which

4

the Receiver and his professionals repeatedly accommodated the defendants and the FTC
on extremely short notice by making available to them the business books, records and
proprietary software of BBFS as a result of the accelerated trial and discovery schedule of
the case.  The Receiver made those accommodations, at times permitting the individual
defendants back onto the premises of the receivership company, while simultaneously
attempting to secure and marshal certain cash and non-cash assets that defendants John
and Julie Colon (the "Colons") had acquired with BBFS funds, including, but not limited
to tens of thousands of dollars worth of personal jewelry, numerous exotic automobiles,
two luxury homes, as well as a myriad of other items of personal or corporate property all
of which constituted assets of the estate.

     While the Receiver brought those assets into the estate, the Colons made
numerous efforts to hinder, interfere with and obstruct the Receiver's work.  Rather than
trouble the Court with those minor infractions, the Receiver and his counsel instead
sought to work with the defendants' counsel in the interest of reducing administrative and
legal costs to the estate – which we did.

     The Receiver also has provided the Court with a detailed analysis of the work and
services that he and his professionals have performed to implement the duties imposed
upon them to liquidate the estate once the parties negotiated and the Court entered the
Final Judgment.  To that end, the Receiver and his professionals prepared the Colons'
home located at 4 Conifer Way, Beverly, Massachusetts (the "Conifer Way Home") for
sale and then marketed and sold it for the sum of $1,087,500.  The preparatory work
necessary to ready the home for sale required substantial time and intervention by the
Receiver's counsel due to a variety of disputes with the Colons that arose out of

misunderstandings between the parties as to their rights and obligations under the Final Judgment.

In addition, the Receiver refused to submit to unreasonably low purchase offers but ultimately prevailed in a proverbial game of "chicken" with a recalcitrant pair of purchasers who wrongfully threatened to walk from the sale. After entering into the purchase and sale agreement with the Receiver, the couple felt they were paying too much for the home and sought to negate the contract. In connection with that dispute, the purchasers claimed that the real estate agent had misrepresented the useable square footage of the home's basement in the multi-listing purchase and sales information. Regardless of whether that information actually was truthful or accurate, the Receiver afforded the purchasers multiple opportunities to inspect the premises, bring their own engineers and experts to inspect it and, ultimately, entered into an agreement with them, containing no representations or warranties concerning the dimensions of the home. Rather, the purchase and sale agreement for the Conifer Way Home expressly stated that the purchasers were buying the residence in "as is" condition.

Nonetheless, at the closing, the purchasers and their attorney became extremely contentious, threatening not to complete the transaction, yet rather than walking away from a beautiful home, they completed the purchase over their own objections at the agreed upon price. A "local attorney" would have been unfamiliar with the receivership issues that led the purchasers to attempt to exploit the circumstances of the sale in the first place, and may not have been able to complete the sale, certainly not at a purchase price in excess of $1 million.

The Receiver also sold the three highly customized automobiles that the Colons

had purchased with BBFS funds – a 2002 Porsche 911 Turbo Coupe, a convertible 2004 Lexus SC430 coupe and a Lexus sedan – for the sum of $180,000, a premium price that the Receiver was able to obtain through the commercial contacts he has developed through years of doing this kind of work. Based on the sale of just these two groups of assets alone, the Receiver and his professionals brought $1,267,500 in gross revenues into the receivership estate.

On its face, the Joint Application is reasonable.

### The FTC Has Failed to Carry Its Burden of Explaining What Is Unreasonable About the Joint Application

Because the Receiver is entitled to a presumption of reasonableness, as the party opposing the Joint Application, the FTC "must carry the burden of explaining what is unreasonable about the Joint Application or, at least, what would be reasonable under the circumstances. Absent such evidence by the FTC, its opposition must fail. Capital Acquisitions, 2005 WL 3676529 at *4; In re Blackwood, 165 B.R. at 112. "A party objecting to a fee application may not do so based on the general proposition that the fee sought is simply too much." Id.; In re Hunt's Health Care, 161 B.R. at 982; In re Cont'l Ill. Sec. Litig., 962 F.2d 566, 570 (7th Cir. 1992) ("a gestalt reaction that there was too much [time spent or that fees are excessive] . . . isn't good enough"). Instead, the party opposing the application must direct the court to any allegedly improper, insufficient, or excessive entries. Id. (emphasis added). The FTC has simply not done that here.

Like in Continental Illinois, the FTC's position here appears to be a gestalt reaction. The FTC apparently has no real issues with the work of the Receiver or his counsel; rather, it simply has arrived at an amount it would like to return to consumers in the form of redress and then has "backed into" that number through pre-textual

arguments that have no factual support.[2]  In fact, on numerous occasions throughout the receivership, representatives of the FTC have complimented the Receiver and his counsel for the work they have been doing.  Indeed, the FTC explicitly states in its opposition papers that "Plaintiff would like to emphasize that this Opposition to the payment of fees is not based on the quality of the work done by the Receiver and his supporting professionals.  Rather, the FTC's Opposition is based upon the view that in the above instances, the Receiver and his professionals should have exercised better judgment in terms of quantity of the work and nature of the work performed at very high billing rates, that in some cases did not have to be performed or could have been performed at much lower fees."[3]  FTC's Opposition Brief, p. 8.  In other words, the FTC's objections to the Receiver's Joint Application amounts to nothing more than an "unsubstantiated dissatisfaction," and we respectfully submit that, on this record, the FTC has failed to establish that the fees and expenses sought by the Receiver and his professionals are unreasonable.  In re Blackwood, 165 B.R. at 111.

But to support its gross fee reduction, the FTC now points to two matters on

---

[2]    The FTC argues that 9,981 consumers exist in this case, and, on average, each consumer, assuming a 100% claims rate, would receive approximately $18 if the Court grants the Joint Application in full.  The Receiver and his professionals are seeking a total of $182,62.12 in connection with the Joint Application.  In contrast, if the Court adds back to the claims pool the sum of $142,373.88, which is the amount of legal fees that the FTC is seeking to strip from the Receiver and his professionals, then the total remainder left for distribution would be the even dollar amount of $325,000.00, which sum also includes that portion of the reserve request to which the FTC objects, then the consumers will receive on average the amount of $32 per consumer.  The FTC theorizes that it will cost approximately $25,000 to administer the distribution of these funds, but it offers no substantiation for this figure other than pure conjecture.  In other words, by asserting its blanket objection to the Joint Application, the FTC is asking the Court to increase the distribution to the consumers by $14 per capita.

[3]    The FTC claims that the Receiver agreed to cap the fees of his professionals.  That is an untrue statement.  The Receiver only agreed to cap his own fees at 25% of the estate; however, Mintz Levin was not asked to agree to this arrangement and did not agree to this arrangement.  Rather, from the very beginning of the receivership, the FTC knew and understood that Mintz Levin would be charging its normal and customary rates.  Moreover, the FTC did not object to the firm's initial fee request in which Mintz Levin charged its usual and customary rates.

which the Receiver and his counsel necessarily devoted considerable time and obtained

significant benefits for the estate. Rather than explaining specifically and cogently what

is unreasonable about the work or services performed by the Receiver and his

professionals, however, the FTC instead reaches unfounded conclusions that have no

basis in the facts underlying the receivership.

For instance, the first matter the FTC refers the Court to concerns the motion to

intervene that was made by the landlord of BBFS, Cummings Properties, LLC

("Cummings") on or about January 3, 2005 (the "Motion to Intervene"). A copy of the

Motion to Intervene, together with the exhibits annexed thereto, is annexed hereto as

Exhibit B. The FTC asserts that the Receiver and his counsel conducted negotiations

without the FTC's knowledge or consent with Cummings concerning the return of a

security deposit, the sale of certain trade fixtures and whether certain rent would be paid,

resulting in Cummings filing its Motion to Intervene. The FTC further suggests that,

ultimately, it inserted itself into the process and prevented a negative outcome from

occurring for the estate. Nothing could be further from the truth.

The truth is that, prior to its filing of the Motion to Intervene, Cummings and the

Receiver had very limited contact. The Receiver, through his counsel, demanded that

Cummings turn over to the Receiver two security deposits it was holding for the premises

BBFS was occupying at 800 Cummings Center, Suite 152-R, Beverly, Massachusetts

01915 (the "Cummings Center") in the aggregate amount of $46,716.22 (the "Security

Deposit"). Cummings refused and filed its Motion to Intervene. Despite the FTC's

assertions to the contrary, the parties' communications were extremely limited and

certainly not "extensive negotiations." FTC Opposition papers, p. 4.

And, once Cummings filed its Motion to Intervene, the Receiver and his counsel presumed that the FTC received electronic notice of the filing of Cummings' papers in the same manner that the Receiver had.  Further, the FTC communicated regularly with the Receiver and his counsel from the beginning of the BBFS receivership.  The Receiver and his counsel also kept each of the parties apprised of their activities as those activities occurred to avoid the very kind of hindsight objections that the FTC is now attempting to make.  Thus, the FTC most assuredly became aware of the dispute with Cummings at or about the same time that the Receiver did but simply chose not to involve itself until later in the process.

Moreover, the FTC seems to suggest that the Receiver had an affirmative duty to defer to the FTC with respect to responding to Cummings' Motion to Intervene so as to "keep the cost to consumers down."  FTC's Opposition Papers, p. 4.  Indeed, the FTC argues that, "[i]t is common in FTC injunction actions such as this one, for a receiver to request that the FTC enforce a temporary restraining order provision where either the FTC or the receiver can act, i.e. demanding that third parties holding the defendants' assets turn them over to the estate."  *Id.* at 4-5.

This statement ignores one of the fundamental tenets of receivership law.  The Receiver acts as a neutral, as an impartial and objective officer of the Court owing allegiances to none of the parties in the underlying litigation.  Fed. Home Loan Mortg. Corp. v. Spark Tarrytown, Inc., 829 F. Supp. 82, 85 (S.D.N.Y. 1993); see also VIBIR v. Lansdale, 172 F. Supp. 2d 636, 654 (D.V.I. 2001).  Instead, the Receiver owes fiduciary duties to the estate to preserve, protect and marshal the assets of the estate, holding those assets for the benefit of the party who ultimately prevails in the case.  *Id.*  If the Receiver

did as the FTC suggests he should have done concerning Cummings and the FTC ultimately lost the case at trial (which, at the time the Motion to Intervene was filed, was still a possibility), the Receiver would have subjected himself to claims that he had acted in an improperly biased manner and wrongfully delegated to the FTC his basic fiduciary obligations.

The results that the Receiver and his counsel obtained for the estate in connection with the Cummings matter were also not as the FTC claims, *i.e.* a net loss to the estate of $21,000. First, the FTC attaches an unexecuted draft of the stipulated settlement agreement that the Receiver <u>and</u> the FTC entered into with Cummings rather than the actual executed version of the document that the parties filed with the Court. A true and complete copy of the executed Cummings Stipulation and Settlement Agreement that was filed with the Court (the "Cummings Settlement") is annexed hereto as Exhibit C.

Second, the FTC fails to provide the Court with a copy of the two leases for Suites 260-T and 152-R, BBFS' premises at the Cummings Center (the "Premises"). Both of those leases are attached hereto as exhibits to the Cummings Motion to Intervene. Those leases contained important provisions that were extremely favorable to Cummings (they were form leases drafted by Cummings' in-house legal staff, but, which, upon information and belief, were not subject to negotiation by BBFS) and were even more unfavorable to BBFS, as the tenant.

Moreover, John Colon, a non-lawyer who apparently negotiated the leases for BBFS, also apparently failed to comprehend the legal significance of certain key lease terms which had substantial implications and which ultimately affected the value of certain trade fixtures that the Receiver sold in connection with the Cummings Settlement.

11

For instance, as part of the settlement negotiations, the Receiver and Cummings compromised concerning who was entitled to certain office equipment located in the Premises that the Receiver believed constituted trade fixtures, including, but not limited to certain partitions and workstations, telephone systems, and audio and video systems. The parties reached this compromise, because a legitimate dispute existed as to whether the express terms of the lease excluded those items, defining them as property of Cummings. Rather than litigating this point, both sides recognized that settlement was the more prudent course of action, because it minimized the inherent risk of litigation, reduced the parties' legal costs and, from the Receiver's perspective, brought actual value to the estate in the form of cash and opportunity costs in the form of claims mitigation.

In conjunction with the Cummings Settlement, the Receiver agreed to pay to Cummings as an administrative rent the amounts due under the two leases from November 1, 2004, through January 22, 2005, in an amount equal to $60,042.20. As a result of Cummings security interest in BBFS' inventory and other property located at the Premises and because of the claims mitigation benefits that the Receiver was able to simultaneously negotiate which are described more fully below, both the Receiver and the FTC agreed to allow Cummings to keep the security deposit it was holding in the amount of $42,500.

The Receiver and his counsel, however, also negotiated two related, simultaneous transactions, which brought substantial value to the estate, but which the FTC improperly ignores in its papers. The Receiver negotiated with Sensitech, Inc. ("Sensitech"), the tenant that occupied the space directly adjacent to Suite 260-T at the Cummings Center, the following agreements: (a) an agreement to enter into a new lease with Cummings,

commencing as of February 1, 2005, for the same or substantially same rent and lease

term as BBFS' lease at Suite 260-T of the Premises; and (b) an agreement whereby the

Receiver would sell and Sensitech would purchase all of the personal property then

located in Suite 260-T for a purchase price of $60,000.  The monthly rent for Suite 260-T

was $16,535.45, and as of the date that the Court approved the Cummings Settlement, *i.e.*

the date the new Sensitech lease at Suite 260-T commenced, there still existed 26 months

remaining on the BBFS lease at that space (the lease term ran from September 1, 2002,

through April 30, 2007).

    In other words, as a result of the Cummings Settlement, the Receiver saved the

estate in mitigation costs alone approximately $430,000, because had the Receiver not

convinced Sensitech to agree to a new lease, Cummings would likely still have claims

against the estate for that amount.[4]  But the FTC's papers are silent on this point.  In

addition, we have also learned that shortly after the parties entered into the Cummings

Settlement, Cummings entered into a new lease with John Colon for Suite 152-R.  The

term of the lease for that space ran from May 1, 2004, through April 30, 2008, and the

monthly rental was $5005.  Upon information and belief, because the Receiver negotiated

with Cummings in the way it did, Cummings re-let the space for the same or substantially

the same rent within a month after the parties entered into the Cummings Settlement.  As

a result, assuming that Cummings entered into its new lease with Mr. Colon's new entity

as of February 28, 2005, the Receiver caused the estate to mitigate damages in connection

---

[4]      The benefit a receiver confers to an estate "may take more subtle forms than a bare increase in
monetary value.  Even though a receiver may not have increased, or prevented a decrease in the value of
the collateral, if a receiver reasonably and diligently discharges his duties, he is entitled to compensation."
Gaskill v. Gordon, 27 F.3d 248, 253 (7th Cir. 1994) (quoting SEC v. Elliott, 953 F.2d 1560, 1577 (11th Cir.
1992) (finding receiver conferred benefit upon estate by mitigating and eliminating claims of numerous
creditors to the collateral at issue)).

with the Suite 152-R lease in an amount equally to approximately $190,000. The

Receiver enabled Cummings to reduce its claim by not disputing ownership to the office

equipment and fixture located in that space, thereby making it possible for the landlord to

rent the space quickly and easily as a turnkey office at virtually no cost to it.

Accordingly, by compromising with Cummings in the manner in which the

Receiver and his professionals did, the Receiver caused the mitigation of this secured

creditor's claims against the assets in the estate, thereby reducing the potential liability of

BBFS by approximately $620,000. This was certainly a benefit that the Receiver and his

counsel conferred upon the estate, yet it appears nowhere in the FTC's papers.

Cummings, having intervened in this action, has received electronic notice of the Final

Report and the Joint Application but has not asserted any claims or objections in

connection with these proceedings within the time specified in the Final Judgment, which

it could have done if it believed any of its rights were being adversely affected or

prejudiced by the relief requested herein by the Receiver. That Cummings has not

asserted any such claims or objections only underscores the proposition that the Receiver

has caused the mitigation of all of this secured party's claims.

Additionally, by selling the personal property to Sensitech for $60,000, the

Receiver brought into the estate the sum of $55,200 in net proceeds from that sale

pursuant to the Cummings Settlement, as well as an additional $5,000 in consideration

pursuant to Section 4 of the Cummings Settlement.

Consequently, contrary to the FTC's contentions that the Receiver and his

professionals caused a net loss to the estate from the Cummings Settlement, in reality,

they caused substantial gross benefits to flow to the estate in connection with this matter,

14

including the mitigation of claims against the estate, which totaled the aggregate sum of approximately $680,200.  Against that figure, the estate paid to Cummings the sum of $60,042.20 in administrative rents, $4,800 for its *pro rata* share of the property sale to Sensitech, resulting in a net gain to the estate of $615,357.80, consisting of claims avoided and cash collected.

The FTC makes a blanket statement that "it would be unjust to compensate the Receiver's counsel $86,000 for this work. . . ."  FTC Opposition Papers, p. 5  It is impossible to determine, however, how the FTC arrived at this amount.  The FTC attaches no invoices to its papers that aggregate to $86,000 worth of time charges; it refers the Court to no invoices or other documents that indicate that the value of Mintz Levin's work on this matter was that amount.  Yet in very matter-of-fact fashion the FTC attributes this amount to the Receiver's counsel and, then, with the same facile ease, requests that the Court reduce the Joint Application by this same unsubstantiated amount.

This is the very kind of argument that courts have found fails to establish that fees and expenses are unreasonable.  In fact, in Capital Acquisitions, a case that is virtually identical to the present one (except there the objector was a secured creditor as opposed to here where it is the FTC), the court found that the objector, like the FTC here, failed to direct the court to any time entries or tasks it deemed unnecessary or unreasonable and instead argued, like the FTC argues, that "the attorney's fees will 'unnecessarily and unjustly deplete the remaining assets of the receivership, including the assets held to pay secured creditors, such as [the objector]."  2005 WL 3676529 at *5.  On this basis, the Capital Acquisitions Court found that the objector failed to rebut the presumption of reasonableness that attached to the fees and expenses of the receiver and his counsel and

15

granted those fees and expenses in their entirety.  *Id.*

Likewise, with respect to the second matter with which the FTC takes issue, it again fails to meet its burden.  That matter concerns the Receiver's sale of the Conifer Way Home.  The FTC attaches as Exhibit B to its opposition papers portions of Mintz Levin's time records spanning the periods from March 4, 2005, through October 31, 2005.  The FTC claims that Mintz Levin charged the estate a total of $40,781 in fees in connection with the sale of the Conifer Way Home, when a local attorney would have done the work for $2,000, but again this speculative assertion is belied by the facts.

First, the FTC employed the same bundling tactic here as it appears to have used with the Cummings issue, namely, it made no effort to allocate a value to work conducted by the same Mintz Levin timekeepers on different receivership matters during the same day.[5]  By way of illustration, on June 3, 2005, Peter B. Zlotnick, Esq., Mintz Levin's senior partner on the project, entered the following time: "Telephone call with Hernan Serrano regarding sale of Conifer Way home and settlement of litigations; exchanged e-mails regarding same."  The value of Mr. Zlotnick's time was $204 for .4 hours of time.  The litigations that the time entry refers to related to various state court litigations that Mintz Levin actually did refer to local attorneys who the Receiver engaged to defend or prosecute the suits because he felt it would be more cost effective for the estate to have local attorneys manage those matters.  Apparently, however, the FTC has included the value of this and numerous other time entries unrelated to the actual sale of the Conifer Way Home into its estimate of the Mintz Levin fees related to the sale of that residence.  That kind of accounting is simply misleading.

---

[5]      The FTC makes no attempt to explain what its markings mean on Exhibit B, but presumably wherever a check mark or asterisk appears, the FTC included that time entry in its computation of the $40,781 fee amount.

The Receiver has annexed hereto as Exhibit D a marked version of the FTC's Exhibit B which more properly allocates the time of the Mintz Levin professionals. When the proper allocations are made, the value of the time that Mintz Levin timekeepers devoted in connection with liquidating the Conifer Way Home pursuant to this Court's directions as set forth in the Final Judgment more closely approximates $27,000.

As the time entries also reveal, from March 10, 2005, the date this Court entered the Final Judgment and directed the Receiver to sell the Conifer Way Home, the FTC was fully aware of the activities of the Receiver and his counsel and the FTC did not object once while the work was being conducted.  For one, as the time records indicate, a significant portion of the Receiver's and his counsel's time from March 2005 through August 2005 focused not just on the actual sale of the Conifer Way Home, but on collateral issues relating to preparing the home for sale.

For example, the Receiver and his counsel spent numerous hours resolving various disputes with the Colons who were entitled to remain in the Conifer Way Home pursuant to the Final Judgment, but who, as a result, created a host of issues for the Receiver.  By way of illustration, the Colons were supposed to pay to the Receiver $1,000 per month rent pursuant to Section VI.A.2 of the Final Judgment, however, for a number of months after the Final Judgment had been entered, they failed and refused to do so.  Rather than seeking the Court's intervention with these kinds of picayune matters, which ultimately would likely have been more costly to the estate, we consulted with the Colons' counsel in an effort to resolve the issues among the professionals in the case and were successful in doing so.

Thus, when a time entry, such as the one that appears for Mr. Zlotnick on March

17

23, 2005, states, ". . . telephone call with Ted Atkinson[, counsel for the defendants,] regarding Conifer Way home issues," it refers to a conference call to resolve the Colons' failure to pay rent at the Conifer Way Home.  The FTC knew about this issue as it occurred, participated in the communications with the Colons' counsel, but neglects to advise the Court that these were the kinds of issues that the Receiver and his counsel were grappling with just to prepare the Conifer Way Home for sale.  These were receivership issues and, in the Receiver's professional judgment and sound discretion, were best handled by his general counsel, Mintz Levin.

In addition, the Receiver and the Colons had a bona fide dispute concerning what fixtures the Colons would be entitled to take from the Conifer Way Home when they vacated it.  The residence had six plasma flat screen televisions that had all been built into the walls of the home, a side-by-side washer/dryer and stacked washer/dryer units, Sub-Zero© Refrigerator and various other luxury items, of which the Receiver had not been aware prior to the entry of the Final Judgment, because he had not been permitted into the home.  Once the Receiver became aware of those assets, however, he and the Colons disputed who was entitled to retain them pursuant to the Final Judgment.  That dispute also is reflected in the time entries to which the FTC appears to refer the Court.  It should be noted that the Receiver and his professionals deferred to the FTC to conduct much of the actual negotiations to resolve that dispute, but the Receiver and his counsel necessarily communicated with representatives of the FTC and the defendants to ensure that the Colons did not strip the Conifer Way Home of fixtures and property that would be essential or valuable to the Home's sale, thereby maximizing its sale value and the value of the estate.

These are but a few examples of the kinds of issues that arose concerning the Conifer Way Home that were unrelated to the actual sale of the home itself. As described in greater detail above, the sale of the home also brought with it exceptionally difficult circumstances that required the diligence, perseverance and historical knowledge that the Receiver and his professionals brought to the transaction. Were it not for their skill and experience in liquidating assets of this nature at a maximum value under "fire sale" conditions, the Conifer Way Home would almost certainly have sold for a price that was substantially lower than the $1,087,500 received and would have taken substantially longer to do so. Accordingly, the effort, time and value that the Receiver and his professionals devoted to the sale of the Conifer Way came back to the estate in the form of a premium recovery.

Thus, to summarize, the FTC has failed to meet its burden to overcome the Receiver's prima facie showing of the reasonableness of the fees and expenses contained in the Joint Application.

**Conclusion**

WHEREFORE, for al of the foregoing reasons, we respectfully request that the

Court grant the Joint Application of the Receiver, WSL, ESB and Mintz Levin in its

entirety.

Dated:  March 23, 2006


Respectfully submitted,

MINTZ LEVIN COHN FERRIS
GLOVSKY & POPEO, P.C.


By:   /s/  Breton Leone-Quick
        Bret Leone-Quick BB0# 655571
One Financial Center
Boston, Massachusetts  02111
(617) 542-6000

Mintz Levin Cohn Ferris Glovsky & Popeo, P.C.
Peter B. Zlotnick (*Pro Hac Vice*)
Seth R. Goldman (*Pro Hac Vice*)
666 Third Avenue
New York, New York  10017
(212) 935-3000)

*Attorneys for Hernan Serrano, Jr.,*
*As Receiver of Better Budget Financial Services,*
*Inc. et al.*


**Certificate of Service**

I, Breton Leone-Quick, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 23, 2006.

   /s/  Breton Leone-Quick                                    Dated:  March 23, 2006